```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                             MARSHALL DIVISION

3    KONINKLIJKE KPN N.V.,          (  CAUSE NO. 2:21-CV-113-JRG
                                    )
4              Plaintiff,           (
                                    )
5    vs.                            (
                                    )
6    TELEFONAKTIEBOLAGET LM         (
     ERICSSON and ERICSSON, INC.,   )
7                                   (  AUGUST 22, 2022
               Defendants,          )  MARSHALL, TEXAS
8                                   (  9:00 A.M.
     _____
9

10

11                              VOLUME 1

12

13   _____

14                         TRIAL ON THE MERITS

15            BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
16                          and a jury
     _____

17

18

19

20

21

22            SHAWN M. McROBERTS, RMR, CRR
                100 E. HOUSTON STREET
                MARSHALL, TEXAS  75670
23                (903) 237-8546
              shawn_mcroberts@txed.uscourts.gov

24

25
```

```
1                      A P P E A R A N C E S

2          FOR PLAINTIFF:        SUSMAN GODFREY, LLP
                                 401 UNION STREET, STE. 3000
3                                SEATTLE, WASHINGTON  98101
                                 (206) 516-3880
4                                BY:  MR. ANDRES HEALY

5                                SUSMAN GODFREY, LLP - HOUSTON
                                 1000 LOUISIANA ST., SUITE 5100
6                                HOUSTON, TEXAS  77002
                                 (713) 653-7883
7                                BY:  MS. ALEXANDRA WHITE
                                     MR. ADAM TISDALL
8
                                 SUSMAN GODREY, LLP - NEW YORK
9                                1301 AVENUE OF THE AMERICAS
                                 32ND FLOOR
10                               NEW YORK, NEW YORK  10019-6022
                                 (212) 336-8330
11                               BY:  MR. RUSSELL RENNIE
                                     MS. TAMAR LUSZTIG
12
                                 WARD, SMITH & HILL, PLLC
13                               1507 BILL OWENS PARKWAY
                                 LONGVIEW, TEXAS  75604
14                               (903) 757-6400
                                 BY:  MR. JOHNNY WARD
15                                   MS. CLAIRE HENRY

16         FOR DEFENDANTS:       ALSTON & BIRD, LLP
                                 2200 ROSS AVE., SUITE 2300
17                               DALLAS, TEXAS  75201
                                 (214) 922-3507
18                               BY:  MR. TED STEVENSON
                                     MR. JEFFREY BECKER
19
                                 BAKER BOTTS, LLP - DALLAS
20                               2001 ROSS AVENUE, SUITE 900
                                 DALLAS, TEXAS  75201-2980
21                               (214) 953-6500
                                 BY:  MR. JEFFREY BECKER
22
                                 McKOOL SMITH, P.C. - MARSHALL
23                               104 EAST HOUSTON, SUITE 300
                                 MARSHALL, TEXAS  75670
24                               (903) 923-9000
                                 BY:  MR. SAM BAXTER
25                                   MS. JENNIFER TRUELOVE
                                     MR. NICK MATTHEWS
```

1           OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                   100 E. HOUSTON STREET
2                                  MARSHALL, TEXAS   75670
                                   (903) 923-8546
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**INDEX**</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| CORNELIA GERRITSE | |
| Direct By MR. HEALY............................................... | 191 |
| Cross By MR. STEVENSON........................................... | 253 |
| Redirect By MR. HEALY............................................ | 306 |
| Recross By MR. STEVENSON......................................... | 319 |

1          THE COURT:  Good morning.  Please be seated.

2      Welcome, ladies and gentlemen.  It's good to see you and

3  good to have you here this morning.  Thank you.

4      My name is Rodney Gilstrap, and I am the chief United

5  States District Judge for the Eastern District of Texas.  I

6  have lived here in Marshall since 1981.  I practiced law in

7  and around this area for 30 years before I was appointed to

8  the federal bench, and I have been on the bench here since

9  2011.

10     Now, they say confession is good for the soul so I'm

11  going to start with a confession--I was not born in Texas, but

12  I got here as quick as I could.

13     I left Florida where I was born and came to Texas to

14  attend college and then stayed and attended law school at

15  Baylor University in Waco.  While I was there, I met a lady

16  from East Texas who became my wife, and we have two grown

17  children now.  And my wife owns and operates a retail floral

18  business here in Marshall.

19     Now, I tell you all these things about myself because in

20  a few minutes I'm going to ask each of you to tell me similar

21  type information about you, and I think you're entitled to

22  know as much about me as I'm about to find out about each of

23  you.

24     We are about to engage in the selection of a jury in a

25  civil case involving allegations of patent infringement.  But

1   if you will indulge me, first I'd like to briefly review with

2   you how we came to have our American civil jury trial system.

3       If you go back in ancient history, if you begin with the

4   first five books of the Old Testament, the Pentateuch, you

5   will find that the ancient Jewish nation impaneled juries to

6   determine issues of property ownership and property value.

7       The ancient Greeks began using a jury system about 1500

8   BC.  And as they did with many other things, the ancient

9   Romans copied the jury system from the ancient Greeks.  And it

10  was the Romans that brought the jury system to what we now

11  know to be Great Britain when they crossed the English channel

12  and conquered that island in the fourth century AD.

13      So from the 4th century to the 12th century, 800 years

14  went by where the jury system was introduced into,

15  established, and a part of daily life in what we know to be

16  Great Britain.

17      But in the 12th century, a rather tyrannical king came to

18  the throne of Great Britain who was King John, and King John

19  attempted to do away with the right to trial by a jury.  That

20  and many other disputes between the king and his nobles led

21  that country to the verge of civil war.

22      But a civil war was avoided by means of the king and his

23  nobles entering into a comprehensive agreement that resolved

24  their disputes.  That agreement was drawn up and executed at a

25  place called Runnymede, and the agreement is known as, and I'm

1    sure you've each heard it referred to as, the Magna Carta,

2    which established in writing the right to trial by jury for

3    Englishmen.

4        And so you can see that that followed the English

5    colonists who left Great Britain and came to North America,

6    and the concept and the traditional and custom of the right to

7    trial by jury crossed the Atlantic ocean with our colonial

8    American founding fathers.  And, in fact, the jury system in

9    British colonial America flourished for over a hundred years

10   until another tyrannical king came to the throne of the Great

11   Britain.  This time his name was King George the III.

12       And as you all know, King George ended up in many, many

13   disputes with his British colonists here in America that led

14   to the American Revolution.  In fact, when Thomas Jefferson

15   sat down and wrote the Declaration of Independence, intending

16   to spell out for the king the various areas of disagreement

17   and conflict that led the colonists in America to conclude

18   they must separate from Great Britain and form their own

19   independent nation, the king's efforts to deprive his citizens

20   here of the right to trial by jury is expressly spelled out as

21   one of those grounds in the Declaration of Independence.

22       So you can see, ladies and gentlemen, that that was one

23   of many rights that our founding fathers viewed as critically

24   important.  In fact, as you-all know, we did enter into a

25   revolution with Great Britain, we did form our own independent

1    nation.  And some short period of time after we achieved our

2    independence, we adopted what is now the supreme law of the

3    land, the governing document for the United States of America,

4    our Constitution.

5         And our Constitution was almost immediately amended to

6    add 10 critical amendments that, but for the promise to add

7    those amendments, probably never would have been ratified in

8    the first place, and those 10 amendments you all know as the

9    Bill of Rights.

10        And among the Bill of Rights, you'll find the Seventh

11   Amendment to the U.S. Constitution which guarantees the right

12   to every American citizen to a trial by jury in a civil case.

13   And that Seventh Amendment, along with the other nine that

14   compose the Bill of Rights, were all ratified in 1791.  So

15   since 1791, every American has a constitutionally-guaranteed

16   right to have their civil disputes resolved by a jury.

17        So by being here, ladies and gentlemen, and participating

18   in this process in 2022, you are doing your part to help

19   preserve, protect, and defend our Constitution, particularly

20   the Seventh Amendment guaranteeing the right to trial by a

21   jury in a civil case.

22        I always tell citizens like yourselves who appear for

23   jury duty in this court that, in my opinion, jury service is

24   the second highest form of public service that any American

25   can provide.  In my personal opinion, the highest form of

 1    public service are those young men and women who serve in the

 2    armed forces of our country.

 3         Now, when the lawyers address you today, and they will

 4    shortly, they're going to ask you various questions, ladies

 5    and gentlemen, and I want you to understand that they are not

 6    seeking to inquire into your personal affairs unduly.  Said

 7    another way, they're not trying to be nosey.  They are simply

 8    asking questions they are entitled to ask as a part of the

 9    process with the Court to secure a fair and an impartial jury

10    to hear the evidence, determine the facts, and return a

11    verdict in this case.

12         It's important for each of you to understand that if you

13    are asked a question by counsel as a part of this process this

14    morning, there are no wrong answers, ladies and gentlemen, as

15    long as the answers you give are full, complete, and truthful.

16         Now, I don't know if it will happen this morning, it

17    rarely does, but every once in a great while a question is

18    asked of somebody on a jury panel that that person views as so

19    personal and so private that they are really not comfortable

20    answering that in front of everyone else in the room.  And so

21    in that case, should that arise, again I don't think it's

22    likely, but should that arise, you always have the right to

23    simply respond by saying, I'd like to talk to Judge Gilstrap

24    about that.  And if that's your answer, I'll provide an

25    opportunity where you can answer that question outside of the

1    presence of everyone else on the jury panel.  But, again, that

2    doesn't come up very often.

3         Now, the trial in this case -- once the jury is selected,

4    the trial in this case will begin today, and it will go -- to

5    the best of my belief, it will go through the end of this

6    week.  Today is the 22nd of August and the end of this week

7    ends on the 26th.  So those of you who would be selected to

8    serve on this jury are going to need to be available to serve

9    throughout the remainder of this week.

10        I want you to understand, that's my best estimate, it's

11   not a guarantee.  We could finish before the end of the week,

12   we might finish a little bit beyond the end of the week, but

13   my best estimate, and I've done this a few times, is that we

14   can finish this trial by the end of this week.

15        So if there are any of you on the panel who have a

16   compelling reason why you could not be here throughout the

17   week if you were selected to serve -- and I don't mean it's

18   just inconvenient because jury service is inconvenient.

19   That's why it's public service.  That's why it's a sacrifice.

20        But if, for example, you have a surgical procedure set

21   for yourself or an immediate member of your family who is

22   completely dependent upon you, if you have a reason like that,

23   then that's what I'm talking about.  And if that's the case, I

24   need you to raise your hand so I can make a note of it right

25   now.

1          Okay.  That's Panel Member No. 4.  Anybody else?  No. 11.

2     Anybody -- No. 26.  Anybody else?  4, 11, 26.  Anybody else?

3          Okay.  Thank you, ladies and gentlemen.

4          At this time I'm going to call the case for announcements

5     on the record.  Before I do, ladies and gentlemen, I want to

6     let you know that in this case the Plaintiff is a global

7     company based in the Netherlands, and the Defendant is a

8     global company based in Sweden along with its American

9     domestic subsidiary.  So I'm going to do my best to pronounce

10    these Dutch and Swedish names correctly, but I won't promise

11    that they are exactly right.

12         At this time for the record, I'm going to call for

13    announcements in the case of Koninklijke KPN NV versus

14    Telefonaktiebolaget LM Ericsson, and Ericsson, Inc., their

15    U.S. subsidiary.  This is Civil Case No. 2:21-CV-113.

16         And, ladies and gentlemen, you're probably going hear

17    these parties referred to throughout the case as KPN for the

18    Plaintiff and Ericsson for the two Defendants.

19         But with that, I'll ask for announcements from counsel on

20    the record, and we'll begin with the Plaintiff.

21         What says the Plaintiff in this case?

22              MR. WARD:  Your Honor, Johnny Ward for KPN, and

23    we're ready.

24              THE COURT:  Would you announce or identify your

25    trial team for the benefit of the jury?

1            MR. WARD:  I'll do that, Your Honor.

2        First, our client representative, Ms. Lia Gerritse.  She

3    is from KPN.  She is our corporate representative.

4        My law partner, Claire Henry.  Ms. Lexie White, Andres

5    Healy, Tamar Lusztig, Russell Rennie, and Adam Tisdall.

6            THE COURT:  All right.  Thank you, counsel.

7        What says the Defendants?

8            MR. BAXTER:  Good morning, Your Honor.  Sam Baxter

9    from McKool Smith for the Defendant.

10       Along with me, Ted Stevenson, Nick Mathews, Doug Kubehl,

11   Jeff Becker, and out in the pews, Jennifer Truelove.

12           THE COURT:  All right.

13           MR. BAXTER:  This is our client representative right

14   here, Mr. Delgado.

15       I'm going to get you to come up, Doug.  I want you to

16   have a seat right here.  We saved you a chair.  Thank you,

17   sir.

18       That's who we have, Your Honor.

19           THE COURT:  All right.  As I mentioned to you,

20   ladies and gentlemen, this is a patent case arising under the

21   patent laws of the United States, and what the Plaintiff is

22   claiming in this case is that its patents were infringed by

23   the Defendants.  The Defendants deny that they've infringed in

24   any way the patents of the Plaintiff, and they contend that

25   the Plaintiff's patents are invalid.

1       Now, what I've just told you is a very short-form,

2   high-level summary of the parties' positions in layman's

3   terms.  I know you've all seen the patent video prepared by

4   the Federal Judicial Center this morning and, having seen

5   that, you more about patent cases than most citizens in East

6   Texas do.

7       As I told you, the lawyers for both sides are about to

8   question the panel and ask the questions that they believe are

9   pertinent to help secure a fair and impartial jury.  Let me

10  remind you, there aren't any wrong answers as long as your

11  responses are full, complete, and truthful.  And as I've told

12  you, the parties and their counsel are entitled to ask the

13  questions that they ask.

14      If for any reason an improper question is asked, I will

15  not hesitate to stop the process.  But these are very

16  experienced trial lawyers on both sides, and they are

17  completely familiar with the rules of procedure and evidence.

18  I don't expect that to happen.

19      One thing I do want to call your attention to before the

20  lawyers begin with their questions because they may ask you

21  about your ability to apply this in the case if you're

22  selected to serve on the jury, and that's the burden of proof.

23      In a patent case, a jury may be called upon to apply two

24  different burdens of proof to the evidence that's presented.

25  The jury may apply a burden of proof known as the

1    preponderance of the evidence, and I'll say that again--the

2    preponderance of the evidence--as well as a different burden

3    of proof known as clear and convincing evidence--clear and

4    convincing evidence.

5          Now, when responding to lawyers' questions about the

6    burden of proof, I need to instruct you that the party who has

7    the burden of proof on any claim or defense by a preponderance

8    of the evidence means that you, the jury, must be persuaded by

9    the credible and believable evidence that that claim is more

10   probably true than not true.  Let me say that again for

11   emphasis--more probably true than not true.  Sometimes this

12   preponderance of the evidence is talked about as being the

13   greater weight and degree of credible testimony.

14         Let me give you an example that I hope will be helpful to

15   you.  I think everybody in the jury box and in the gallery can

16   see in front of our court reporter that we have a statue in

17   the courtroom, a statue of the Lady of Justice.  She's

18   blindfolded.  In her right hand lowered at her side, she holds

19   the unsheathed sword of justice.  In her left hand raised

20   above her, she holds the balanced and equal scales of justice.

21         Let's focus on those scales of justice for a minute.

22   They are balanced and they are equal, and that's where these

23   parties start off at the beginning of a trial--balanced and

24   equal, neither one in a better position than the other.

25         And throughout the course of the trial, the Plaintiff

 1    will put its case on and present its evidence and its

 2    witnesses to the jury.  And think of it this way:  All of that

 3    evidence and all that testimony will go on one side of the

 4    scales.  Then when the Plaintiff's presented its evidence, the

 5    Defendants will present their case to the jury, and they will

 6    call their witnesses and present their exhibits.  And all the

 7    evidence presented by the Defendants will go on the other side

 8    of the scales.

 9         And when the jury's heard all the evidence, there are

10    going to be certain questions that I'm going to require the

11    jury to answer.  Those questions are part of what we call the

12    verdict form.  And in answering those questions, the jury is

13    going to need to decide:  Has the party who has the burden of

14    proof by a preponderance of the evidence shown, by comparing

15    both side's evidence to the other, that those things are more

16    probably true than not true?  If so, then the party has met

17    its burden of proof by a preponderance of the evidence.  If

18    they are not more probably true than not true, then that party

19    has not met its burden of proof by a preponderance of the

20    evidence.

21         On the other hand, when a party has this second burden of

22    proof called clear and convincing evidence, that means that

23    the jury must have an abiding conviction that the truth of the

24    party's factual contentions are highly probable.  I'll say

25    that again for emphasis--an abiding conviction that the truth

1    of the party's factual contentions are highly probable.

2    That's a different burden of proof than the preponderance of

3    the evidence.

4        Let's return to the same example I gave you with the Lady

5    of Justice and the balanced scales in her left hand.  The

6    Plaintiff puts its evidence on one side of the scales.  It

7    goes on one side of the scales.  The Defendants put their

8    evidence on during this trial, it goes on the other side of

9    the scales.  And the jury will be asked and will answer

10   certain questions.

11       If a question presented to the jury is presented by a

12   party who has the burden of proof by clear and convincing

13   evidence, it's not adequate that you find that it's more

14   probably true than not true; you must find that it is highly

15   probable.  Again, the truth of the party's factual conditions

16   are highly probable.  That's what's required to meet the

17   second burden of proof, clear and convincing evidence.

18       Sometimes the two burdens of proof are conveyed to a jury

19   like yourselves by saying that for a preponderance of the

20   evidence, the scales only need to tip ever so slightly in

21   favor of the party who has that burden of proof.  And if they

22   tip ever so slightly, then that party has met the

23   preponderance of the evidence standard.

24       But for the second burden of proof, clear and convincing

25   evidence, with the Plaintiff's evidence on one sides and the

1    Defendants' on the other, those scales must tip definitely.

2    It's not adequate that they tip just ever so slightly.  But if

3    they tip definitely, then the party with the burden of proof

4    by clear and convincing evidence has met that burden of proof.

5         Now, neither of these two burdens of proof, ladies and

6    gentlemen, should be confused at all with a completely

7    different and third burden of proof that I'm sure you've all

8    heard about called beyond a reasonable doubt.  Beyond a

9    reasonable doubt is the burden of proof applied in a criminal

10   case, and it has no application whatsoever in a civil case

11   like this.

12        Now, I give you these instructions in case the lawyers

13   for either or both sides want to ask you about your ability to

14   apply these two burdens of proof to the evidence if you're

15   selected to serve on this jury.

16        Now, before the lawyers address you and begin with their

17   questions, I'm going to ask each of you to tell me as much

18   about each of yourselves as I told you about myself, and this

19   is how we're going to do it.  We have our two court security

20   officers here in the courtroom, Ms. Denton and Mr.

21   Fitzpatrick.  They both have individual hand-held microphones.

22        We're going to do this one at a time.  We're going to

23   begin with Panel Member No. 1, Mr. Pitts.

24        And, Mr. Pitts, when I call on you, I'm going to ask you

25   to stand up, take one of those microphones, and answer these

 1    nine questions that are on the screen.  And you have printed

 2    copies of them as well.  Then when you're finished, if you'll

 3    pass the microphone down to Panel Member No. 2, Mrs. Lacy,

 4    she'll stand up, take that microphone, answer those same nine

 5    questions, and we'll follow that process throughout the

 6    entirety of this.

 7         Also, ladies and gentlemen, once you've all answered

 8    these nine set questions, if during the remainder of the jury

 9    selection process one of the lawyers calls on you specifically

10    to answer a question, then you should wait until you get the

11    handheld microphone from the Court Security Officer, you

12    should stand up, and then you should answer the question.

13         This is a big room.  We have a lot of people.  It's very

14    important that you're heard.  It's very important that our

15    court reporter hears clearly because he's going to take down

16    everything that's said throughout the entire trial process.

17    So please make sure that when you're giving any specific

18    response, either now or when you're asked a follow-up question

19    later, that you wait till you get the handheld microphone,

20    that you stand up, and then answer the question for me.

21    Please follow those instructions.

22         So with that, we will begin with Panel Member No. 1, Mr.

23    Pitts.  If you'll stand and answer those nine questions for

24    us, sir.

25              THE PANEL MEMBER:  Your Honor, ladies and gentlemen,

1    Your Honor, like you, I wasn't born in Texas, but I did get

2    here as soon as I could.  I also arrived in 1981.

3         My name is Louis Pitts.  I do live in Hughes Springs,

4    Texas.  I have three children.

5         I worked for the United States Postal Service for 28

6    years.  I've been retired for six.

7         My educational background, finished high school and

8    actually got a few credit hours in college, but none to speak

9    of.

10        My spouse's name is Rhonda Kay Pitts.  Her -- she had

11   many jobs over the years because she was wrangling my children

12   and trying to contribute to the family at the same time, but

13   her last employment was office manager.

14             THE COURT:  She's retired now?

15             THE PANEL MEMBER:  Yes, sir.

16             THE COURT:  Okay.

17             THE PANEL MEMBER:  And my prior jury services, I was

18   on a criminal case in Linden, Texas, about 30-some years ago.

19             THE COURT:  Have you ever served on a civil case?

20             THE PANEL MEMBER:  No, sir.

21             THE COURT:  All right.  Thank you, Mr. Pitts.

22             THE PANEL MEMBER:  Thank you, sir.

23             THE COURT:  If you'll pass the microphone to Mrs.

24   Lacy.

25        Mrs. Lacy?

```
 1              THE PANEL MEMBER:  Hello.  My name is Vickie lacy,

 2   and I live in Marshall, Texas, and I have three children.

 3        And I'm retired, but I worked at the parole office.  And

 4   I was there for 13 years.

 5              THE COURT:  State of Texas?

 6              THE PANEL MEMBER:  In the state of Texas, yes.  Yes.

 7   And I have a Master's degree.

 8        My husband's name is Mike Lacy.  He was a parole

 9   supervisor, and then he was a Probation officer and retired

10   from both of them.  And let's see.  That was for like 12

11   years.

12        And I have never served on jury.

13              THE COURT:  All right.  Thank you very much, ma'am.

14        Next is Panel Member No. 3, Mr. O'Connor?

15              THE PANEL MEMBER:  Good morning.  My name is Timothy

16   O'Connor.  I live here in Marshall, and I have two children

17   and some grandchildren.

18        I work for Blackhawk Transportation.  I am medically

19   retired from the military.  I've been there about two years on

20   and off.  When I'm not teaching truck drivers how to drive the

21   trucks, I'm driving them.  I have a Bachelor's degree.

22        My wife's name is Mary O'Connor.  She is a teacher.

23   Well, she was a teacher here in Marshall, and now she is a

24   librarian, and she works for the school -- Marshall school

25   district.  And she's been there a long time, working on 20
```

```
 1    years now.

 2         And I have never served on a jury before.

 3              THE COURT:  All right, sir.  Thank you very much.

 4              THE PANEL MEMBER:  Thank you.

 5              THE COURT:  Next is Mrs. Wilder, Panel Member No. 4.

 6              THE PANEL MEMBER:  My name is Crystal Wilder.  I

 7    live in Bivins, Texas.  I have two kids.

 8         I've worked at Curtis Stout company in Shreveport for 19

 9    years.  I graduated high school.

10         I'm married to Jimmy Wilder.  He owns Wilder Brothers

11    Construction.  He's been there about 30 years.

12         And I've never been on the jury.

13              THE COURT:  What does the company you work for do,

14    ma'am?

15              THE PANEL MEMBER:  We're a manufacturer's rep firm.

16    I'm a quoter for high voltage equipment, SWEPCO Upshur.

17              THE COURT:  Thank you.  That's helpful.  If you'll

18    pass the microphone to Panel Member No. 5.

19         Mrs. Collins, you're next.

20              THE PANEL MEMBER:  My name is Labricha Collins.  I

21    live in Atlanta.  I have two children.

22         My place of employment is Texas Health and Human Service

23    Commission.  I've worked there for 13 years.  I have attended

24    Atlanta High School and Texarkana College in Texas A&M Texas

25    ear can a in a.
```

1    My spouse's name is Chris Collins, Sr.  He is employed

2    with Cooper Tire Rubber Company and been there for -- the type

3    of work, he recently got a new job there, and I can't remember

4    exactly what he does, the name of it.

5         THE COURT:  But he's retired?

6         THE PANEL MEMBER:  He's still there.  And he's been

7    there 33 years.

8    My prior jury services was a criminal case.

9         THE COURT:  And where was that and how long ago?

10         THE PANEL MEMBER:  It's been a very long time,

11    probably about 13, 14 years.  And I thought it was in

12    Jefferson.

13         THE COURT:  All right.  In state court?

14         THE PANEL MEMBER:  Uh-huh.

15         THE COURT:  Thank you, Mrs. Collins.

16    Next is Panel Member No. 6, Mr. Stevens.

17         THE PANEL MEMBER:  My name is Bobby Stevens.  I'm

18    from Daingerfield.  I have four kids.

19    I'm a bi-vocational pastor, pastor a church called True

20    Vine Fellowship.  I'm also an accountant and controller for a

21    family business insurance company in Arkansas that I drive

22    back and forth to.  Been there about nine years.  Have a

23    couple of master's degrees and a Bachelor's degree.

24    My wife's name is Tonia.  She's an assistant principal at

25    Daingerfield and Lone Star Independent School Districts.  Just

 1    started that a couple of months ago.

 2         And I've not been on jury before.

 3              THE COURT:  When you say you work for a family

 4    business insurance company, is that your family's business?

 5              THE PANEL MEMBER:  Yes, yes, yes.

 6              THE COURT:  All right.  Thank you, sir.

 7         No. 7 is next, Mr. Sellers.

 8              THE PANEL MEMBER:  My name is David Sellers, born

 9    and raised here in Marshall, Texas.  I have two children.

10         I have only had two jobs in my life.  I owned a metal fab

11    shop for 28 years, which I sold two years ago.  I am

12    unemployed now.  Graduated 12th grade.

13         Wife's name is Marcy Sellers.  She is the HR director for

14    Genesis Prime Care, and she's been there, I guess, 16 years

15    now or in the HR field for 16 years.

16         And I've never served before.

17              THE COURT:  All right, sir.  Thank you, Mr. Sellers.

18         Next we'll go around to Panel Member No. 8, Mrs. Brewer.

19              THE PANEL MEMBER:  My name is Kourtney Brewer.  I

20    have two kids.

21         I'm employed at Fresinious Kidney Care.  I've been there

22    for eight years.  I am in college now for nursing degree.

23         My spouse's name is Mark Brewer.  He works as a detective

24    for Mt. Pleasant, Texas.  He's been there for six years.

25              And I've never served in jury service.

1          THE COURT:  And where are you in school for a

2    nursing degree?

3          THE PANEL MEMBER:  NTCC, Mt. Pleasant.  North Texas

4    Community College.

5          THE COURT:  Thank you, ma'am.

6       All right.  Next is No. 9, Mrs. Dunagan?

7          THE PANEL MEMBER:  Yes.  My name is Emily Dunagan.

8    I live in Hallsville, Texas.  I have two children.

9       My place of employment is the Hallsville Independent

10   School District.  I am a dyslexia specialist.  I have been

11   there for 20 years.  I have a Bachelor's degree in education

12   from East Texas Baptist University.

13      My spouse's name is Joey Dunagan.  He was employed for

14   the city of Marshall.  He retired from the fire department.

15   He was a fireman/paramedic and also served as the fire marshal

16   for several years.  He now works for Eastman Chemical Plant.

17   He has been there for -- let me think -- about a year and a

18   half at Eastman Chemical Plant.  He worked in Marshall for 21

19   years.

20      And now I have served on a chemical -- on a criminal case

21   for the district court here in Harrison County.

22          THE COURT:  All right.  But not this courthouse.

23   The state courthouse?

24          THE PANEL MEMBER:  Yes.

25          THE COURT:  How long ago was that, ma'am?

1            THE PANEL MEMBER:  Probably about eight years ago.

2            THE COURT:  And that's the only time you served on a

3   jury?

4            THE PANEL MEMBER:  Yes.  And I was the alternate.  I

5   should say that.

6            THE COURT:  Okay.  Thank you, Mrs. Dunagan.

7        Next is No. 10, Mr. McCoy?

8            THE PANEL MEMBER:  Yes.  My name is Bret McCoy.  I

9   have four children, ranging in ages from 11 to 6.

10       I'm a financial advisor with Edward Jones.  I've been

11   doing that for 15 years.  I hold a bachelor's and Master's

12   degree.

13       My wife's name is Elizabeth.  She is a schoolteacher for

14   Pewitt ISD, fifth year at that district, 20th year teaching

15   for her.

16       And I've never served on a jury.

17            THE COURT:  Which school district does she teach in?

18            THE PANEL MEMBER:  Pewitt.

19            THE COURT:  All right, sir.  Thank you very much.

20       Next is No. 11, Mrs. Shields?

21            THE PANEL MEMBER:  My name is Madison Shields, and I

22   live here in Marshall, Texas.  I have three children.

23       I currently stay home and help my husband with his

24   business, and I've done that for five years now.  I completed

25   high school.

1          My husband's name is Casey shields.  And he has -- he

2     owns a mobile home moving company which he's worked at for 25

3     years total but owned for five years, the last five years.

4          And I've never served on a jury.

5               THE COURT:  And how do you help him with his

6     business?

7               THE PANEL MEMBER:  Answering the phone.

8               THE COURT:  Working the office?

9               THE PANEL MEMBER:  Whatever he tells me to do.

10              THE COURT:  All right.  Thank you, Mrs. Shields.

11     Next is No. 12, Mrs. Thomas?

12              THE PANEL MEMBER:  Okay.  My name is Shirley Thomas.

13     I have three kids, three grandkids.

14          I work for the city of Marshall.  I've been there three

15     years.  High school diploma.

16          My spouse's name is Robert Thomas.  He works for Nover

17     Compact.  He's a mobile mechanic.

18              THE COURT:  And what do you do for the city of

19     Marshall, ma'am?

20              THE PANEL MEMBER:  Whatever.  I work just two levels

21     down at Moore City Hall.

22              THE PANEL MEMBER:  Okay.

23              THE PANEL MEMBER:  And he's been at this new job

24     because it changed over like a year and a half.

25          And then I've did civil and criminal.

```
 1                THE COURT:  You've been on both a civil case and a
 2    criminal case?
 3                THE PANEL MEMBER:  In Jefferson.
 4                THE COURT:  Okay.  How long ago were you involved in
 5    the jury trial in a civil case?
 6                THE PANEL MEMBER:  Oh, a long time.
 7                THE COURT:  Hold the microphone a little closer.
 8                THE PANEL MEMBER:  Oh.  Over 10 years.
 9                THE COURT:  Okay.  Thank you, ma'am.
10          All right.  Next is No. 13, Mrs. Morrow?
11                THE PANEL MEMBER:  Good morning.
12                THE COURT:  Good morning.
13                THE PANEL MEMBER:  My name is Gail Morrow.  I stay
14    here in Marshall, Texas.  I have one grown daughter.
15          I work for the city of Marshall, the library, been there
16    21 years.  I'm a cataloger.  And I have a high school diploma
17    and some college classes.
18          My husband's name is Ernest Morrow, works for Texas
19    Eastman, lab tech, been there 24 years, and also a sergeant
20    major in the military for 33.
21          And I have served in a civil case over 10 years ago.
22                THE COURT:  And where was that, ma'am?
23                THE PANEL MEMBER:  Over at the courthouse.
24                THE COURT:  At the Harrison County courthouse?
25                THE PANEL MEMBER:  The Harrison courthouse.
```

```
 1              THE COURT:  Thank you, ma'am.

 2         All right.  Next is No. 14, Mr. Henderson?

 3              THE PANEL MEMBER:  Hello.  My name is Anthony

 4    Henderson.  I'm a Baptist preacher in Linden, Texas.  I live

 5    in Jefferson, Texas.  I have three kids.

 6         I'm employed by Jefferson ISD.  I'm a mechanic at

 7    Jefferson ISD.  I've been working there for six years.  I have

 8    my associate degree and my Bachelor degree in theology.

 9         I'm not married, and I've never served on a criminal or

10    civil case.

11              THE COURT:  Never served on a jury of any kind?

12              THE PANEL MEMBER:  No, sir.

13              THE COURT:  Thank you.

14         All right.  Next is No. 15, Mr. Hogue?

15              THE PANEL MEMBER:  My name is Chris Hogue.  I live

16    in Omaha, Texas.  I have two children.

17         I work for Graphic Packaging International.  I do

18    maintenance work.

19              THE COURT:  Mr. Hogue, would you mind holding the

20    microphone a little closer so I can hear you?

21              THE PANEL MEMBER:  I work for Graphic Packaging

22    International.  I do maintenance-type work.  I've been there

23    seven years.  I got a high school education.

24         My wife's name is Kim Hogue.  She's a substitute teacher

25    at Paul Pewitt ISD.  She's been there a couple of years.
```

1        And I've never served before.

2              THE COURT:  All right.  Thank you, sir.

3        Next is No. 16, Mr. Youngblood?

4              THE PANEL MEMBER:  My name is Randall Youngblood.  I

5  live in Waskom.  No children.

6        I'm a retired educator, 38 years as a teacher, coach, and

7  principal.  I have a master's in school administration.

8        Never married, and no jury experience.

9              THE COURT:  Was your educational career at Waskom

10  ISD or other places?

11              THE PANEL MEMBER:  I've worked at four different

12  school districts in my 38 years, but retired from Waskom.

13              THE COURT:  And how many years did you work in the

14  Waskom --

15              THE PANEL MEMBER:  21.

16              THE COURT:  Thank you very much, Mr. Youngblood.

17        Next is No. 17, Mr. Adams.

18              THE PANEL MEMBER:  My name is Cliff Adams.  I live

19  in Big Sandy, Texas, have two children.

20        Worked for TXU for a little over 34 and a half years

21  as -- and I'm retired now -- as an instrumentation technician

22  supervisor before I retired.  I have an Associate's degree in

23  instrumentation technology.

24        Spouse's name is Cindy Adams, and she worked for Good

25  Shepherd Christus, Good Shepherd, for about 22 and a half

1    years.

2         And I have served on a criminal case in Russ County,

3    Henderson, Texas, about -- about 30 years ago.

4              THE COURT:  Ever served on a civil jury?

5              THE PANEL MEMBER:  No, sir.

6              THE COURT:  Okay.  Thank you, Mr. Adams.

7         Next is Panel Member No. 18.

8              THE PANEL MEMBER:  My name is Rhonda Saintignan.  I

9    live in Jefferson, Texas.  I have two children.

10        I now work at Fort Jefferson Outpost.  Before that, I

11   worked 19 years at Blue Cross Blue Shield.  I have been at the

12   Outpost for going on three years.  Graduated from Marshall

13   High.

14        My husband's name is Ronnie Saintignan.  He worked at

15   Delta Fab before he retired.  He was there for about six

16   years.  He was the quality control, QC, manager there.  And

17   prior to that, he worked at MasterCraft and Republic for many

18   years there.

19        And I worked on a criminal case in Marion County.

20             THE COURT:  How long ago, ma'am?

21             THE PANEL MEMBER:  Five years ago probably, four or

22   five.

23             THE COURT:  Never on a civil case?

24             THE PANEL MEMBER:  Un-huh.

25             THE COURT:  Thank you.

 1          All right.  Next is Panel Member No. 19, Mrs. Mashaw.

 2              THE PANEL MEMBER:  My name is Shelly Mashaw.  I live

 3     in Hughes Springs.  I have one five-year-old son.

 4          I'm a stay-at-home mom, but I hold a degree, an associate

 5     degree, and a state license for physical therapist assistant.

 6     And I also kind of did just a little bit of what we call

 7     outflowing for a medical staffing company where I searched

 8     through medical resumes for job positions, kind of do that on

 9     an as-needed business for a friend's company.  I was a

10     physical therapist assistant for 12 years before I became a

11     stay-at-home mom.

12          And let's see.  My husband's name is Morgan, and he is an

13     ID tech for Midcoast Energy, been in the oil and gas company

14     business for 20 years, but he's been with Midcoast for about

15     five.

16          And I've -- this is my first jury experience.

17              THE COURT:  All right.  Thank you very much, Mrs.

18     Mashaw.

19          Next is No. 20, Mrs. Younger?

20              THE PANEL MEMBER:  Good morning.  My name is Nancy

21     Younger, and I do live here in Marshall.  I have two grown

22     sons.

23          My place of employment, I'm a supervisor with a

24     personalized auto insurance group.  I've worked there for 34

25     years now.  And my education, I graduated from Marshall High

1    School.

2         My husband's name is Aaron Younger, Jr., and he was a

3    captain with the fire department here in Marshall, and he has

4    retired for 15 years.

5         And I have served on a criminal case here at the Harrison

6    County courthouse.

7              THE COURT:  That's the only jury service you've had?

8              THE PANEL MEMBER:  That's it.

9              THE COURT:  And what's the name of the insurance

10   group you work for?

11             THE PANEL MEMBER:  I work for Lewis Williams and

12   Associates here in Marshall.

13             THE COURT:  Thank you, ma'am.

14             THE PANEL MEMBER:  Yes, sir.

15             THE COURT:  All right.  Next is No. 21, Mr. Whitlow.

16             THE PANEL MEMBER:  Thomas Whitlow.  Lived here all

17   my life.  No children.

18        Retired from an oil field service company in 2014.  Last

19   time I worked there was about 20 years.  I graduated from East

20   Texas State University, which is no more.  It's now Texas

21   A&M-Commerce.

22        My wife's name is Faye.  She worked for the school

23   district.  She's a math teacher for a long time.

24        No jury service.

25             THE COURT:  Mrs. Whitlow's retired now?

```
 1                THE PANEL MEMBER:  Yes.

 2                THE COURT:  Okay.  Thank you, sir.

 3                THE PANEL MEMBER:  My name is Donovan Pleban.  I

 4     live here in Marshall, Texas.  I do not have a spouse or kids.

 5          I work at the local Cash Saver, formerly Save-a-Lot.

 6     I've worked there almost four years.  I have an Associate's

 7     degree in software engineering from TSTC here in Marshall,

 8     Texas.

 9          I technically do not have any jury services, but many

10     years ago, I don't know exactly where, I was part of a social

11     experiment that was a mock trial.  And it also was a patent

12     dispute within the mock trial, although they weren't as formal

13     as here.

14                THE COURT:  But you've never been on a jury in a

15     court, either state or federal?

16                THE PANEL MEMBER:  No, no, no, not at all.

17                THE COURT:  All right.  Thank you, sir.

18          Next is No. 23?

19                THE PANEL MEMBER:  Good morning.  My name is Nick

20     Emerine.  I live here in Hallsville, Texas.  I have one son.

21          I work for West Lake Chemical Corporation, and I work as

22     a process engineer.  I've worked there for about a total of

23     nine years.  I have a Bachelor of Science in chemical

24     engineering.

25          My spouse's name is Stephanie Emerine.  She works for
```

```
 1    Hallsville ISD, and she's a teacher.  And she's worked there

 2    for a total of five years.

 3          And I've never served as a jury member.

 4              THE COURT:  Thank you, sir.

 5          Next is No. 24, Mr. Franklin.

 6              THE PANEL MEMBER:  My name is Byron Franklin.  I

 7    live in Daingerfield, Texas.  I have two children.

 8          I work at the Morris County Sheriff's Department.  I've

 9    been there 12 years.  High school diploma.

10          No spouse, and I never served.

11              THE COURT:  And what do you do at the sheriff's

12    office there?

13              THE PANEL MEMBER:  I'm a jailer.

14              THE COURT:  All right, sir.  Thank you very much.

15          Next is No. 25, Mrs. Welch?

16              THE PANEL MEMBER:  Hi.  My name is Sally Welch.  I

17    live near Linden.  I have two children.

18          And I'm retired.  I've worked at various places.  The

19    last one I worked at is Capital One bank.  I was a contractor

20    to a contractor at Capital One bank.  I worked for IM, which

21    was a contractor.  I worked there four or five years.

22              THE COURT:  And what did you actually do when you

23    were working at the bank?

24              THE PANEL MEMBER:  It was a data center for Capital

25    One Bank.  So I worked with the servers, physical, and also
```

1    administrative work with the servers.

2              THE COURT:  Thank you.

3              THE PANEL MEMBER:  I have a Bachelor's degree.

4       My husband's name is Walter Welch.  He worked for 30

5    years for the state of Texas at Texas A&M University and also

6    at the University of Texas at Dallas.  He's an

7    electrical -- he retired as a foreman for the electrical shop.

8    Well, he worked at UTD probably about 11 years, something like

9    that.

10              THE COURT:  All right.

11              THE PANEL MEMBER:  Prior jury service, I was on a

12    civil trial, DWI.

13              THE COURT:  Whereabouts?

14              THE PANEL MEMBER:  That was in McKinney, Texas.

15              THE COURT:  And how long ago?

16              THE PANEL MEMBER:  Fifteen years.

17              THE COURT:  You say it was a civil case involving a

18    DWI?  DWI is a criminal charge.  Was it a criminal case or

19    civil case?

20              THE PANEL MEMBER:  I was pretty sure it was civil.

21    I guess it was criminal.

22              THE COURT:  It's been a long time ago?

23              THE PANEL MEMBER:  It's been a while.  We were hung

24    anyway.  We just could not come to a verdict.

25              THE COURT:  All right.  Thank you, Mrs. Welch.

1        Next is No. 26, Ms. Clark?

2              THE PANEL MEMBER:  Hi.  My name is Brandi Clark.

3    I'm originally from south Louisiana.  I just moved here about

4    10 years ago.  I have two girls, one of which has my

5    granddaughter who I raise.  She just turned three.

6        My employment is I work for Dollar General.  I just

7    started that back in April, I believe.  I'm a key holder.  I

8    open and close the store on my own.  The highest education is

9    high school.

10       I'm currently going through a divorce, and I have no

11   prior jury services.

12             THE COURT:  Where is the Dollar Store that you work

13   at, ma'am?

14             THE PANEL MEMBER:  Harleton, Texas.

15             THE COURT:  Harleton.  Thank you.

16       Next is No. 27, Mrs. Autry?

17             THE PANEL MEMBER:  My name is Cheyanne Autry.  I'm

18   from Queen City, Texas.  I have two young children.

19       I'm a family nurse practitioner at Genesis Prime Care in

20   Texarkana.  I've been there about two -- two weeks.  So been a

21   registered nurse for seven years, though.

22       My spouse's name is Douglas Autry.  He works for A E P

23   sip toe and he's a supervisor over the lineman crew there.

24   And he's been there for 10, 12 years, somewhere through there.

25             And I've never served on a jury before.

1          THE COURT:  Thank you, ma'am.

2       Next is No. 28, Miss Crawford?

3          THE PANEL MEMBER:  Good morning.  My name is Demisha

4    Crawford.  I live in Karnack, Texas.  I have one child.

5       I work at the Harrison County Courthouse with Judge

6    Clarice Watkins, Precinct 2.  I am the civil/criminal case

7    manager.  I have been there for 13 years.  I have a high

8    school diploma.  I hold a Master's degree in criminal justice.

9       6, 7, and 8 does not apply to me because I do not have a

10   spouse.  And, no, I do not have prior jury services.

11         THE COURT:  Okay.  Thank you, Miss Crawford.

12      Next is No. 29, Mr. Grundy.

13         THE PANEL MEMBER:  Good morning.  My name is Willie

14   Grundy.  I live in Domino, Texas.  I have four kids.

15      I worked for International Paper in Domino for 24 years

16   before they sold out in 2018 to Graphic Packaging.  I've been

17   there a total of 28 years.  I retired last Saturday, this past

18   Saturday.

19      And I am not married.  And I served on a criminal case in

20   Cass County, Linden, Texas.

21         THE COURT:  How long ago was that, sir?

22         THE PANEL MEMBER:  That was over 11 years ago.

23         THE COURT:  Never served on a civil case?

24         THE PANEL MEMBER:  No, sir.

25         THE COURT:  Thank you, Mr. Grundy.

1        Next is Panel Member No. 30?

2             THE PANEL MEMBER:  Yes.  I'm Ed Raney.  I'm a poor

3    dirt farmer from West Texas.  My wife is from east Texas.  We

4    have two children and five grandchildren.

5        I have an Associate's degree in computer science, a

6    Bachelor's degree in computer science, and a master's in

7    business administration.

8        My wife was a cancer registrar, and she's now retired.

9        I worked in the computer field for over about 40 years

10   and have extensive work with IT and tech support, both in

11   computers and the telecommunications.  So I've been associated

12   with the Ericsson and KPN products and services as well.

13            THE COURT:  Are you employed now, sir?

14            THE PANEL MEMBER:  Yes.  I'm still working with a

15   company out of Hawaii.  We actually went to Hawaii for about

16   10 years, and I'm still a computer consultant with them.

17            THE COURT:  What's the name of that company, sir?

18            THE PANEL MEMBER:  It's High Performance Systems

19   there in Hawaii.  They work mainly with Microsoft products.

20            THE COURT:  Okay.

21            THE PANEL MEMBER:  And I have a small company called

22   Raney Electronics, and we developed a drug controller system

23   and went through some of the patent process with that under a

24   federal grant.

25            THE COURT:  Does your wife work anywhere right now?

1    Does your wife work outside the home right now?

2              THE PANEL MEMBER:  No.  She's currently retired and

3    finally got on Medicare.

4              THE COURT:  And have you had any prior jury service?

5              THE PANEL MEMBER:  Yes.  I've served on a criminal

6    jury in Pittsburg, Texas.

7              THE COURT:  How long ago was that?

8              THE PANEL MEMBER:  One-to-two years.

9              THE COURT:  All right.  You've never served in a

10   civil case?

11             THE PANEL MEMBER:  No, I have not.

12             THE COURT:  Okay.  Thank you very much, sir.

13             THE PANEL MEMBER:  Thank you.

14             THE COURT:  Next is No. 31, Mrs. Steward.

15             THE WITNESS:  My name is Laurie Steward.  I am from

16   Linden, Texas.  I have two children.

17        I am a retired fourth grade teacher from Hughes Springs

18   ISD.  I have -- worked there or was an educator for 25 years.

19   I have a Bachelor's degree.

20        My spouse's name is Keith Steward.  He works for Wilkes

21   Power Plant in Avenger, Texas, as a senior operator.  He's

22   been there about 10 years.

23        And I have served on a civil jury before.

24             THE COURT:  And where was that?

25             THE PANEL MEMBER:  Here.

1          THE COURT:  In this court?

2          THE PANEL MEMBER:  Yes, sir.

3          THE COURT:  And how long ago?

4          THE PANEL MEMBER:  About nine years.

5          THE COURT:  And do you remember what the case was

6     about?

7          THE PANEL MEMBER:  Yes, sir.

8          THE COURT:  What was it about?

9          THE PANEL MEMBER:  It was rentals --

10         THE COURT:  Was it a patent case?

11         THE PANEL MEMBER:  Yes, sir.

12         THE COURT:  Okay.  And did the jury return a verdict

13    for the plaintiff or for the defendant or do you remember?

14         THE PANEL MEMBER:  For the defendant.

15         THE COURT:  Okay.  Thank you very much, ma'am.

16      All right.  Next is No. 32, Mr. Bynum?

17         THE PANEL MEMBER:  My name is Thomas Bynum.  I live

18    here in Marshall.  I've got six grown daughters.

19      I was a maintenance manager for Novak Drilling Patterson

20    UTI.  Retired.  I've got an Associate degree.

21      My wife is deceased.  Her name was Janie.

22      And I served on a criminal case about 10 years ago.

23    Settled before we went to trial.

24         THE COURT:  Never served in a civil case?

25         THE PANEL MEMBER:  No, sir.

 1          THE COURT:  Thank you, Mr. Bynum.

 2     And next is Mr. Robison.

 3          THE PANEL MEMBER:  Wayne Keith Robison.  I am from

 4     Marshall, Texas.  I have three kids.

 5          I'm currently the owner of Maintenance Furniture Company

 6     in Longview, Lakeside Classic Car and Motorcycle Sales in Ore

 7     City, and a partner the Deuce Custom Creations Motorcycle ATV

 8     Repair in Ore City.  Those last two for the last two years.

 9     I've owned Maintenance Furniture since 2006.  High school

10     graduate, 12 years in the Navy in communications.

11          My wife's name is Kathy.  Currently she's on disability.

12     She was a nurse by training.

13          And I was on a civil case in Gray County about 10 years

14     ago.

15          THE COURT:  That's the only jury service you've had

16     before, sir?

17          THE PANEL MEMBER:  Yes, sir.

18          THE COURT:  Thank you very much.

19          All right, ladies and gentlemen.  Thank you very much for

20     that information.

21          Now, I need to say just a couple of additional things to

22     you before I turn the questioning over to the lawyers.

23          The jurors that are selected to serve in this case will

24     serve in the role as the judges of the facts, and the jurors

25     selected will make the sole determination about what the facts

1    are in this case.

2         Now, my job as the judge is to rule on questions of law,

3    evidence, and procedure, to maintain the decorum of the

4    courtroom, and to oversee hopefully an efficient flow of the

5    evidence over the course of the trial.

6         Also, I want to say a couple of things to you about our

7    judicial system that I hope will put things in a proper

8    perspective for you.  In any jury trial, besides the parties

9    themselves, there are always three participants--the jury, the

10   judge, and the lawyers.

11        With regard to the lawyers, I think it's important for

12   each of you to understand that our judicial system is an

13   adversary system, which simply means that during the trial

14   each of the parties will seek to present their respective

15   cases to the jury through their counsel in the best light

16   possible.

17        Now, it's no surprise to any of you that lawyers are

18   sometimes criticized in the public and in the media, but the

19   Court's observed that at least some portion of that criticism

20   results from a basic misunderstanding of our adversary system

21   in which the lawyers act as advocates for the competing

22   parties, and as an advocate, a lawyer is ethically and legally

23   obligated to zealously assert his or her client's position

24   under the rules of our adversary system.  And by presenting

25   the best case possible on behalf of their clients, the lawyers

1   hopefully will enable the jury to better weigh the relevant

2   evidence to determine the truth and arrive at a just verdict

3   based on that evidence.

4        This system, this adversary system of justice, has served

5   our country well for over 200 years, and America's lawyers

6   have been and are now and will in the future continue to be an

7   indispensable part of this process.

8        So as we go forward with the trial, even though it's

9   possible the jury may see me frown or roll my eyes at the

10  lawyers from time to time, it's simply because I'm trying to

11  make sure that they don't get outside the boundaries of our

12  adversary system.  But please keep in mind that they are just

13  doing their jobs, and it's important for all of you to

14  understand that as we go forward.

15       Also, ladies and gentlemen, for those of you selected to

16  serve on the jury in this case, I am going to do my very best

17  throughout the trial to make sure that the jury has no idea

18  about what I think about the evidence that's presented,

19  because it is the jury's job to determine the facts based on

20  the evidence and that is not my job.

21       So those of you selected on the jury should not take any

22  expressions or comments that you see or hear from me or you

23  think you hear from me as something to consider in making the

24  ultimate decision about what the facts are in this case.

25       With that, ladies and gentlemen, the lawyers for both

```
 1    sides, the competing parties, will address you at this time.

 2         Mr. Ward, you may address the panel on behalf of the

 3    Plaintiff.

 4              MR. WARD:  Thank you, Your Honor.

 5              THE COURT:  Would you like a warning on your time,

 6    counsel?

 7              MR. WARD:  I would, Your Honor.  If I could have a

 8    five-minute warning.

 9              THE COURT:  I will warn you when you have five

10    minutes remaining.  Please proceed.

11              MR. WARD:  Thank you, Your Honor.

12         Good morning again.  My name is Johnny Ward, and I

13    represent KPN.  I'm not even going to try to do the

14    pronunciation that His Honor did.

15         You-all have told us a little bit about yourselves.  I'm

16    going to tell you briefly about myself so you know who I am.

17    I was born and raised in Longview.  I've been practicing law

18    there for about 25 years.  I'm married.

19         My wife's name is Nell.  She was a schoolteacher.  We've

20    got three kids who are all out of the house now.  She taught

21    school for four or five years, then retired to chase kids, and

22    then went back after about 20 years and got cured of that

23    after about two years.

24         My hobby, I like to duck hunt.  I've got no prior jury

25    service, but I've stood up in front of juries many times.
```

1          Let me first start off by telling you a little bit about

2     voir dire.  I'm going to tell you briefly about the case, a

3     real high-level overview, and then I'm going to ask you some

4     questions.  And some of you might think, well, if I don't

5     raise my hand, if I don't answer anything, then maybe I won't

6     get called upon.

7          Those in the jury box, and I'll refer to you as the jury

8     box, I can tell you I'm going to talk to every one of you or

9     try to.  And those in the first two rows of the gallery, I'm

10    going to try to talk to you as well.  The third and fourth

11    rows back there are probably pretty safe from making it on

12    this jury panel.  You-all are at risk, so be aware I'm going

13    to call on and talk to you.

14         You were kind enough to fill out those jury

15    questionnaires, and they gave us a lot of information.  And

16    that's really what I'm going to follow up on and maybe some of

17    the things that you've said this morning in response to the

18    information that His Honor asked you to provide us.

19         Let me ask you this first question.  Who all, when you

20    found out you got the jury summons and you were coming to

21    court and you now know you're going to sit in judgment of a

22    dispute between two companies, how many of you want to be fair

23    to both sides?  Okay.

24         Is there anybody who came in and said, I don't want to be

25    fair?  All right.  We chuckle.

1      In March, I picked a jury, and a guy raised his hand, he

2  said, "I don't want to be fair."

3      And I said, "Why don't you want to be fair?"

4      He said, "Whoever filed this lawsuit, I'm mad at and it's

5  their fault."

6      So I ask that kind of in jest, but I got an answer to

7  that.  So nobody sitting in the jury box is sitting I'm angry,

8  KPN filed this lawsuit, and that's why I'm here.

9      Anybody feel that way before we get started jury box and

10  gallery?  All right.

11      Because can we all agree that we have different life

12  experiences?  Right?  Things that might affect our ability to

13  be fair because of the nature of the case?  And I see Mr.

14  McCoy, Juror No. 10.

15      Mr. McCoy, you and I met before in this courtroom, I

16  think.  You were on a jury panel, and I think in that case you

17  owned stock in one of the companies, didn't you?

18              THE PANEL MEMBER:  Verizon.

19              MR. WARD:  Verizon.  That's right.  So you couldn't

20  be on that panel because Verizon was a defendant.  Right?

21              THE PANEL MEMBER:  Yes, sir.

22              THE COURT:  Would you mind standing up, sir?

23              THE WITNESS:  I apologize.

24              MR. WARD:  No problem.  That's something that had

25  nothing to do with the facts of the case, but it might cause

1    you to lean one way or another.  Right?

2              THE PANEL MEMBER:  It could.

3              MR. WARD:  Okay.  Thank you.  I'll tell you what,

4    while I've got you, do you own stock in Ericsson?

5              THE WITNESS:  I wish I did.

6              MR. WARD:  You don't?

7              THE PANEL MEMBER:  Do not.

8              MR. WARD:  That's an example of something that

9    doesn't have anything to do with the case, but it might start

10   you leaning one way or the other before you hear the evidence.

11   And that's all I want to find out.

12        Leaning does not disqualify you.  You can lean one way or

13   the other, and you've just got to tell us about it.  What

14   would disqualify you is if you lean to such an extent that you

15   couldn't decide the case based upon the facts and the law that

16   Judge Gilstrap gives you.  All right.

17        So that's what we're trying to find out.  Leaning is

18   okay; it doesn't disqualify you.

19        Let me talk to you briefly about the case.  The case is

20   about these three patents.  This is a copy of the patents.

21   Those of you who make it on the jury will have copies of these

22   patents in the jury notebook.  It's the '637, '235, and '089.

23   It doesn't mean anything to you right now, but those of you

24   that make it on the panel are going to hear those numbers a

25   whole lot.

1          I know that many of you had heard of Ericsson.  One of

2     the jurors I think said he'd heard of Ericsson.  They are a

3     well-known manufacturer of cell phone infrastructure

4     technology, the base station antennas and the hardware and all

5     the guts that kind of go into our cellular networks.  And they

6     sell those to telecommunications providers like Verizon, AT&T,

7     and T-Mobile are companies I know you're familiar with.

8          KPN is also a telecommunications provider but only in the

9     Netherlands.  I don't think anyone had heard of KPN, and I'm

10    not surprised.  I had not, either, before I got hired by them.

11    But they've got about 4 million customers, 20,000 employees,

12    but they only do business in the Netherlands.  But they have

13    patents around the world that protect their inventions, and

14    they are the owner of these U.S. patents.  They've got about

15    1500 worldwide patents and 200 U.S. patents.

16         They say that Ericsson is using the inventions, is using

17    the inventions in these patents without permission.  Ericsson

18    says, we don't use those patents, we're not on your property.

19    And, in fact, they say one of the patents is invalid.  They

20    also dispute how much money they owe.  We say they owe us over

21    $30 million.  They say not nearly that much if they are on our

22    property and the patents are valid.

23         And that's all I'm going to tell you about the facts.

24    And you-all might say, well, that's not a very convincing

25    argument, Mr. Ward, for why you should win.

1       Well, despite how strongly I believe in our positions,

2   this is not the time for me to argue to you.  I'd get in

3   trouble, and, plus, I don't want to affect how you view this

4   case before I find out if there's things in your life that

5   might affect your ability to be a fair and impartial juror in

6   this case.

7       So let me start.  My first question is, does anyone know

8   Mr. Sam Baxter.

9       Mr. Baxter, would you mind standing up.

10      Mr. Baxter is a lawyer here in Marshall.

11      Thank you, Mr. Baxter.

12      And one of his partners, Ms. Jennifer Truelove, is also

13  here.

14      I want to know if anybody in the jury box -- and I'm

15  going to come to the first and second rows in just a second.

16  Thank you -- in the jury box knows Mr. Baxter.  When I say

17  know, it could be it's the broadest sense of the word, I

18  recognize him or maybe I've been on a local organizations

19  board, something like that.  If you know Mr. Baxter or Ms.

20  Truelove or their law firm of McKool Smith and you're in the

21  jury box, would you raise your hand.

22      Yes, sir, Mr. Sellers.  You're Juror No. 7.  Who do you

23  know?

24          THE PANEL MEMBER:  I don't know Mr. Baxter

25  personally, but we've done business together.  My business

1    prior, I did do some work for Mr. Baxter.

2             MR. WARD:  That's an example of something you could

3    imagine me and my client would want to follow up with.  Right?

4             THE PANEL MEMBER:  Sure.

5             MR. WARD:  Did you do metal work for Mr. Baxter?

6             THE PANEL MEMBER:  Yes.

7             MR. WARD:  How long ago was that?

8             THE PANEL MEMBER:  Probably two years ago, two and a

9    half.

10            MR. WARD:  Okay.  Only you can tell me.  If you sat

11   on this jury and you had to rule against Mr. Baxter, would you

12   have difficulty doing that?  If you had to rule against his

13   client?

14            THE PANEL MEMBER:  No.

15            MR. WARD:  All right.

16            THE PANEL MEMBER:  Not at all.

17            MR. WARD:  So the work you did for him doesn't start

18   you leaning one way or the other in the case?

19            THE PANEL MEMBER:  No, sir, none.

20            MR. WARD:  KPN and Ericsson, we start out equal.  Is

21   that right?

22            THE PANEL MEMBER:  Yes.

23            MR. WARD:  Thank you, Mr. Sellers.

24        I did have one more question for you from your

25   questionnaire.  I think you indicated that for lawsuits, you

1    feel like there's lots of lawsuits and no one takes

2    responsibility for their own conduct, words to that effect.

3    Is that right?

4              THE PANEL MEMBER:  Yes, sir.

5              MR. WARD:  And, again, there's no wrong answers in

6    voir dire.  We appreciate you giving us that information.

7    We've obviously brought this lawsuit.  Anything about your

8    feelings about lawsuits that starts you leaning one way or the

9    other before we start?

10             THE PANEL MEMBER:  Not on this particular

11   application, no.

12             MR. WARD:  Okay.  Thank you, sir.

13        Anybody else in the jury box know Mr. Baxter, Ms.

14   Truelove, or McKool Smith?  All right.  First row of the

15   gallery.

16        And then second row, Juror No. 21, Mr. Whitlow?

17             THE PANEL MEMBER:  Yes.

18             MR. WARD:  Do you know somebody at that firm or Mr.

19   Baxter?

20             THE PANEL MEMBER:  Just know of him and know Ms.

21   Truelove.

22             MR. WARD:  Okay.  Have you ever employed their firm

23   to represent you or Martex?

24             THE PANEL MEMBER:  No.

25             MR. WARD:  Anything about knowing Mr. Baxter or his

```
 1    firm that's going to start you leaning one way or the other?

 2              THE PANEL MEMBER:  Not at all.

 3              MR. WARD:  All right.  And you retired from Martex a

 4    few years ago.  Is that correct?

 5              THE PANEL MEMBER:  14.

 6              MR. WARD:  Okay.  And what did you do while you were

 7    at Martex?

 8              THE PANEL MEMBER:  Purchasing.

 9              MR. WARD:  Okay.  All right.  Thank you, Mr.

10    Whitlow.

11         All right.  And then I know this is a long shot, I think,

12    but anyone know Mr. Ted Stevenson?  He's with the law firm of

13    Alston & Bird in Dallas.  Anybody know Mr. Stevenson or Mr.

14    Doug Kubehl?  He's with the law firm of Baker & Botts in

15    Dallas.

16         All right.  So no one knows any of these law firms,

17    McKool Smith, other than what you talked to me about, McKool

18    Smith, Baker Botts, or Alston Bird in Dallas.

19         Anybody have friends or relatives that work for any of

20    those firms?

21         All right.  Mr. Pitts, I'm going to talk to you, and

22    we're going to go down the row real quick or try to go not too

23    quick.  I want to hear what you-all have to say.

24         I think you indicated you worked for the U.S. Postal

25    Service.  Is that correct?
```

```
 1                 THE PANEL MEMBER:  Yes, sir.

 2                 MR. WARD:  And you were there for a number of years.

 3     Correct?

 4                 THE PANEL MEMBER:  Yes, sir.

 5                 MR. WARD:  And where was it that you were working

 6     for the U.S. Postal Service?

 7                 THE PANEL MEMBER:  In Texarkana, Texas side and

 8     Arkansas side.

 9                 MR. WARD:  And were you there the entire time that

10     you worked or in the area?

11                 THE PANEL MEMBER:  Yes.  This is -- well, I actually

12     worked a short while carrying mail in Pittsburg, Texas.  I did

13     that for about three months.

14                 MR. WARD:  Okay.  And your wife is an office manager

15     or was?

16                 THE PANEL MEMBER:  Was.

17                 MR. WARD:  Where was she an office manager.

18                 THE PANEL MEMBER:  A firm called Marshall Robinson,

19     Incorporated.  They provided security for conventions across

20     the nation.  And she worked in his office in Omaha and

21     traveled some to the different cities.

22                 MR. WARD:  Okay.  Anything you've heard so far that

23     makes you lean one way or the other in this case?

24                 THE PANEL MEMBER:  No, sir.

25                 MR. WARD:  Thank you.
```

1        Right next to you Mrs. Lacy.  Good morning.

2             THE PANEL MEMBER:  Good morning.

3             MR. WARD:  I think you indicated that you'd been a

4    defendant in a lawsuit.  Is that right?

5             THE PANEL MEMBER:  Well, we never went to trial.  It

6    was mitigated.

7             MR. WARD:  Something over a septic system?

8             THE PANEL MEMBER:  Yes.  Something dumb.

9             MR. WARD:  Anything about that that causes you to

10   lean one way or the other?  Obviously Ericsson is the

11   Defendant, you've been a defendant.  Anything that would cause

12   you to lean one way or the other?

13            THE PANEL MEMBER:  No.

14            MR. WARD:  I know you said the name of the law firm,

15   and I didn't catch it.  What was the name of the law firm you

16   worked for?

17            THE PANEL MEMBER:  I worked for the Parole Division

18   TDCJ, Texas Department of Criminal Justice.

19            MR. WARD:  I'm sorry.

20            THE PANEL MEMBER:  As a parole officer.

21            MR. WARD:  I misunderstood you.  Thank you, ma'am.

22       Mr. O'Connor?

23            THE PANEL MEMBER:  Yes, sir.

24            MR. WARD:  Good morning.

25            THE PANEL MEMBER:  Good morning.

```
 1              MR. WARD:  You said you had a Bachelor's degree.
 2    What did you study when you were in college.
 3              THE PANEL MEMBER:  Occupational safety.
 4              MR. WARD:  Okay.  Not computer science or anything
 5    like that?
 6              THE PANEL MEMBER:  No.
 7              MR. WARD:  All right.  You also indicated on your
 8    questionnaire that lawsuits are a waste of taxpayer dollars?
 9              THE PANEL MEMBER:  Sometimes they are.
10              MR. WARD:  All right.  Sometimes they are.  I agree
11    with you.
12              THE PANEL MEMBER:  In my opinion.
13              MR. WARD:  Does that belief you had, is that going
14    to start you leaning one way or the other in this case, kind
15    of the question I asked earlier?
16              THE PANEL MEMBER:  No.  That was more of a personal
17    frivolous lawsuit type of thing.
18              MR. WARD:  Okay.  All right.  There's lots of
19    frivolous lawsuits.  Right?
20              THE PANEL MEMBER:  Yes, sir.
21              MR. WARD:  And we've brought this lawsuit, and some
22    folks say every lawsuit is frivolous.  That's not you?
23              THE PANEL MEMBER:  No, I don't agree with that.
24              MR. WARD:  Okay.  Mrs. Wilder, I think you'd
25    indicated that you'd also been a defendant in a car wreck
```

1    case?

2              THE PANEL MEMBER:  It was settled.  We never went to

3    court, but yes.

4              MR. WARD:  All right.  Same question I've been

5    asking:  Anything about that experience that starts you

6    leaning one way or the other before you hear evidence in the

7    case?

8              THE PANEL MEMBER:  No.

9              MR. WARD:  Okay.  Fair enough.

10       Mrs. Collins, right next to you, on your questionnaire

11   you said that you'd been a former chairperson, I think, if I

12   wrote it down correctly.  Have you been a chairperson on maybe

13   a church organization or --

14             THE PANEL MEMBER:  Yes.

15             MR. WARD:  Okay.  And that's what I was wondering.

16   What kind of -- what kind of committee was it?

17             THE PANEL MEMBER:  It was a prison committee.

18             MR. WARD:  Okay.  I just was curious about that.

19   Anything about what you've heard so far that starts you

20   leaning one way or the other before you've gotten to the

21   evidence in the case?

22             THE PANEL MEMBER:  Oh, no, sir.

23             MR. WARD:  All right.  Next to you, Mr. Stevens, you

24   also indicated on your questionnaire that there's a large

25   number of lawsuits and it's a waste of money.

```
 1              THE PANEL MEMBER:  Kind of talking about the
 2    frivolous lawsuits.
 3              MR. WARD:  Okay.  Nothing about that belief that
 4    starts you thinking this is one of those frivolous lawsuits?
 5              THE PANEL MEMBER:  No.
 6              MR. WARD:  Okay.  All right.  Thank you, sir.
 7         Mr. Sellers, we've talked.
 8         Let's go to Mrs. Brewer, Juror No. 8.  Mrs. Brewer, you
 9    told us that you're studying to become a nurse.  Are you
10    working on getting your RN?
11              THE PANEL MEMBER:  Yes, sir.
12              MR. WARD:  And how long have you been at school at
13    NTC.
14              THE PANEL MEMBER:  It's been off and on, but I just
15    started this semester.
16              MR. WARD:  All right.  And you are currently working
17    at Fresinious?
18              THE PANEL MEMBER:  Yes, sir.
19              MR. WARD:  Is that dialysis treatment?
20              THE PANEL MEMBER:  Yes, sir.
21              MR. WARD:  How long have you done that?
22              THE PANEL MEMBER:  Eight years.
23              MR. WARD:  Again, anything that causes you to lean
24    one way or the other before we get started?
25              THE PANEL MEMBER:  No, sir.
```

```
 1                   MR. WARD:  All right.  Mrs. Dunagan, I think you

 2     indicated you've been on a criminal jury, but you were an

 3     alternate?

 4                   THE PANEL MEMBER:  Correct.

 5                   MR. WARD:  So you didn't get to deliberate in that

 6     case?

 7                   THE PANEL MEMBER:  I did not.

 8                   MR. WARD:  They kicked you out before you got to the

 9     jury room?

10                   THE PANEL MEMBER:  Exactly.

11                   MR. WARD:  Okay.  Anything about that experience

12     being involved sitting on a jury that's causing you to lean

13     one way or the other before we get started?

14                   THE PANEL MEMBER:  No, sir.

15                   MR. WARD:  All right.  Mr. McCoy, we've talked, but

16     anything that you've heard so far cause you to lean one way or

17     the other before we get started?

18                   THE PANEL MEMBER:  No, sir.

19                   MR. WARD:  All right.  Thank you.

20          Mrs. Shields, I think you indicated on your questionnaire

21     that you'd worked for a personal injury law firm?

22                   THE PANEL MEMBER:  Yes.

23                   MR. WARD:  All right.  Which firm was that?

24                   THE PANEL MEMBER:  Baldwin & Baldwin here in

25     Marshall.
```

1          MR. WARD:  Okay.  How long ago was that?

2          THE PANEL MEMBER:  Before I had kids, so 2011.

3          MR. WARD:  Okay.  Anything about your experience

4    working for -- that's a plaintiff's firm.  Correct?

5          THE PANEL MEMBER:  Uh-huh.

6          MR. WARD:  Anything about that work for Baldwin &

7    Baldwin that starts you to lean one way or the other before

8    you hear any evidence in the case?

9          THE PANEL MEMBER:  No, sir.

10          MR. WARD:  Okay.  Mrs. Thomas, Juror No. 12.  Good

11    morning, ma'am.

12          THE PANEL MEMBER:  Good morning.

13          MR. WARD:  How long have you worked for the City of

14    Marshall?

15          THE PANEL MEMBER:  Three years.

16          MR. WARD:  What did you do prior to working for the

17    City of Marshall.

18          THE PANEL MEMBER:  I worked for Rio Animation.

19          MR. WARD:  Okay.  Anything that you've heard so far

20    that's going to cause you to lean one way or the other?

21          THE PANEL MEMBER:  No.

22          MR. WARD:  All right.  Thank you, ma'am.

23       Mrs. Morrow, you've been 20 years at the City of

24    Marshall library?

25          THE PANEL MEMBER:  Actually 21.

1          MR. WARD:  21 years?

2          THE PANEL MEMBER:  July made 21.

3          MR. WARD:  All right.  And you work as a cataloger?

4          THE PANEL MEMBER:  Uh-huh.

5          MR. WARD:  And you've been on a civil jury before.

6     Is that right?

7          THE PANEL MEMBER:  Yes.

8          MR. WARD:  Were you the foreperson of that jury?

9          THE PANEL MEMBER:  No, sir.

10          MR. WARD:  Anything about that experience that

11    causes you to lean one way or the other before we get to any

12    evidence?

13          THE PANEL MEMBER:  No, sir.  I'm fine.

14          MR. WARD:  Okay.  Thank you, ma'am.

15       Mr. Henderson?

16          THE PANEL MEMBER:  Yes, sir.

17          MR. WARD:  You sound like you're a busy man.

18          THE PANEL MEMBER:  All the time.

19          MR. WARD:  All right.  Working at the Jefferson ISD?

20          THE PANEL MEMBER:  Yes, sir.

21          MR. WARD:  When you're not there, you're preaching?

22          THE PANEL MEMBER:  Yes, sir.

23          MR. WARD:  Which one takes up more time?

24          THE PANEL MEMBER:  Preaching.

25          MR. WARD:  Preaching?  All right.  Anything that

1    you've heard that causes you to lean one way or the other?

2         THE PANEL MEMBER:  No, sir.

3         MR. WARD:  Thank you, sir.

4      Let's go to Juror No. 15, Mr. Hogue.

5         THE PANEL MEMBER:  Yes, sir.

6         MR. WARD:  I think you indicated on your

7    questionnaire that you write and edit computer code or you

8    have?

9         THE PANEL MEMBER:  Yes, sir.  For computer numerical

10   control machines.

11        MR. WARD:  All right.  Do you read C++ language by

12   any chance?

13        THE PANEL MEMBER:  No, sir.

14        MR. WARD:  Okay.  Anything you've heard so far

15   that's going to cause you to lean one way or the other?

16        THE PANEL MEMBER:  No, sir.

17        MR. WARD:  Mr. Youngblood, good morning.

18        THE PANEL MEMBER:  Good morning.

19        MR. WARD:  I think you indicated on your -- your

20   questionnaire that you felt like large corporations and

21   governments are destroying small business or something to that

22   effect.  Do you recall that?

23        THE PANEL MEMBER:  Yes.

24        MR. WARD:  Okay.  And we appreciate you giving that

25   information.  You aren't the only one who gave it.  Is there

1    anything about that feeling that starts you leaning one way or

2    the other in this case before you've heard any evidence?

3            THE PANEL MEMBER:  No.  This looks like two big

4    corporations after each other.

5            MR. WARD:  Okay.  All right.  We start out equal?

6            THE PANEL MEMBER:  Yes.

7            MR. WARD:  All right.  Thank you, sir.

8        Mr. Adams?

9            THE PANEL MEMBER:  Good morning.

10           MR. WARD:  Good morning.  How are you doing?

11           THE PANEL MEMBER:  Good.  How are you?

12           MR. WARD:  I'm doing all right.  You invented a

13   water bottle.  Is that right?

14           THE PANEL MEMBER:  No.  It was actually called a

15   hydration rack --

16           MR. WARD:  Okay.

17           THE PANEL MEMBER:  -- and it was for sports like in

18   a dug-out for baseball.  Keep the bottles clean and off the

19   ground for the young kids.

20           MR. WARD:  All right.  Did you actually get a patent

21   for that?  Did you get through the process?

22           THE PANEL MEMBER:  A patent attorney out of Tyler,

23   Texas.

24           MR. WARD:  Okay.  And did you obtain a patent?

25           THE PANEL MEMBER:  Yes, I did.  Me and a friend of

```
 1   mine.
 2             MR. WARD:  Okay.  Anything about the experience of
 3   dealing with an attorney and the Patent and Trademark Office
 4   that starts you leaning one way or the other in this case
 5   knowing it's a patent dispute?
 6             THE PANEL MEMBER:  No, sir.
 7             MR. WARD:  All right.  Thank you, sir.
 8        And, Mrs. Saintignan, did I get that right?  Kind of
 9   close?
10             THE PANEL MEMBER:  Yes, sir.
11             MR. WARD:  You've been a defendant in a car wreck
12   case where insurance had to defend you.  Is that right?
13             THE PANEL MEMBER:  Yes.
14             MR. WARD:  All right.  Anything about the fact that
15   you've been a defendant going to cause you to lean one way or
16   the other?
17             THE PANEL MEMBER:  No.
18             MR. WARD:  We start out equal.
19             THE PANEL MEMBER:  Yes.
20             MR. WARD:  All right.  Thank you, ma'am.
21        I'm going to move on.  I know I said I was going to talk
22   to that row, but I'm running out of time, so I've got some
23   other areas that I want to -- I want to cover.
24        Now, Ericsson is obviously more well-known in the United
25   States than -- than KPN.  We don't do business here.  You're
```

1    going to learn that Ericsson actually has its North America

2    headquarters in the Eastern District of Texas up in Plano.

3            How many of you knew Plano was in the Eastern District?

4    It's up there close to Dallas, but it's part of this -- the

5    district we're in.

6            They've got about 10,000 employees in the United States.

7    They do business in 180 countries, including the United

8    States.

9            Here's my question.  Folks have heard of Ericsson.

10   Ericsson does business in Texas.  They've got employees here.

11   Are there folks on the jury that say, you know what?  I'm

12   leaning in favor of Ericsson because they're in the United

13   States and they do business here and KPN doesn't.

14           And there's nothing wrong with that if you find yourself

15   leaning that way, but this is the time to raise your hand and

16   tell me that.

17           Mrs. Shields, you kind of -- you gave me a look like, I

18   don't know about that.  Maybe I mis --

19           Ms. Denton, could we pass the microphone to Juror No. 11?

20           We just happened to make eye contact when I was asking

21   that question.  Tell me what you're thinking.

22                   THE PANEL MEMBER:  I just don't think that that's a

23   deciding factor, I guess.

24                   MR. WARD:  Okay.

25                   THE PANEL MEMBER:  It seems kind of silly.

```
 1              MR. WARD:  Okay.  You know, you might think it's
 2   silly, but guess what?  Sometimes people raise their hands
 3   and, like I say, we've all had different experiences.  Right?
 4              THE PANEL MEMBER:  Uh-huh.
 5              MR. WARD:  So anybody in the jury -- Mr. Sellers,
 6   let me ask you, does it make a difference to you that Ericsson
 7   is here, they're employing people, they are investing money in
 8   the district and KPN isn't?
 9              THE PANEL MEMBER:  No, sir, none whatsoever.
10              MR. WARD:  All right.  We start out equal.
11              THE PANEL MEMBER:  Yes.
12              MR. WARD:  All right.  Thank you, sir.
13         Anybody in the jury disagree and feel like, you know
14   what?  Ericsson might be starting out a little bit ahead based
15   on what you just told me?  Anybody in the jury?  First or
16   second row of the gallery.
17         Yes, sir.  Mr. Whitlow, No. 21.
18              THE PANEL MEMBER:  If you said -- you said that
19   they're ahead, yes, they are ahead because they're in the
20   United States.
21              MR. WARD:  Okay.  No wrong answer.  That's what we
22   need to know.  You start out leaning in favor of them.
23              THE PANEL MEMBER:  Well, no, I'm not leaning in
24   favor of them.  I'm just saying that since they are doing
25   business in the United States, then they've got a little bit
```

1    of an edge.

2         MR. WARD:   Okay.   And that's not a wrong answer.

3    Who agrees with Mr. Whitlow, that they feel the same way, that

4    because they're doing business in the United States and in the

5    Eastern District, they've got a little bit of an edge in this

6    case?  Anybody in the jury box?  Anybody else agree with Mr.

7    Whitlow?

8         See, he didn't get thrown in handcuffs or put in jail.

9    He just told us how he felt.

10        Thank you, Mr. Whitlow.

11        Now, I know there are folks that had strong feelings

12   about lawsuits.  How many of you on the jury panel feel like

13   if you have a dispute with a company, don't try to negotiate,

14   don't try to work it out, sue them first?  Anybody feel that

15   way?  All right.

16        There's another end of the spectrum, right, where you try

17   to work things out and you can't.  And some folks say, I don't

18   care how long you work on it, how hard you try to work it out,

19   you should never bring a lawsuit for personal reasons,

20   religious reasons, tax reasons, whatever the reason might be.

21   Does anyone feel like, no matter how hard you try to work

22   things out, you should never file a lawsuit if you can't work

23   it out?

24        Anybody in the jury box feel like never file a lawsuit,

25   no matter how many of your rights have been -- how many rights

1    you feel like have been trampled?  Anybody in the gallery feel

2    like you should never file a lawsuit for personal or religious

3    reasons or I don't care whatever reason, that you should never

4    file a lawsuit?

5        Mr. Pleban, you indicated you've been on a mock trial in

6    a patent case?  Juror No. 22.

7                  THE PANEL MEMBER:  Yeah.

8                  MR. WARD:  Is that correct?

9                  THE PANEL MEMBER:  Correct.

10                 MR. WARD:  How long ago was that?

11                 THE PANEL MEMBER:  I honestly don't remember.  If I

12   were to guess, it would be around 2013, 2014.  It was when I

13   was at TSTC.  I remember because I had to like ask for some

14   time off for class to go for it, but I can't exactly remember

15   exactly when in those two or three years.

16                 MR. WARD:  All right.  No problem.  Anything about

17   that experience that starts you leaning one way or the other

18   in this case?

19                 THE PANEL MEMBER:  Not really.

20                 MR. WARD:  Okay.  When you say not really, that

21   makes me think, well, is there a little bit of something that

22   makes you lean one way or the other?

23                 THE PANEL MEMBER:  Not really.

24                 MR. WARD:  Okay.  All right.  Fair enough.  Thank

25   you.

```
 1          And by the way if I ask you something and you're like, I
 2     don't want to say this in front of this entire panel, you can
 3     say, Mr. Ward, I want to answer your question, but let's do it
 4     in private at the bench.  Okay?
 5          Is there anything I've asked so far that someone says, I
 6     would have answered it but it's too private.  Anyone in the
 7     jury box or anyone in the gallery?
 8               THE COURT:  Five minutes remaining, counsel.
 9               MR. WARD:  Five minutes, Your Honor?
10               THE COURT:  Yes.
11               MR. WARD:  Thank you.
12          Okay.  Those of you that make it on this panel are going
13     to learn that there's really three large manufacturers, kind
14     of the big three manufacturers of infrastructure equipment,
15     and I bet some of you have heard of all of them.  Of course,
16     Ericsson is one of them, Nokia is another one, and the third
17     one is Huawei.  That's a Chinese company.  It's actually the
18     largest manufacturer of infrastructure equipment in the world.
19          You-all are going to learn that my client KPN has done
20     business with all of them.  Over the last few years, they've
21     stopped doing so much business with Ericsson and they've
22     started doing more business with Huawei and Nokia.
23          Here's my question to those of you in the jury box.
24     Knowing that they're doing business with a Chinese company,
25     just the simple fact that they're doing business with a
```

```
 1    Chinese company, buying products from them, does that cause

 2    anyone on the panel to lean against them?  All right.  I'll

 3    give you a minute to process it.

 4         Mr. McCoy, we made eye contact.  I'm coming back to you.

 5    Anything about the fact --

 6         He's Juror No. 10, Ms. Denton.

 7         Anything about the fact that we do business with a

 8    company from China that causes you to lean one way or the

 9    other in this case?

10              THE PANEL MEMBER:  No.  I mean, Huawei's been

11    scrutinized in the media.  I don't know the details, but --

12              MR. WARD:  They've been in the news, haven't they?

13              THE PANEL MEMBER:  You know, spying on Americans and

14    whatnot.  So I'm willing to listen to the facts, so --

15              MR. WARD:  Okay.

16              THE PANEL MEMBER:  Not that they would apply to

17    this, but...

18              MR. WARD:  Yeah, I think they're banned from doing

19    business in the U.S.  Is that what you're referring to?

20              THE PANEL MEMBER:  I think so.

21              MR. WARD:  Yes, sir.  Obviously they're in the

22    Netherlands.

23         I'm not -- I'm not done quite yet.  Go back to Mr. McCoy.

24         Anything about that, knowing that, do you start out

25    leaning whatsoever?
```

```
1              THE PANEL MEMBER:  No.

2              MR. WARD:  Okay.  All right.  Anyone feel

3    differently than Mr. McCoy in the box.

4         Mr. Stevens, I'm going to come to you.  We made eye

5    contact as I asked that question, so I'm going ask if you

6    start out leaning one way or the other.

7              THE PANEL MEMBER:  No.

8              MR. WARD:  We're going to start out even, even

9    though we do some business with a company based in China.

10             THE PANEL MEMBER:  No.

11             MR. WARD:  Thank you, sir.

12        Anybody in the first or second row of the gallery feel

13   different than Mr. McCoy and Mr. Stevens, that the fact that

14   KPN does some business with a Chinese company starts you to

15   lean ever so slightly?  Anybody on the first or second row?

16   The rest of the gallery?

17        All right.  I've got two minutes remaining.  Here's my

18   last theory, and it has to do with damages.  I told you we

19   seek to recover $30 million in damages.  The vast majority of

20   those damages are associated with one patent.  There's six

21   figures involved with another patent, and one of the patents

22   involves damages of $512.  All right?  We've brought suit on

23   all three patents.

24        Is there anyone that feels like, Mr. Ward, the fact that

25   you just told me that there is a claim for $512 in damages in
```

1    this case makes me lean in favor of Ericsson?  All right.  If

2    anyone feels that way -- that's not the only claim, but that

3    is a claim in this case.  Anybody feel like that's ridiculous,

4    Mr. Ward.

5         Mr. Pitts, I see you pondering my question.

6              THE PANEL MEMBER:  No, sir.

7              MR. WARD:  Juror No. 1, Ms. Denton.  I'm sorry.

8              THE PANEL MEMBER:  No, sir.  My thought was how

9    would you arrive at $512 in damages on a patent.  Your fees

10   are much more than that, I'm sure.

11             MR. WARD:  I think they probably are.  And you'll

12   hear from an expert.

13        I'll ask you this.  Do you know how long a patent lasts?

14             THE PANEL MEMBER:  I thought it was maybe 10 years?

15             MR. WARD:  I think 20 years will be the evidence in

16   this case.

17             THE PANEL MEMBER:  All right.

18             MR. WARD:  So if someone starts infringing a patent

19   and there is 12 or 13 years left on the patent, there might be

20   a reason why you might want a finding about whether or not

21   someone's on your property.  You understand that?

22             THE PANEL MEMBER:  Yes, sir.

23             MR. WARD:  And damages might continue to accrue if

24   they continue to use it.  Do you follow me?

25             THE PANEL MEMBER:  Yes, sir.

1        MR. WARD:  All right.  Knowing that, knowing that

2   $512 -- we never would have brought a case over $512, but

3   there's $30 million involved in another patent.  Knowing those

4   facts, does that cause you to lean one way or the other before

5   you hear the evidence?

6        THE PANEL MEMBER:  No, sir.

7        MR. WARD:  All right.  Thank you, sir.

8      Anybody disagree that they're leaning based upon what I

9   just told you about this one claim on this one patent?  First

10  or second row?  All right.

11       THE COURT:  Your time's expired, Mr. Ward?

12       MR. WARD:  Okay.  Thank you, Mr. Whitlow.  I'll have

13  to hold it.

14     Obviously I had lots of questions.  I got one last

15  question, and that is, is there anyone sitting there right now

16  that says if Mr. Ward would have asked this question, he'd

17  know that I'm not the right juror for KPN, I'm leaning against

18  his client, maybe you don't like my tie or the way I talked or

19  you don't like my questions.

20       THE COURT:  Mr. Ward, your time is expired.  Have a

21  seat.

22       MR. WARD:  All right.  Thank you, sir.

23       THE COURT:  All right.  Mr. Baxter, you may address

24  the panel on behalf of the Defendants.  Would you like a

25  warning on your time?

```
 1              MR. BAXTER:  Five and two, Your Honor, if it please
 2    the Court.
 3              THE COURT:  I will warn you when you have five
 4    minutes and two minutes remaining.
 5              MR. BAXTER:  Thank you.
 6              THE COURT:  You may proceed.
 7              MR. BAXTER:  Good morning, folks.  My name is Sam
 8    Baxter.  I'm a lawyer here in Marshall, Texas with McKool
 9    Smith.  I've been practicing law in Marshall about 52 years,
10    I'm afraid.
11         I used to be a DA in another life, and then I was judge
12    for a while, not like His Honor but down in the state court.
13    And since that time, I've been practicing law.
14         I'm married to Judge Lauren Parish.  She is the retired
15    senior judge in the 115th District Court, was that judge there
16    for 24 years.  And I am often asked do I have to stand up when
17    she comes in the room, and the answer is yes.
18         I have three kids, three adopted children:  Andrew, from
19    Brazil, works here at the Boys and Girls Club; Matthew, who is
20    from Thailand, works as a computer specialist in Dallas; and
21    the princess, Sophie, is from India, and she actually is a
22    daycare worker in Bangkok, Thailand.  I wish I could get her
23    to come home, but she likes it and won't come.
24         Now, is there anybody that knows my wife, Lauren Parish,
25    or been in front of her, had family members in court?  She was
```

1    a very pleasant judge, but you didn't want to be a criminal in

2    her court.  So if there's anybody that's got some residual

3    feeling about that, let me know.

4         Let me introduce for you the rest of the team.  Here is

5    the most important member of our team, Melissa Kalka.

6         Stand up, Melissa.

7         She is a paralegal, and she's the one that holds this

8    case together.  Without her, we probably can't even find the

9    courthouse tomorrow, but she's the most important person we've

10   got.

11        We've also got my friend and sometimes partner, Ted

12   Stevenson, from Dallas.  Ted's got -- he's an empty nester

13   now.  He's got three kids that have all flown the coop and ask

14   for tuition money.

15        Nick Matthews, my partner, has young children.  Nick has

16   spent a lot of time the last week worrying about the flag

17   football game and not this case, but we'll get through.

18        We also have Doug Kubehl.  He's got a couple of kids.

19   Doug is with Baker Botts.  He's going to do the technical side

20   in this case along with his partner, Jeff Becker, who is

21   techie.  And they'll be handling the technical part.

22        And then I have my partner, Jennifer Truelove, who we've

23   got out here in the benches.  She's got three kids, two at

24   Texas and one here in Marshall High School.  And we've been

25   practicing law here together for a pretty good while.

```
 1          Let me ask you if you know the people on this side of the
 2    courtroom.  Mr. Ward, who talked to you, I gave Mr. Ward a job
 3    out of law school, and I used to say I taught him all that he
 4    knows.  And he finally corrected me and said, no, you taught
 5    me all you know; that's not all I know.
 6          But Mr. Ward is now -- I'm shocked to hear he's been
 7    practicing law 25 years.  It seems like yesterday.  But he's
 8    in Longview in a law firm there.  Anybody know Johnny Ward or
 9    his partner?
10          I think we have lawyers from out of town.  I think Ms.
11    Lexie White, who is here, is going to be talking to you this
12    afternoon.  Anybody know any of the out-of-town lawyers?
13          The last person I want to introduce is our corporate rep,
14    Mr. Delgado.
15          Come up here, Mr. Delgado.
16          Let me brag on him just a minute.  He's vice president at
17    Ericsson.  He went to Stanford.  Then he went to Harvard Law
18    School and unfortunately became a lawyer.  But he gave that up
19    as fast as he could and went on the business side of Ericsson.
20    And you'll be hearing from him in this case and be interested
21    in what he's got to say in this case.
22          Thank you, Mr. Delgado.
23          Anybody know, ever heard of KPN?  None at all.
24          They've got three patents that are in this case.  The
25    Judge is going to let me have just a couple of minutes to talk
```

 1    generally about the technology, not that I really understand

 2    very much of it.  But the first patent has got to do with an

 3    attempt to have telephone companies--and basically that's AT&T

 4    and Verizon and T-Mobile--find dead spots in their system.

 5         And the way that patent works, as I understand it at

 6    least, is that you load up the software or hardware and you

 7    put it in the phone.  And then at the base station, there's

 8    corresponding hardware or software.  And the phone pings the

 9    base station and says, here I am and I want to measure the

10    strength of the signal.  And so they send them information

11    back and forth, and that happens on a regular basis -- on a

12    basis of either milliseconds or seconds, and certainly not any

13    longer than that.  And so that the phone would be continually

14    pinging the base station and the base station would ping back

15    and they measure strength.

16         And then you've got to take all that information and put

17    in some sort of coverage map to indicate where the holes are,

18    and that's the purpose of that patent.

19         The second patent has to do with what I'm going to call

20    blackout, and that it allows the phone company, if it's on

21    your phone during peak hours, to tell you you can't make a

22    call; that we're going to cut off certain devices.

23         Now, I think there's going to be a squabble in this case

24    about whether it's just devices like water meters or

25    electronic waste cans or things of that sort.  But the patent,

 1     when you read the patent, and you'll get a chance to hear

 2     about it, is much broader than that, and it would allow the

 3     phone company during peak hours to deny you service.  That's

 4     the second patent.

 5          And then the third patent is the $512 patent, and it's

 6     some sort of channel authenticating patent.  Now, the reason

 7     apparently we owe them $512 is that sometime in ancient

 8     history we sold three black boxes to the military.  And it's

 9     the base that -- we don't make that anymore.  We don't make it

10     at all.  It's based on those three boxes that they want $512.

11          Now, my partners and I have been talking about that, and

12     here's the alarm that they raised with me:  Wait a minute, the

13     jury's going to get in that jury room and say, well, that

14     arrogant Ericsson, they wouldn't even pay $512.  What's wrong

15     with them?  They must be infringing.

16          And the truth is, they never asked us for $512.

17               MR. WARD:  Your Honor, I'm going to object we've

18     been going five minutes without a question.  It's an argument.

19               THE COURT:  I sustain the objection.  You need to

20     get on to specific questions of the panel, Mr. Baxter.

21               MR. BAXTER:  I am, Your Honor.  Thank you.

22               THE COURT:  Let's do it right now.

23               MR. BAXTER:  Yes, sir.

24          Now, here's one of the things that I think you're going

25     to hear about in this case, and that is you're going to hear

1    about claims in a patent.  Is anybody familiar with that?  Do

2    you have patents that have claims?  Now, here's the

3    interesting part about that.

4         And can I get the first slide, Mr. Moreno, the one with

5    the legal language on it?

6         Here's what I think you're going to hear from His Honor

7    at some point in this trial is that a claim covers a product

8    where each of the claim elements is present in that product,

9    and if the product is missing even one element of a claim, the

10   product is not covered by the claim.

11        And I'm going to show you an example now, if I can have

12   the next slide, Mr. Moreno.

13        And this is one I've just made up, but it's a patent on a

14   football.  And you see the elements that we talked about.

15   This is the claim:  It's made of cow hide; it's got an

16   interior bladder; it's got two separate laces, each one and a

17   half feet long; what its weight is; what its measurement is.

18   And then there's this accused product that looks like a

19   football.  Here's the problem, if I can have the next slide,

20   is that it doesn't have two separate laces each 1.5 feet long.

21        Now, I'm believing that under the instruction that Judge

22   Gilstrap's going to give you -- if you went back to that first

23   slide, Mr. Moreno -- that says if it's missing even one

24   element, it doesn't infringe.

25        How many people, if we can go back to the football, would

1    say, well, it's just missing one, but it's got the other five

2    so it must infringe.  Is there anybody that would say that?

3    Anybody at all?

4        If, in fact, it turns out that their patent or patents

5    have a missing element, that they don't -- that we don't do

6    one of the things that the patent says to do, would there be

7    anybody that would hesitate to find a verdict of

8    non-infringement because that patent doesn't cover the

9    products that we sell?  Anybody at all?

10       Yes, sir.

11             THE PANEL MEMBER:  I thought I --

12             MR. BAXTER:  There you go.  You got one.

13             THE PANEL MEMBER:  I think I understand your

14   analogy, but I know from experience that arguments from

15   analogy are not necessarily proof.  So I'm going to hold my

16   peace until I know whether or not it applies.

17             MR. BAXTER:  Fair enough.  And certainly it is an

18   analogy, but it's just an example of the sort of thing that

19   you may hear in a case in that, yes, the product may do some

20   of the things in the patent, but it doesn't do everything.

21   And that's the issue that we have before you.

22       If it doesn't do everything and if Judge Gilstrap tells

23   you it's got to do everything, is there anybody that would

24   say, well, it does enough so I'm going to say it infringes?

25   Anybody like that at all?  All right.

1      Now, Judge Gilstrap told you about the burden of proof,

2   and he told you that it was on the Plaintiff, they go first,

3   they've got the burden, and it's by a preponderance of the

4   evidence.  And so one of the things let me ask you, if you

5   would expect the Plaintiff to prove this, is that the three

6   major carriers, T-Mobile and AT&T and Verizon, actually use

7   the features of the patent when they have their base stations?

8   Would you expect to hear from those carriers that, in fact,

9   they do it?

10      Is there anybody that's going to be disappointed if they

11   don't hear from the carriers one way or another?  All right.

12      Now, how many people think that battery life is important

13   on their phones?  Is there anybody that doesn't constantly

14   look at their phone to see what their battery life is and

15   wished they had a phone charger with them and why did I leave

16   it at home and why isn't it in my desk and why do my kids have

17   my phone charger?  Is everybody pretty much concerned with

18   battery life?

19      Well, it turns out that this thing is a radio.  That's

20   really what it is.  When you -- when they get down to the

21   technicalities, it turns out that the phone, mine's old, but

22   it's still a radio.  And every time it pings the tower or the

23   tower pings it, it takes up battery.  Does everybody

24   understand -- anybody that thinks that's not right that the

25   phone's got to run on something and it turns out that every

1    time it gets turned on, then battery gets used.

2         Now, if you were to go into a store and say -- say you go

3    into a T-Mobile store, and you say you want to switch, I'm at

4    AT&T and I'm mad at them and I want to switch, and they go,

5    oh-ho, we're so glad to have you, going to sell you a new

6    phone, you're going to like our coverage; oh, by the way, I

7    just want to tell you there's a feature on your phone that's

8    going to drain your battery, just wanted you to know, anybody

9    still going to buy that phone?

10        You are because you don't care about battery life?

11             THE PANEL MEMBER:  I just think it's kind of --

12             THE COURT:  Just a minute.  Let's wait until you get

13   a microphone.

14             THE PANEL MEMBER:  I just think it's kind of

15   ridiculous because, like you said, the phone by sheer virtue

16   of existence, every single app is going to drain your battery

17   life.  That's like if you do this activity, you're going to

18   have to eat more.

19             MR. BAXTER:  Okay.  All right.  Do you think battery

20   life's important, sir?

21             THE PANEL MEMBER:  Yes, it's important.  But I think

22   the question is whether or not it drains the battery, but

23   whether or not it's worth the battery getting drained.

24             MR. BAXTER:  Right.  And so here is the reason your

25   battery would be getting drained is because the carrier wants

1   to know where the holes in their service are.  It doesn't help

2   you.  How about then?

3             THE PANEL MEMBER:  I thought we were done.  Could

4   you repeat that?

5             MR. BAXTER:  I'm sorry.  Yes, sir.  What if the

6   testimony is that the draining of the battery just helps the

7   carrier and doesn't help you, the consumer, at all?

8             THE PANEL MEMBER:  I would question what's your

9   basis for saying that.

10            MR. BAXTER:  If that would be true, what do you

11  think?

12            THE PANEL MEMBER:  Well, if it only helps the

13  carrier, then I would not want to be forced to have it.

14            MR. BAXTER:  Okay.  Thank you.

15        Anybody else feel differently than that.

16        Now, how many people think that privacy is important,

17  that -- I don't know how many of you have had the experience

18  that seems to be prevalent, but you talk about some topic or

19  you get on somebody's website and look at a pair of shoes that

20  you might be thinking about, a pair of hunting boots, and the

21  next thing you know, this thing is full of ads for hunting

22  boots, or you just talked about hunting boots and all of the

23  sudden it just appears.  Everybody had that experience?

24        Does anybody think that privacy of your phone is

25  important and that you would like to guard that privacy as

1    much as you could?  Is that important?  Okay.

2        Now, I think one of the things that's going to be at

3    issue in this case is what I'm going to call the three-step

4    process on the first patent--that is, that's the patent --

5    that's the ping patent.  And that is where you've, first of

6    all, got to have some software or hardware in your phone; then

7    the base station, let's say it's an Ericsson base station, has

8    to have some key turned on that will accept --

9            MR. WARD:  Your Honor, I object.  He's going into

10   how these patents and what the functionality is of his view of

11   the accused products.  It's nothing to do with asking this

12   jury questions.  It's not a question he's talking about.

13           MR. BAXTER:  I'm fixing to ask him a question, Your

14   Honor.

15           THE COURT:  Well, thank you, Mr. Ward.

16       I'm going to sustain the objection.  This process is

17   about finding jurors that can be fair and impartial, and you

18   need to probe their thinking, Mr. Baxter, rather than ask them

19   to react to your views about what might be at issue.

20           MR. BAXTER:  Yes, Your Honor.

21           THE COURT:  Let's get into the mindset of these men

22   and women out here and how they feel about things.

23           MR. BAXTER:  Yes, sir.

24       Let me see the red map, if I can, just a moment, Mr.

25   Moreno.

1       How many of you on TV have seen this red map?  You can

2    hardly cut on the TV now.  That's a coverage map.  Anybody

3    have any idea how they generate this coverage map?  You do?

4    Yes, sir?

5            THE PANEL MEMBER:  Pretty sure they do it --

6            THE COURT:  Just a minute, sir.  You need to wait

7    until you get a microphone and then stand up?

8            THE PANEL MEMBER:  Apologies.  Pretty sure they do

9    it by some kind of pinging system.

10           MR. BAXTER:  Okay.  And what do you base that on,

11   sir?

12           THE PANEL MEMBER:  Because the phone, in order to

13   connect to the other phones, has to connect to the towers.

14           MR. BAXTER:  All right, sir.  Anybody else think

15   that that's how the map is generated, by a ping system?

16   Anybody at all?

17       Let me ask how many people have got a cell phone.

18   Everybody?  How many people are on AT&T?  How many people are

19   on Verizon?  How many people are on T-Mobile?  Do anybody know

20   how the carriers find the dead spots now?  Anybody know?

21       Is there anybody on this jury panel that can write code?

22       What kind of code do you write, sir?

23           PANEL MEMBER NO. 30:  Primarily in my free time, I

24   sometimes dabble around in making games.  I'm not really into

25   the wireless things.

 1              MR. BAXTER:  All right.  Do you write C++ or

 2    something else?

 3              THE PANEL MEMBER:  I dabble in C++.  I primarily try

 4    to write in python.

 5              MR. BAXTER:  Thank you, sir.

 6         Anybody else a code writer?  Anybody involved in their

 7    work at setting up a network?

 8         In the very back here.  You're the computer science guy,

 9    aren't you?

10              THE PANEL MEMBER:  Yes.  I actually developed and

11    co-wrote a C cross development compiler.  I do know a little

12    bit about C.

13              MR. BAXTER:  Okay.  And explain that to me in

14    English what that is.

15              THE PANEL MEMBER:  Cross development compiler?

16              MR. BAXTER:  Yes.

17              THE PANEL MEMBER:  It will take high-level language,

18    and when it takes it down to machine code, you can actually

19    bring it out in multiple languages.

20              MR. BAXTER:  Okay.  And you've done that?

21              THE PANEL MEMBER:  Yes.

22              MR. BAXTER:  Anything about that, sir, that you

23    think, you get on one of these PAT cases, it's going to be a

24    problem?

25              THE PANEL MEMBER:  It's not going to be a problem.

1    It will probably give a little bit more insight.

2              MR. BAXTER:  Okay.  Thank you, sir.

3        Who on the jury panel is what I'm going call a phone

4    techie?  That is, when people have problems with their phone,

5    you say, let me see that, I think I can help you out on that,

6    and whether it's getting an app to run or me just getting it

7    turned on or whatever it is.  Who is -- who is that person on

8    the panel?

9        You are, ma'am?  Kind of tell me what your experience

10   about that is and how you got the knowledge.

11             PANEL MEMBER NO. 4:  I got the knowledge just from

12   trial and error, learn as you go.  But I've been there 20

13   years, and we have a lot of people older than me that don't

14   even try.  They just bring it to me.

15             MR. BAXTER:  Folks like me --

16             THE PANEL MEMBER:  Yeah.

17             MR. BAXTER:  -- and they give it to you and you fix

18   it?

19             THE PANEL MEMBER:  Regularly.

20             MR. BAXTER:  Anybody else in the jury box that kind

21   of considers themselves the phone guru?  Anybody out here on

22   the first row or the second row?

23        Let me talk to you about another burden of proof that His

24   Honor mentioned to you, and that's the burden of proof of

25   clear and convincing.  And he told you that the Plaintiff's

1    got the burden of proof, and it's by a preponderance of the

2    evidence.  But if the Defendant, that's me, wants to show that

3    either one or more of the patents is invalid, that they've got

4    to do so by clear and convincing standard.  And he read that

5    to you.

6         And if you think about sort of a foot-long ruler, that

7    would be the Plaintiff has to get past the six-inch mark and

8    we probably have got to get past the seven-and-a-half-inch

9    mark.  Would that pose a problem for anybody that our burden

10   is higher, but if we meet the burden, we've proved the patent

11   could be unvalid?  Is that a problem for anybody?

12        Now, some people get on juries and say, well, the Patent

13   Office gave them a patent so it must be good.  And it turns

14   out that you learned from the patent film that that's not so;

15   that the jury system is the last check and balance on a patent

16   and that there may be information given to that jury that

17   wasn't given to the Patent Office, they didn't have all the

18   prior art, and they didn't understand the situation and,

19   therefore, that jury is the final arbiter of that.

20        Is there anybody that has any problem with saying, if you

21   prove it by a burden of clear and convincing, that we could

22   find the patent invalid?  Can everybody do that?

23        Is there anybody that would hesitate to say, oh, well,

24   I'm really not a patent person and I'm not a techie person,

25   and the Patent Office gave them the patent so it must be good?

1    Is there anybody that would hesitate to invalidate the patent

2    if, in fact, you felt by a clear and convincing standard that

3    the patent were invalid?

4         Now, I want to talk to you about damages just a moment.

5    In this case the Plaintiff, as Mr. Ward said, is asking for

6    something in excess, in addition to the $512, to the $30

7    million that they're asking for in the first two patents, and

8    primarily it's on what they consider to be damages on the ping

9    patent.

10        Now, Ericsson is going to take the position and will in

11   this case, and you'll hear about it in opening statement, that

12   we don't owe any money, zero.

13        Now, is there anybody that's going to say, well, that

14   can't be right?  They sued you; you must owe them something.

15   If Ericsson takes the position that it's zero, is there

16   anybody that has a problem with that?  Anybody at all?

17        Now, then it gets a little bit more complicated, because

18   Judge Gilstrap is going to tell you, when he tells you what

19   the law in this case is, about a case called *Georgia-Pacific*.

20   At least I believe he will.  And *Georgia-Pacific* is a case

21   that tells judges and lawyers how to go about thinking about

22   damages in a patent case.

23        But one of the things that's true when you analyze a

24   patent case in the construct of the *Georgia-Pacific* case is

25   that you have to assume the patent is infringed and the patent

1    is valid.  That's what the damages people have to work with.

2         Anybody got any questions -- it's a figment of

3    everybody's imagination, but that's what we have to do, and

4    Judge Gilstrap is bound to do it because the appellate courts

5    say we have to.

6         Anybody got any question about that--that when you start

7    talking about damages in this case, despite the fact that we

8    think we don't owe them any money, that there's going to be a

9    number and the reason there's going to be a number is because

10   we have to assume that they're infringed and they're valid.

11   And that number that Ericsson is going to put out there, which

12   is about $300,000, my fear is that someone's going to say,

13   well, because you used a number and you gave us a number, that

14   you think the patent is infringed somehow and you owe them

15   money.  And I want to try to dispel that now.  That's not so.

16   It's just that we have to under what the framework of the law

17   is that we have to do that in order to meet the burdens that

18   we have in the court.

19        But does everybody understand, does anybody have any

20   question, that just because we've put out a damage number

21   doesn't mean that we think we infringe any of the patents?

22             THE COURT:  You have five minutes remaining.

23             MR. BAXTER:  Thank you, Your Honor.

24        Does anybody have any question about that or does that

25   give anybody any concern that we're going to put out a damage

```
 1    number when, in fact, we say we don't infringe?  Anybody at

 2    all?  Anybody going to hold that against us?

 3        All right.  Now, who has had, besides my one inventor

 4    here, who has had experience with the Patent Office, ever

 5    dealt with it, know anything about it, know how it works, know

 6    anything at all.

 7        You do.  And, ma'am, you do?  Okay.  You, sir, you've got

 8    a patent.  Is that right?

 9            PANEL MEMBER NO. 30:  We had done the research and

10    was prepared to do the patent.  We didn't go through the

11    entire process.

12            MR. BAXTER:  Okay.  Is that still pending?

13            THE PANEL MEMBER:  No.  We had a patent pending for

14    four years.  And then, due to funding, we negated that.

15            MR. BAXTER:  It turns out it's expensive, isn't it?

16            THE PANEL MEMBER:  Yes.

17            MR. BAXTER:  Yes, it is.  How was your experience

18    with the Patent Office?  Did you get in some to and fro with

19    them about claims and language?

20            THE PANEL MEMBER:  The -- the difficulty on ours was

21    the software covered such a broad range, it's hard to narrow

22    it down to just one patent without stepping on other

23    patents --

24            MR. BAXTER:  Okay.

25            THE PANEL MEMBER:  -- as well.
```

1          MR. BAXTER:  That is always a problem, isn't it?

2          THE PANEL MEMBER:  Yes.

3          MR. BAXTER:  Did you finally have to give up on

4    that?

5          THE PANEL MEMBER:  We gave up due to the grant

6    funding ended.

7          MR. BAXTER:  Anything about that that's going to

8    cause you to lean one way or another in this case, sir?

9          THE PANEL MEMBER:  No.

10         MR. BAXTER:  Okay.  Thank you very much.

11      Anybody else know anybody that's got a patent or had any

12   experience with the Patent Office?

13      Who works for a company that owns intellectual property?

14   Texas Eastman has a bunch, I know.

15      You do, sir.

16         PANEL MEMBER NO. 23:  Yes, sir.

17         MR. BAXTER:  Tell me about that.

18         THE PANEL MEMBER:  I work for Westlake Chemical.  A

19   lot of it has to do with catalyst chemistry.

20         MR. BAXTER:  Okay.  Have you ever been involved in

21   applying for a patent or researching for a patent or been

22   asked to help on that?

23         THE PANEL MEMBER:  No, I haven't.

24         MR. BAXTER:  Do you know anything at all about the

25   patent process?

```
 1            THE PANEL MEMBER:  I know about the patent process
 2   just because I work with folks that have been involved with
 3   that, but other than that, no.
 4            MR. BAXTER:  Did they tell you it was a good
 5   experience or a lengthy, long experience?
 6            THE PANEL MEMBER:  Lengthy, long experience.
 7            MR. BAXTER:  Okay.  All right.  Thank you, sir.
 8   Anything about that going to cause a problem in this case?
 9            THE PANEL MEMBER:  No, sir.
10            MR. BAXTER:  All right.
11         Anybody else know somebody or work for a company that's
12   got a patent or intellectual property and uses it?
13         Now, you were kind enough to fill out the questionnaires.
14            THE COURT:  You have two minutes remaining, Mr.
15   Baxter.
16            MR. BAXTER:  Thank you, Your Honor.
17         And His Honor gave us one copy of those.  There was a
18   question on there, and I think you were asked about it
19   earlier, about big versus little, does the little guy somehow
20   not stand a chance against the big guy.  Who believes that?
21   All right.
22         Let me ask you, No. 11, do you understand in this case
23   that's not the facts?
24            THE PANEL MEMBER:  Yes.
25            MR. BAXTER:  It ain't big versus little.
```

1          THE PANEL MEMBER:  Neither are little.

2          MR. BAXTER:  It's big and bigger.  Anything that is

3   going to cause you a problem?

4          THE PANEL MEMBER:  No, sir.

5          MR. BAXTER:  I don't need to worry about that?

6          THE PANEL MEMBER:  No, sir.

7          MR. BAXTER:  Thank you very much.

8       Anybody else believe that the fact that Ericsson is a big

9   corporation and, of course, the Plaintiff's a big corporation,

10  anything about that that causes you any concern of sitting on

11  this jury and sitting in judgment in the positions they take?

12      And as Mr. Ward said, they are in Plano, they've got

13  10,000 employees or so up there, they're an Eastern District

14  company, and we're proud to be here and it's my pleasure to

15  represent them in this trial.  I think you're going to find

16  the information to be interesting, and we look forward to

17  bringing it to you.

18      And that's all I have, Your Honor.

19          THE COURT:  All right.  Thank you, counsel.

20      Counsel, approach the bench, please.

21          (The following was had outside the hearing of the

22          jury panel.)

23          THE COURT:  Mr. Ward, does the Plaintiff have any

24  challenges for cause?

25          MR. WARD:  Your Honor, I'd like to follow up with

 1    Mr. Whitlow, 21.  He said that Ericsson was starting out a

 2    little bit ahead.

 3              MR. BAXTER:  He's so far outside of the range.

 4              MR. WARD:  I think he is, but --

 5              THE COURT:  Do you have any others besides 21?

 6              MR. WARD:  No, sir.

 7              THE COURT:  Mr. Baxter, do you have any challenges

 8    for cause?

 9              MR. BAXTER:  We don't, Your Honor, no, sir.

10              THE COURT:  All right.  No. 4, No. 11, and No. 26

11    indicated scheduling problems.  We're going to seat eight.

12    Each side's going to strike four.  That's 16.  I don't see

13    that we get to either Mr. Whitlow or No. 26, Ms. Clark, on her

14    scheduling issue.  But I'm prepared to hear from Mrs. Wilder,

15    No. 4, about her scheduling problems and Mrs. Shields, No. 11,

16    about her scheduling problems.  But even if those two are

17    excused, we won't reach 21.

18              MR. WARD:  Very well.

19              THE COURT:  All right.  If you'll take your places,

20    I'll...

21              (The following was had in the presence and hearing

22              of the jury panel.)

23              THE COURT:  Ladies and gentlemen, I'm going to need

24    to talk to a few of you here at the bench.  Most of you, I'm

25    not going to need to talk to you here at the bench.  Those of

 1   you that I'm not going to need to speak with at the bench, I'm

 2   about to excuse you for recess, but I want to go over a couple

 3   of ground rules about that.

 4       When I excuse everybody except the people I'm going to

 5   identify in a second that I need to remain so I can talk to

 6   them here at the bench, when I excuse everybody else for

 7   recess, if you'll file out through the double doors in the

 8   back of the courtroom.  Once you go through those double

 9   doors, if you take a left and go around the corner, you'll

10   find two important things--the water fountain and the rest

11   rooms.  Obviously if you turn to the right, you're going to go

12   out toward the entrance to the building.

13       I'm going to ask that nobody leave the building during

14   this recess.  Stay in this building and stay on this floor.

15   Don't go to any other floor.

16       Also, I want to remind you, we haven't heard any evidence

17   in this case.  So while you're on recess, if you happen to

18   know somebody who's on the panel or you just are friendly and

19   want to talk like my wife is and you want to talk to a

20   stranger, talk about anything you want to talk about, except

21   don't talk about anything that happened here in the courtroom.

22       Talk about this wonderful rain we got overnight that we

23   needed so badly, talk about upcoming football season in your

24   community, talk about your grandchildren or your kids.  Don't

25   talk about anything that happened during jury selection in the

1    courtroom.

2          Again, you have not heard any evidence in this case.  And

3    I'll remind you, and I'm going to tell you this later, what

4    the lawyers tell you in this case is not evidence.  So for

5    those reasons, don't talk about anything during the recess

6    that happened while you were in the courtroom.

7          And with that, ladies and gentlemen, I need to ask to

8    stay back and not leave during recess Mrs. Wilder, No. 4, and

9    Mrs. Shields, No. 11.  Other than those two ladies, I am now

10   excusing under those instructions everybody else on the panel.

11         And, Mr. Sellers, if you'll start us off and lead the

12   way.  Thank you.

13              (Whereupon, the jury panel left the courtroom.)

14              THE COURT:  All right.  Be seated, please.

15         Counsel, approach the bench.

16         Mrs. Wilder would you come around and let me see you up

17   here, please?

18              (The following was had at the bench.)

19              THE COURT:  Good morning, Mrs. Wilder.  This is our

20   microphone.  If you and I can just talk quietly toward this

21   microphone.

22              THE PANEL MEMBER:  Okay.

23              THE COURT:  You indicated when we started this

24   morning, Mrs. Wilder, that you might have something very

25   serious or difficult if you were required to stay all week and

1    be on this jury.  Tell me about that.

2              THE PANEL MEMBER:  I have two different things.

3    Neither one existed when I filled out that thing.

4        My mother has to do post-op on Friday for her vein

5    surgery on Monday, and my husband is having a heart cath on

6    Thursday, and I'm driving them both, or I'm supposed to.

7              THE COURT:  Your mother has had or will have vein

8    surgery?

9              THE PANEL MEMBER:  She will have.  She's got to do

10   the post-op -- pre-op, what you do in front of it.

11             THE COURT:  Is she having that surgery today?  You

12   said on Monday.

13             THE PANEL MEMBER:  She has it Monday.  That's

14   supposed to be on Friday.  My husband's heart cath is on

15   Thursday.  They are both in Shreveport.

16             THE COURT:  Your husband's heart cath is on

17   Thursday?

18             THE PANEL MEMBER:  Yes.

19             THE COURT:  And when is the your mother having her

20   surgery?

21             THE PANEL MEMBER:  Monday.  They are doing stuff for

22   it on Friday.

23             THE COURT:  Okay.  They are doing the prep for her

24   surgery on this Friday?

25             THE PANEL MEMBER:  Yes, all the bloodwork and

1    whatever else they're doing.

2            THE COURT:  Okay.  And I gather both your husband

3    and your mother are dependent upon you to get them back and

4    forth?

5            THE PANEL MEMBER:  Yes.

6            THE COURT:  Okay.  All right.  Mr. Ward, do you have

7    any questions of Mrs. Wilder?

8            MR. WARD:  I have no questions.

9            THE COURT:  Mr. Baxter?

10           MR. BAXTER:  No, Your Honor.

11           THE COURT:  Okay.  Mrs. Wilder, I'm going to excuse

12   you from the jury panel.  Obviously I think we have more than

13   enough people to seat a jury, and I'm not going to prevent you

14   from being with your husband and your mother during this.  I'm

15   going to ask you to join the rest of the panel outside for

16   recess.

17           THE PANEL MEMBER:  Okay.

18           THE COURT:  But please don't discuss the fact that

19   I'm going to excuse you or anything about this discussion with

20   anybody else on the panel.  Okay?

21           THE PANEL MEMBER:  Appreciate it.

22           THE COURT:  Mrs. Shields, would you come up, please?

23       Good morning, Mrs. Shields.  This is our microphone, if

24   you and I can just talk quietly here.

25           When we started the process this morning, when I asked if

```
 1    anybody would have a very difficult time being available all

 2    week if they were selected, you raised your hand.

 3              THE PANEL MEMBER:  Yes.

 4              THE COURT:  Tell me about that.

 5              THE PANEL MEMBER:  It's -- we have a -- we're

 6    supposed to be out-of-state on Thursday, starting on Thursday.

 7    So it's not a procedure or anything.  I just didn't want to

 8    not mention.

 9              THE COURT:  Okay.  When you say "We are supposed to

10    be," who is the 'we' there?

11              THE PANEL MEMBER:  My entire family.

12              THE COURT:  Is this a vacation or is it business or

13    what is it?

14              THE PANEL MEMBER:  Well, it's supposed to be

15    business, but it's kind of a vacation as well, yes, sir.

16              THE COURT:  Okay.  And where are you going?

17              THE PANEL MEMBER:  Hot Springs, Arkansas.

18              THE COURT:  Okay.  And you're leaving when?

19              THE PANEL MEMBER:  Thursday afternoon.  So it would

20    be after the school day on Thursday.

21              THE COURT:  And you and your husband are going?

22              THE PANEL MEMBER:  Uh-huh.  And we have three kids.

23              THE COURT:  And your three kids?  Are there other

24    family members going?

25              THE PANEL MEMBER:  No, sir.
```

1      THE COURT:  And what's the business component?  I
2  understand what the vacation part is.
3      THE PANEL MEMBER:  Okay.  He is looking -- there's
4  an equipment that he's -- some of the equipment my husband
5  uses.  He's going to be looking into purchasing a new piece of
6  equipment.
7      THE COURT:  Okay.  And has he already got an
8  appointment with somebody?
9      THE PANEL MEMBER:  No, no, nothing formal scheduled.
10  It's just kind of as he was there, he was going to inquire.
11      THE COURT:  Okay.  And I gather you-all would be
12  driving?  It's not far.
13      THE PANEL MEMBER:  Yes, sir.
14      THE COURT:  You're not flying?
15      THE PANEL MEMBER:  No.
16      THE COURT:  And you already have reservations for a
17  place to stay?
18      THE PANEL MEMBER:  Yes, sir.
19      THE COURT:  Okay.
20     All right.  Mr. Ward, any questions of Mrs. Shields?
21      MR. WARD:  No questions.
22      THE COURT:  Mr. Baxter?
23      MR. BAXTER:  No.
24      THE COURT:  Mrs. Shields, I'm going to excuse you
25  from jury duty.

 1                    THE PANEL MEMBER:  Okay.

 2                    THE COURT:  We're not going to be finished with this

 3      case by Thursday afternoon.

 4                    THE PANEL MEMBER:  Okay.

 5                    THE COURT:  I'm going to ask you to join the rest of

 6      the panel outside the courtroom for recess, but don't

 7      discuss --

 8                    THE PANEL MEMBER:  Yes, sir.

 9                    THE COURT:  -- what we've talked about here.

10                    THE PANEL MEMBER:  Yes, sir.

11                    THE COURT:  Okay.  Thank you.

12                    THE PANEL MEMBER:  Thank you very much.

13                    THE COURT:  Okay, counsel, I've excused No. 4 and

14      I've excused No. 11, which tells me we should strike through

15      18.  Do you agree?

16                    MR. BAXTER:  Yes.

17                    MR. WARD:  Yes.

18                    THE COURT:  How long do you need to strike your

19      list?

20                    MR. BAXTER:  About 20 minutes, 15.

21                    THE COURT:  As much as you can get.  Right?

22                    MR. BAXTER:  Yes, sir.

23                    THE COURT:  A quarter to 12:00.  That will give you

24      21 minutes.

25                    MR. BAXTER:  Yes, sir.

1          THE COURT:  All right.

2          (The following was had in open court.)

3          THE COURT:  While counsel exercise their peremptory

4     challenges, the Court stands in recess.

5                         (Brief recess.)

6          THE COURT:  Be seated, please.

7      Ladies and gentlemen, if you will listen carefully as

8     your name is called, when your name is called please come

9     forward and take a seat in the jury box.

10      As I told you, we're going to seat eight jurors in this

11    case.  I'm going to ask that the first four people whose names

12    are called, if you will take a seat on the first row of the

13    jury box, and the second four take a seat on the second row or

14    the back row of the jury box.  And to make sure that nobody is

15    bunched up and you're evenly spaced, I'm going to ask the

16    first person whose name is called to go on the front row, go

17    down to the last chair, stand in front of the last chair.  The

18    second person whose name is called, enter the jury box on the

19    front row and go down to the third chair from the end and

20    stand in front of it and leave the second chair from the end

21    in between as a vacant chair.  And then the third person will

22    do the same thing with the chair in between, and the fourth

23    person.

24      And then when we get to No. 5 who will be the first of

25    the four people on the back row, if you'll do the same

 1    thing--go down to the last chair and stand and leave a chair

 2    vacant between you; and the sixth person on the jury, who will

 3    be the second person on the second row.  That way we'll have

 4    four on the front row, four on the back row, and everybody

 5    should have a vacant chair between you to give you plenty of

 6    room.

 7         And if all eight of you will remain standing up till all

 8    eight of you are in the jury box and I instruct you, I would

 9    appreciate it.

10         So with that, I'll ask our Courtroom Deputy Ms. Brunson

11    to call the names of our eight members of the panel that have

12    been selected as jurors in this case.

13              THE CLERK:  Louis Pitts, Vickie lacy, Timothy

14    O'Connor, Bobby Stevens, Kourtney Brewer, Gail Morrow,

15    Clifford Adams, Rhonda Saintignan.

16              THE COURT:  Please be seated, ladies and gentlemen.

17         Those of you that were not selected on the jury, I'm

18    about to excuse you from your service here today, but before

19    you leave I want to take a moment and tell you how much the

20    Court appreciates you being here.

21         I hope you understand that even though you weren't

22    selected to serve on the jury, you have performed very real

23    and important public service by being here.  I hope you also

24    understand if just these eight people had showed up we would

25    not have been able to select a jury.  You being here, even

1    though you weren't selected, facilitated the process that

2    could not have gone forward without you being here.  So what

3    you've done is very important and in a very real and tangible

4    way you have helped uphold the Seventh Amendment to our U.S.

5    Constitution by being here.  That is no small thing, ladies

6    and gentlemen.

7        I want you to know that on behalf of the Court and the

8    Court staff, all of these parties, and all of these trial

9    teams, the lawyers that are in this courtroom, everyone of

10   them I speak for when I say we appreciate the sacrifice you've

11   made to be here.  It was not a bright sunny day when you got

12   up and drove to the courthouse in Marshall.  Some of you came

13   40, 50 miles away down two-lane roads in many cases to get

14   here.  Every one of you had other places to be today that

15   called on your time, you had other things to do in your lives

16   that were important to you and your family, and you set those

17   things aside and you sacrificed by being here as directed as

18   good citizens to do your duty and report for jury duty.  And

19   even though you weren't selected, what you've done is very

20   real and meaningful and important, and on behalf of the entire

21   Court and the lawyers and the parties in this case, I want you

22   to know that we very much recognize and appreciate what you've

23   done.

24       Now, when I excuse you in just a moment, if you'll exit

25   through the double doors in the back and if you'll turn to the

1   right as you go out, you'll go right by the Clerk's Office.

2   If you need any documentation for an employer as to why you

3   didn't show up at work today, if you have any questions about

4   your service, if you have anything that's on your mind that

5   you need some direction or answers to, if you will see

6   Ms. Clendening or her staff, the staff of the Clerk's Office

7   will be more than happy to help you.

8        Ladies and gentlemen, thank you for being here and thank

9   you for being good citizens that have responded as you have by

10  presenting yourself for jury selection, even though you

11  weren't chosen.

12       With that, ladies and gentlemen, those not selected from

13  the panel are now discharged and excused.

14            (Whereupon, the jury panel left the courtroom.)

15            THE COURT:  All right.  I'd like to ask everybody

16  but the eight members of the jury to be seated, please.

17       And members of the jury, I'm going to ask Ms. Brunson to

18  administer the oath to you as jurors at this time.

19            (Whereupon, the oath was administered by the Clerk.)

20            THE COURT:  Please be seated.

21       Ladies and gentlemen, we're about to recess for lunch.

22  It's about five minutes until 12:00, but there are some things

23  I need to go over with you before I let you recess for lunch.

24       First of all, I need to talk to you about lunch.  I've

25  entered an order directing the Clerk's Office to provide lunch

1    to you each day during this jury trial.  That means you are

2    not going to have to leave this building and get in your

3    vehicles and go some place and find some lunch somewhere.

4    That will save us some time, it will make it easier on you,

5    and it will work a lot more efficiently.  So when you leave in

6    just a few minutes, I'm going to ask you to go into the jury

7    room and lunch will be brought to you there.  And each day

8    that we're in trial lunch will be brought to you in the jury

9    room by the Clerk's Office.

10         I have no idea what's on the menu, it's usually very good

11   stuff, but that burden is something you won't have to worry

12   about.  I know those of you that are not from Marshall may not

13   even know where is a good place to go to get lunch.  So don't

14   worry about that.  That's going to be provided by the Court.

15         Also, while you're on this lunch break I'd like you to

16   make sure you take a moment and make sure that Ms. Clendening

17   and the Clerk's Office has a good working cell phone number

18   for you.  It is possible that we might need to reach you after

19   hours after the end of trial for one day and before we start

20   the next day.  There are innumerable things that can come up.

21   I don't think any of that's likely, but I always ask the

22   members of the jury to make sure that the Clerk has a good

23   cell phone number in case you need to be reached after hours.

24   So please try to make sure she has those numbers for you

25   during the lunch break.

1     And speaking of cell phones, I'm going to ask that you

2   leave your cell phones, if you have them with you, in the jury

3   room when you come back from lunch today.  And I'm going to

4   ask starting tomorrow, when you come to the courthouse either

5   leave them at home or leave them in your vehicles, but don't

6   bring them into the building.

7     One of the things I'm going to tell you later in this

8   process, ladies and gentlemen, is that you're not to do any

9   outside research about anything related to this case.  The

10  decisions that you're going to make as jurors must be limited

11  to the sworn testimony of the witnesses given under oath and

12  subject to cross examination that takes place from this

13  witness box in this courtroom and the exhibits and documents

14  that the Court has already judged to be admissible under the

15  rules of evidence and which the Court has pre-admitted to be

16  published and presented to you during the trial.  No outside

17  sources of information are allowed whatsoever, and, in fact,

18  if there is the introduction of any outside sources of

19  information beyond the testimony and the exhibits that are

20  going to be presented to you in open court during the trial,

21  if that should happen it would probably require me to declare

22  a mistrial, excuse all of you, start all over again with a new

23  jury, and there would be innumerable amount of time,

24  resources, and money wasted.  So it's very important that you

25  not do any outside research.

1      And I think we all understand that smartphones today are

2  just a small computer that fits in your pocket, and if you

3  have it in the jury room and you heard something from a

4  witness you weren't quite sure about, you might be tempted to

5  do an online search, you might be tempted to use that phone as

6  a way to violate the instruction that I'm giving you.  So I

7  understand if you're expecting a critical call from somebody

8  related to your work or your business, if there's some other

9  reason, but leave the phone in your vehicle and when we recess

10  or when we break for lunch you'll have an opportunity to go to

11  the vehicle and check.  But otherwise there's too big a risk,

12  so I'm going to ask you not to bring your cell phones back

13  into the courtroom today and not to bring them to the

14  courthouse at all tomorrow through the end of the trial.

15      Now, you're going to see these lawyers use iPhones and

16  iPads and similar type electronic devices.  Those are just

17  what legal pads and pens used to be back in the earlier days.

18  They are tools of the trade, if you will, so they have a

19  justifiable reason to use them.  So don't feel like they are

20  getting one set of rules and you are getting another if you

21  see them using those kinds of electronic devices.  However,

22  they are under very strict instructions from me to make sure

23  those devices don't sound, ring, or interrupt this process,

24  and they're likely to have them confiscated if their devices

25  ring or sound or interrupt this trial.  So they'll be very

1    careful so that you can see them but you won't hear them,

2    hopefully.

3         Also, ladies and gentlemen, during the lunch break I'm

4    going to ask you not to discuss anything that happened during

5    jury selection today.  As I told you when you recessed a

6    little bit ago, you haven't heard any evidence in this case,

7    and what the lawyers tell you in this case is not evidence;

8    it's just what they hope the evidence will prove, but it is

9    not evidence.  So please don't discuss anything that happened

10   during jury selection today while you're at lunch.

11        Also and in line with my discussion with you about

12   outside sources of information, you're not to communicate with

13   anybody about this case.  That means orally, that also means

14   digitally or electronically.

15        And I can tell you, unless you live alone, when you get

16   to wherever you live tonight at the end of the day, whoever is

17   there when you walk through the door, I guarantee you the

18   first thing they are going to say is, Well, what happened in

19   federal court in Marshall.  Don't even try to answer that

20   question, because if you do you're going to almost inevitably

21   violate the instruction I'm giving you about not discussing or

22   communicating about the case in any way.

23        And this all comes back to that one fundamental principle

24   that the sole source of the information that you will have

25   before you to draw upon to answer the questions I'm going to

1    submit to you in the verdict form after all the evidence has

2    been presented must be limited to and must only come from the

3    sworn testimony of the witnesses and the exhibits that are

4    admitted into evidence by the Court; nothing more.  And that

5    is a fundamental principle throughout this entire process.

6        So with that said, when I say don't communicate about the

7    case in any way, that means not only don't talk to whoever you

8    live with about it when you get home tonight, that means don't

9    get on the telephone and talk to anybody about it, but it also

10   means if you're a user of social media of any type, don't post

11   on Facebook, don't tweet on Twitter, don't go to Tik Tok,

12   don't go to any kind of online social media platform and put

13   anything about this case, because you will be violating my

14   instruction if you do.

15       And again, I give you this instruction to protect the

16   integrity of the process.  That's the sole reason for it.  And

17   I want you to understand that a violation of these

18   instructions jeopardizes the integrity of the whole process

19   and there are very real risks and penalties associated with

20   that as regards wasted time, wasted effort, wasted money.  And

21   I know you'll respect that, but I just want to put that in the

22   proper context for you and make sure that you understand it.

23       Also, ladies and gentlemen, over the course of this trial

24   you're going to be coming in every morning, you're going to be

25   leaving every evening.  There will be times inevitably when

1    you're going to pass one of these lawyers either on the

2    sidewalk out front, on the front steps, in the hallway

3    somewhere you're going to pass one of these support people, a

4    paralegal, or some other person on the support team on one

5    side or another in this case.  Whenever you come in close

6    contact with somebody associated with either the Plaintiff or

7    the Defendants, they're not going to speak to you.  They're

8    not going to enter into a conversation with you.  They're not

9    going to stop you on the front steps outside with a cup of

10   coffee in their hand and say, Good morning.  How are you?

11   Tell me about your day.  They're not going to do that because

12   I've instructed them not to.

13        And that goes back to the fundamental principle that the

14   only contact, the only communication, the only material of any

15   kind that you should have before you as a part of your

16   decision-making process at the end of this trial must come

17   only in open court under oath subject to cross examination and

18   the exhibits that the Court has scrutinized carefully before

19   the trial and found to be admissible under the rules of

20   evidence.

21        So when that lawyer or paralegal, or whoever it is, on

22   either the Plaintiff's side or the Defendants' side walks

23   right by you on the front sidewalk or the front steps or

24   whenever you may come in contact with them and they don't look

25   you in the eye, they don't stop, they don't enter into

1    conversation, they're not friendly, they're not gregarious

2    like we in East Texas usually are, don't hold that against

3    them.  Don't penalize them in your own mind for that in any

4    way because, be aware, they are simply doing what the Court's

5    instructed them to do and they're following my directives to

6    them in that regard.  So please keep that in mind.

7         All right, ladies and gentlemen it's five minutes after

8    12:00 according to the clock in the courtroom.  With those

9    instructions I'm going to excuse you for lunch, which should

10   be waiting for you in the jury room.  When you come back from

11   lunch, I'm going to give you some additional instructions on

12   the record.

13        After I've given you those instructions, the parties are

14   going to present their opening statements to you.  The

15   Plaintiff will go first; the Defendant will go second.  Those

16   opening statements are not arguments; they are intended to

17   provide a roadmap to you about what each side believes the

18   evidence that they are going to present will show you.

19        Once you've heard opening statements from the Plaintiff

20   and from the Defendant, then we'll proceed with the evidence.

21   And the Plaintiff has the burden of proof on most of the

22   issues, and they will go first and they will present their

23   witnesses, and they'll call their witnesses, those witnesses

24   will testify, and then they'll be cross examined by Defense

25   counsel.

1          And when the Plaintiff's put on all their witnesses, the

2     Plaintiff will rest their case in chief.  And that's what

3     that's called--their case in chief.  And when the Plaintiff

4     rests their case in chief, then the Defendants will call their

5     witnesses.  And they'll put them on and they'll testify under

6     direct examination, and the Plaintiff's lawyers will cross

7     examine them.  And when each of the Defendants' witnesses will

8     have testified, then the Defendants will rest their case in

9     chief.

10         Then because the Plaintiff has the burden of proof on

11    infringement and damages, they'll have the opportunity to call

12    rebuttal witnesses, if they choose to.  They're not required

13    to.  But they will have an option to call witnesses to rebut

14    any of the testimony that the Defendants have put on in the

15    Defendants' case in chief.  And if they do that, they will

16    call their witnesses in their rebuttal case and they'll

17    testify, and then they'll be cross examined by Defense

18    counsel.  And then if there are rebuttal witnesses at the end

19    of the rebuttal case, or if there aren't rebuttal witnesses,

20    then at the end of the Defendants' case in chief you will have

21    heard all the evidence.

22         And once you've heard all of the evidence in this case,

23    then I will give you my final instructions, sometimes called

24    the Court's charge to the jury.  And then counsel for the

25    Plaintiff and Defendant will present their closing arguments.

1          And after you've heard closing arguments from the

2     Plaintiff and the Defendants, then I will instruct you to

3     retire to the jury room and to deliberate on your verdict.

4          And when you go back to the jury room, I will send a

5     document called the verdict form with you and it will have

6     several questions in writing that you're to answer.  Those are

7     the questions that you must answer solely from the sworn

8     testimony produced during the trial and the exhibits admitted

9     under the rules of evidence by the Court.

10          Also, when I give you those final instructions that

11     you're to follow, the Court's charge to the jury, I'm going to

12     send a printed copy of those back to the jury room with you

13     when you retire to deliberate because when I'm giving you

14     those final instructions, I don't want you furiously taking

15     notes or trying to pay attention; I want you to listen to what

16     I'm saying and I want you to focus on what I'm saying.  So you

17     will have your own printed copy of those to refer to after you

18     retire to the jury room.  You're not going to have to worry

19     about taking notes or doing anything other than focusing on my

20     delivery of those final jury instructions to you.

21          So at that point you'll go back to the jury room, you'll

22     have a printed copy of the final instructions from the Court

23     to each of you, and you'll have a clean copy of the single

24     verdict form with the questions in it you're to answer.  And

25     then you'll deliberate and answer those questions, and the

1    answers to those questions will constitute the jury's verdict

2    in this case.

3        I will cover more of this as we go forward, but I wanted

4    to give you a brief roadmap of how we're going to proceed.

5        And in that vein, I'll mention one more thing and then

6    I'll let you leave for lunch.  I want you to understand as you

7    plan your week that I have found over my 10-plus years on the

8    bench here that folks in East Texas would rather work a long

9    day each day and be away from their families and their

10   businesses a shorter total number of days than if you worked a

11   short day each day.

12       Said another way, some places in some parts of the

13   country that would try this case would try it in two weeks,

14   but you'd start at 9:30 or 10:00 and quit about 4:00 in the

15   afternoon.  I don't do it that way.  Starting tomorrow, I'm

16   going to do my best to have you back in that jury box with

17   another witness coming to the witness stand at 8:30 in the

18   morning, and we're probably -- well, I'll just tell you this

19   right now.  We're not going to stop at 5:00.  We're probably

20   going to go to 5:30 or maybe 6:00.  If we've had a witness

21   that's on the witness stand an hour-and-a-half and with 15

22   minutes to go and they're finished and it's 6:00, we may go

23   until 6:15 to get that witness off the witness stand and be

24   ready for the next witness.

25       So you can count on long days this week but, by the same

```
 1    token, I'm going to do my best to make sure that it's just

 2    this week and that it doesn't go longer.  And so when you're

 3    talking with your families and you're planning your travel,

 4    plan it accordingly.

 5         Make sure you check -- the other thing is, you've heard

 6    that old expression that a convoy only moves as fast as its

 7    slowest ship?  Well we don't move until eight jurors are here

 8    each morning.  Some of you are from Marshall; some are not

 9    from Marshall.  There are six counties in this division that

10    we draw on for jurors.  So check the weather, plan your travel

11    time, make sure that there's not anything that would keep you

12    from being here so we can all start by 8:30 each morning

13    starting tomorrow.

14         Plan to be in the jury room about 8:15.  And there's

15    going to be coffee and there's going to be pastries and

16    there's going to be some kind of breakfast-type food in there

17    for you from the Clerk's Office, so make sure you are here so

18    that we can start at 8:30 each morning, and then we will go

19    till sometime 5:30 or 6:00 each day, in all likelihood.  But

20    if we do that, we can finish this trial in a week, in all

21    likelihood.  That's not a promise, but that's my best

22    estimate.  But if we don't do that, we'll take most, if not

23    all, of next week to finish, and I don't want to handle it

24    that way.

25         There's not a right way and a wrong way.  I have judge
```

 1    friends that are in big metropolitan centers and the jury just

 2    can't get downtown by 8:30 in the morning.  We don't have that

 3    issue.  So we're going to take advantage of our issues, we're

 4    going to make our days a little longer, but we're going to try

 5    this case to conclusion in a shorter number of days so that

 6    the overall interference with your schedules and your families

 7    will be at least as much as we can minimize them.

 8         All right, ladies and gentlemen.  With those instructions

 9    I'm going to excuse you to the jury room where lunch should be

10    waiting for you.

11         The jury is excused.

12              (Whereupon, the jury left the courtroom.)

13              THE COURT:  Be seated, please.

14         Counsel, we're going to break for lunch.  I'm going to

15    try to start at 1:00.  That gives you just a little over 45

16    minutes.

17         I want to say this.  I know on the Plaintiff's [sic] side

18    that your offices are directly next door, but that doesn't

19    mean I need to wait on you because you've left the building

20    and you have to come back through security.  I waited about

21    five or 10 minutes before I came out this morning because

22    there was only one side of the lawyers in the courtroom.  I

23    could have come out and started and made you parade in front

24    of the entire venire panel coming in late, but I didn't do

25    that.

 1          So it's no problem with me if you want to go next door

 2     when it's time to meet or confer, but I'm not going to wait on

 3     you to do that.  If you need to meet and confer there's a

 4     conference room, there's a jury room downstairs, or you

 5     certainly can leave the building, but keep up with your time.

 6     Understand if you leave the building you're going to have to

 7     go through security again.  And I'm not going to habitually

 8     wait on folks just because your office is next door or in

 9     close proximity if you left the building.

10          Also, we met this morning in chambers and talked about an

11     objection to certain testimony where the Court expressed a lot

12     of questions.  This had to do with deposition testimony about

13     Ericsson indicating they could care less on three different

14     occasions as reflected in some of the emails that have been

15     admitted with redactions covering that portion of those emails

16     and whether that same testimony could properly be proffered by

17     a live witness in light of the redactions that had been agreed

18     to and entered in the email portions of that evidence.

19          I indicated that I wanted you to meet and confer about

20     that and that if you had any kind of a mutually acceptable

21     reason on that I wanted to know about it.  I'm going to let

22     you to continue to do that over the next 45 minutes, but

23     before I bring the jury in and give them my preliminary

24     instructions I need to know if there's been any agreement

25     that's been reached or if there's not any agreement that's

1    been reached, in which case I'll give you guidance on that

2    issue.  The other issues that developed in disputes overnight

3    I have given you guidance on in chambers, principally with

4    demonstratives and other related matters.

5        Are there any questions?

6            MR. BAXTER:  Not from the Defendants, Your Honor.

7            MR. WARD:  Not from the Plaintiff, Your Honor.

8            THE COURT:  All right.  I'd like to see counsel I

9    met with this morning in chambers about 10 minutes till 1:00

10   so I can visit with you about your position on that objection

11   that I carried this morning and see if you've worked out

12   anything or if you haven't.  Other than that, I'll bring the

13   jury back in at 1:00 and begin with my preliminary

14   instructions.

15       All right.  With that understanding, the Court stands in

16   recess for lunch.

17                        (Lunch recess.)

18           THE COURT:  Be seated, please.

19       Counsel, before I bring the jury in and begin with my

20   preliminary jury instructions, I want to review a matter that

21   we took up this morning in chambers before jury selection.  It

22   has to do with the dispute regarding proposed testimony from

23   Ms. Gerritse, who is I understand to be KPN's corporate

24   representative.

25       The dispute is that during pretrial various emails were

 1    raised and discussed with the Court as a part of the proposed

 2    pre-admitted exhibits.  The parties raised various objections

 3    as to certain inflammatory and other type language embedded in

 4    the emails, and the Court instructed the parties to meet and

 5    confer and see if they could not resolve those issues by way

 6    of agreed-upon redactions.

 7         One of the emails that was addressed in this manner had

 8    to do with what's identified as Section 1.3 where the prior

 9    testimony of this witness was that Ericsson has taken -- or

10    the prior email involving this witness was that Ericsson was

11    taking the firm position in the February 4 meeting that there

12    will be no compensation in 2019, and we heard this at least

13    three times repeated under the wording Ericsson couldn't care

14    less; is this understanding correct that, under the current

15    Ericsson proposal, there will be no compensation for 2019 and

16    is it correct that Ericsson couldn't care less about this?

17         That was the excerpt from the email that was raised among

18    other emails at pretrial.

19         Per the Court's instructions, as I noted, the parties met

20    and conferred, and they by agreement resolved the disputes as

21    to this email by agreeing to redact the sections that talk

22    about 'we heard at least three times Ericsson couldn't care

23    less.'  There are two sections of this email where that

24    language is redacted by agreement.

25         The possibility of that same testimony being presented

 1    other than through the emails that were raised at pretrial was

 2    never discussed at pretrial.  Neither party raised it.     At

 3    approximately 20 minutes until 6:00 p.m. yesterday evening,

 4    KPN sent an unsolicited letter brief to the Court and to

 5    Ericsson urging that their corporate representative be

 6    entitled to testify to the same language that was redacted in

 7    the emails that I've discussed, i.e., is this Ericsson

 8    couldn't care less and that was communicated at least three

 9    times.

10         That was taken up this morning in chambers before we went

11    on the record, and I heard fully from both sides on this

12    issue.  I asked the parties or I requested the parties to meet

13    and confer about this and see if they could find some

14    resolution of their own crafting, and I've just been told

15    that, despite efforts, they have not been able to resolve this

16    issue.

17         Consequently, it falls to me, and here's the Court's

18    resolution.  I'm going to permit the corporate representative

19    to testify to the redacted portions of the emails if she can

20    testify that she heard in person and knows of her own personal

21    knowledge that at least three times it was indicated by a

22    representative of Ericsson that they couldn't care less,

23    quote, unquote, about this issue.

24         However, I find that this should have been raised at the

25    pretrial conference.  And if it wasn't raised at the pretrial

1    conference outside of the email issue and if it wasn't raised

2    at the pretrial conference about live testimony of a witness

3    covering the same thing, it should have been.

4         The redactions covering this were agreed upon.

5    Apparently from the time those agreed redactions were

6    submitted sometime shortly after pretrial was complete until

7    5:40 p.m. on the night before jury selection, KPN had not

8    heard from Ericsson -- excuse me.  KPN had not communicated to

9    Ericsson that they wanted to go forward with live testimony of

10   what was, in fact, redacted per agreement previously.

11        Having considered the arguments of both sides, I find

12   that this subject matter is relevant to issues in the case.

13   Particularly, it relates to the issue of FRAND obligation and

14   the issue of willfulness.  Therefore, I'm going to allow the

15   witness to testify to what was redacted in the emails.  Again,

16   if she can do so based on her own personal knowledge.

17        However, I find that KPN has violated the Court's rules

18   in the pretrial order about meeting and conferring with the

19   opposing party; that while I don't impute any malicious intent

20   to KPN, I find that it effectively appears to be an ambush on

21   the eve of jury selection, and consequently I think the

22   failure to comply with the Court's instructions and rules on

23   disclosing issues to each other and meeting and conferring

24   with them -- over them and the lack of timeliness here, the

25   immediate proximity to jury selection when there's not a real

1    opportunity to otherwise prepare, all those factors lead me to

2    believe that an appropriate sanction should be imposed here

3    with regard to KPN, and I am going to delete 20 minutes of

4    designated trial time from the allocated 11 hours per side

5    from KPN.  They will have 10 hours and 40 minutes to present

6    their evidence as opposed to 11 hours.

7         And I think that's reasonable in light of the entirety of

8    the circumstances here.  If the material were not wholly

9    relevant in my view, I would probably have not let it in at

10   all.  But I don't feel that its relevance can be ignored, but

11   I don't feel that KPN's failure to comply with the Court's

12   rules and clear instructions and their failure to do so in a

13   way that on its face appears to be a calculated surprise can

14   go unpunished.

15        So that's the Court's order with regard to that matter.

16   The other issues resolved in chambers this morning appear to

17   be resolved and without further dispute.

18        Okay.  I'm prepared to bring the jury in and proceed with

19   the Court's preliminary instructions.  Is there anything I

20   need to hear from either party on before we do that?

21             MR. STEVENSON:  Nothing from Ericsson.

22             MS. WHITE:  Nothing from KPN, Your Honor.

23             THE COURT:  All right.  And do I understand -- who

24   will be presenting opening statements for KPN?

25             MS. WHITE:  I will, Your Honor.

1            THE COURT:  And for Ericsson?

2            MR. STEVENSON:  Ted Stevenson for Ericsson.

3            THE COURT:  Okay.  All right.  Mr. Latham, please

4    bring in the jury.

5            (Whereupon, the jury entered the courtroom.)

6            THE COURT:  Welcome back from lunch, ladies and

7    gentlemen.  Please have a seat.

8        I now have some preliminary instructions that I want to

9    give you on the record before we start with the opening

10   statements from the competing parties and then get on to the

11   evidence.

12       You've now been sworn as the jurors in this case and, as

13   the jury, you are the sole judges of the facts, and as such,

14   you will decide and determine what all the facts are in this

15   case.

16       Now, as the judge, I'm going to give you instructions on

17   the law, both now and later throughout the trial.  I will

18   decide any questions of law that arise during the trial and

19   I'll address any matters of evidence and procedure.  I'm also

20   responsible for overseeing the flow of the evidence and

21   maintaining the decorum of the courtroom.

22       At the end of the evidence, I'll give you detailed

23   instructions about the law to apply in deciding this case, and

24   I'll then give you a list of questions that you're then to

25   answer.  As I've mentioned to you, this list of questions is

1    called the verdict form, and your answers to those questions

2    will need to be unanimous and those unanimous answers to those

3    questions will constitute your verdict in this case.

4         Now, I want to briefly tell you what the case is about.

5    As you know, this is a patent case where there are allegations

6    of patent infringement, and I know that you saw the video this

7    morning produced by the Federal Judicial Center, but I need to

8    give you some additional instructions now and on the record

9    about a patent and how one is obtained.

10        Patents are either granted or denied by the United States

11   Patent and Trademark Office, which you'll hear referred to for

12   short throughout the trial as the PTO.  You may hear it simply

13   called the Patent Office.  The United States Patent and

14   Trademark Office is an agency of the United States government.

15   It's a part of the Department of Commerce.

16        Now, a valid United States patent gives the patentholder

17   the right for up to 20 years from the date the patent

18   application is filed to prevent others from making, using,

19   offering to sell, or selling the patented invention within the

20   United States or by importing it into the United States

21   without the patentholder's permission.

22        A patent is a form of property called intellectual

23   property, and like other forms of property, a patent can be

24   bought or sold.  A violation of the patentholder's rights is

25   called infringement.  The patentholder may try to enforce a

1    patent against persons it believes to be infringers by filing

2    a lawsuit in a United States District Court, and that's what

3    we have in this case.

4        The process of obtaining a patent is called patent

5    prosecution.  To obtain a patent, one must first file an

6    application with the PTO.  As I've noted, the PTO is an agency

7    of the United States government and employs trained examiners

8    who review applications for patents and other materials.

9        An application to the Patent Office includes within it

10   what is called a specification.  The specification contains a

11   written description of the claimed invention telling what the

12   invention is, how it works, how to make it, and how to use it.

13   The specification concludes or ends with one or more numbered

14   sentences.  These numbered sentences, ladies and gentlemen,

15   are called the patent claims.

16       When a patent is granted by the PTO, it is the claims of

17   the patent that define the boundaries of the patent's

18   protection and give notice to the public of those boundaries.

19   Patent claims may exist in two forms referred to as

20   independent claims or dependent claims.

21       An independent patent claim does not refer to any other

22   claim within the patent.  It is independent, and it is not

23   necessary to look to any other claim to determine what an

24   independent claim covers.  In other words, a dependent patent

25   claim refers to at least one other claim in the patent.

1    A dependent claim includes each of the limitations or

2    elements of that other claim or claims to which it refers or,

3    as we sometimes say, from which it depends, as well as those

4    additional limitations or elements recited within the

5    dependent claim itself.  Therefore, to determine what a

6    dependent patent claim covers, it's necessary to look at both

7    the dependent claim itself and the independent claim or claims

8    from which it depends or to which it refers.

9    Now, the claims of the patents in this suit use the

10   word 'comprising'.  Comprising means including or containing.

11   A claim that includes the word 'comprising' is not limited to

12   the methods or devices having only the elements that are

13   recited in the claim, but also covers other methods or devices

14   that add additional elements.

15   Let me give you an example.  If you take a patent claim

16   that covers a table and the claim recites a table comprising a

17   table top, legs, and glue, the claim will cover any table that

18   contains these three structures even if it also contains other

19   structures such as leaves to expand the table top or wheels to

20   go on the ends of the legs.  That's a simple example using the

21   word 'comprising' and what it means.  In other words, it can

22   have other features in addition to those that are covered by

23   the claim -- covered by the patent.

24   Now, after the applicant files his or her application

25   with the PTO, an examiner from the Patent Office is assigned

1    and reviews the application to determine whether or not the

2    claims are patentable--that is to say, appropriate for patent

3    protection, and to decide whether or not the specification

4    adequately describes the invention that's claimed.

5         In examining a patent application, the examiner reviews

6    certain information about the state of the technology at the

7    time the application was filed.  The Patent Office searches

8    for and reviews this type of information that's publicly

9    available or that might have been submitted by the applicant.

10   This type of information is called prior art.  The examiner

11   reviews this prior art to determine whether or not the

12   invention claimed is truly an advance over the state of the

13   art at the time.

14        Prior art is defined by law, and I'm going to give you

15   specific instructions at a later time as to what constitutes

16   prior art.  However, in general, prior art includes

17   information that demonstrates the state of the technology that

18   existed before the claimed invention was made or before the

19   application for a patent was filed.

20        Now, a patent contains within it a list of certain prior

21   art that the examiner has examined, and the items on this list

22   within the patent itself are called the cited references.

23   Now, after the prior art search and examination of the

24   application, the examiner informs the applicant in writing of

25   what the examiner has found and whether the examiner considers

1    any claim to be patentable, in which case it would be allowed,

2    and this writing from the examiner is called an office action.

3        Now, if the examiner rejects the claims, the applicant

4    has an opportunity to respond to the examiner to try to

5    persuade the examiner to allow the claims.  The applicant also

6    has a chance to change or amend the claims or to submit new

7    claims, and the papers generated during these communications

8    back and forth between the examiner and the applicant are

9    called the prosecution history.

10       And this prosecution history, this process of

11   communicating in writing may go back and forth between the

12   applicant and the examiner for some time until the examiner is

13   satisfied that the application meets the requirements for a

14   patent and, in that case, the application issues as a United

15   States patent; or, in the alternative, if the examiner

16   ultimately concludes that the application should be rejected,

17   then no patent is issued.  Sometimes patents are issued after

18   appeals within the Patent Office or to a court.

19       Now, the fact that the Patent Office grants a patent does

20   not necessarily mean that any invention claimed in the patent,

21   in fact, deserves the protection of a patent.  While an issued

22   United States patent is presumed to be valid under the law, a

23   person accused of infringement has the right to assert and to

24   prove in federal court that the claimed invention in a patent

25   is invalid.

1         Now, it's your job as the jury to consider the evidence

2    presented by the parties and to determine independently and

3    for yourselves whether or not the Defendants have proven by

4    clear and convincing evidence that any asserted patent is

5    invalid.  As you heard earlier, there are three asserted

6    patents in this case, and the Defendants claim that one of

7    those three patents is invalid.  They do not claim that the

8    other two patents are invalid.

9         Now, to help you follow the evidence, I'm going to give

10   you a brief summary of the positions of the competing parties.

11        As you know, the party that brings a lawsuit, that files

12   the lawsuit, is called the Plaintiff.  The Plaintiff in this

13   case is Koninklijke KPN NV, which you're going to hear

14   referred to simply as KPN, or you may hear them referred to

15   simply as the Plaintiff.

16        And as you know, the party or parties against whom a

17   lawsuit is filed or is brought are called the defendants.  In

18   this case there are two Defendants, and they are

19   Telefonaktiebolaget LM Ericsson and Ericsson, Inc.  And you're

20   going to hear these Defendants referred to jointly or

21   collectively throughout the trial as either the Defendants and

22   you'll also hear them referred to in that way simply as

23   Ericsson --

24        Now, as I told you during jury selection, this case

25   involves allegations of patent infringement brought by KPN

1    against Ericsson.  And as I've already mentioned, there are

2    three United States patents at issue here that have been

3    asserted by KPN against Ericsson.

4        The  first asserted patent in this case is United States

5    Patent No. 48,089.  And as you know, patents are commonly

6    referred to by their last three digits, so in this case Patent

7    No. 48,089 is going to be referred to as the '089 Patent.

8        The second patent at issue in this case is United States

9    Patent 9,253,637, which you'll hear referred to as the '637,

10   or the '637 Patent.

11       The third patent at issue in this case is United States

12   Patent No. 8,881,235, which you'll hear referred to as the

13   '235, or the '235 Patent.

14       Now, these three patents, members of the jury,

15   collectively will be referred to at various times throughout

16   the case as either the asserted patents or the

17   patents-in-suit.  When you hear those terms, it means all

18   three of these patents.  And these patents-in-suit generally

19   relate to telecommunications networks.

20       Now, the Plaintiff KPN contends that the Defendants

21   Ericsson are willfully infringing certain claims of the

22   patents-in-suit by making, using, importing, or selling

23   products that include their patented technology.  KPN also

24   includes that Ericsson has induced and continues to induce

25   infringement by others.  And KPN contends that it's entitled

1    to money damages as a result of that infringement.

2        Over the course of the case, you'll learn more about

3    which claims are asserted against Ericsson.  KPN alleges that

4    various Ericsson telecommunications network products infringe

5    KPN's patents.  And the parties are going to refer throughout

6    the trial and you will perhaps hear me refer to these accused

7    products, these Ericsson telecommunication network products as

8    simply the accused products.

9        Now, the Ericsson Defendants deny that they are

10   infringing any of the three patents-in-suit asserted against

11   them by KPN, and the Ericsson Defendants contend that the

12   asserted claims of the patents-in-suit are invalid as

13   anticipated in the light of prior art, at least as to one of

14   the three patents.

15       Now, I know, ladies and gentlemen, there are various new

16   words and new concepts that have been thrown at you since you

17   appeared this morning for jury duty.  I'm going to define a

18   lot of these for you as we go through these instructions.  The

19   lawyers for both of the parties are going to address some of

20   them in their opening statements, which will be helpful to

21   you.  The witnesses throughout the trial are going to help you

22   with their testimony to understand these words and concepts.

23   So please do not feel overwhelmed at this point.  I know

24   that's natural, but I promise you it's all going to come

25   together as we go through the trial.

1    Now, one of your jobs in this case is to decide whether

2  or not the asserted claims of the three patents-in-suit have

3  been infringed, and you'll also be asked to decide whether or

4  not certain of the asserted claims are invalid.  If you decide

5  that any claim from the patents-in-suit has been infringed by

6  the Defendants and that claim is not invalid, then you'll need

7  to decide whether or not that infringement has been willful.

8  You'll also need to decide what amount of money damages should

9  be awarded to the Plaintiff as compensation for that

10  infringement.

11    Now, my job in this case is to tell you what the law is,

12  to handle and address rulings on evidence and procedure, and

13  to oversee the conduct of the trial, and to maintain the

14  decorum of the courtroom.

15    In determining the law, ladies and gentlemen, it is

16  specifically my job to determine the meanings and

17  interpretation of any of the claim language from within the

18  asserted patents that needs to be interpreted or construed.

19  I've already determined the meanings of certain language from

20  the claims of the patents-in-suit, and you must accept those

21  meanings that I have already reached and that I will give you

22  when you decide whether any particular claim has or has not

23  been infringed, and when you decide whether or not any claim

24  is or is not invalid.  And you're going to be given a document

25  in a few minutes that reflects these constructions or

 1    interpretations of certain claim language that the Court has

 2    already reached.

 3           Now, for any language within the asserted claims where I

 4    have not provided you with a construction or definition, you

 5    should apply the plain and ordinary meaning of that language

 6    as understood by a person of ordinary skill in the art.  But

 7    if I've provided you with a definition for any of the claim

 8    language, you must apply my definition to that language and

 9    those terms throughout the case.

10           However, please understand that any interpretation of the

11    language from the claims by the Court is not to be taken by

12    you as an indication that the Court has any personal opinion

13    regarding the issues of infringement and invalidity because

14    those issues, ladies and gentlemen, are yours and yours to

15    decide in this trial.

16           I'll provide you with more detailed instructions on the

17    meaning of the claims before you retire to deliberate and

18    reach your verdict.

19           In deciding the issues that are before you, you'll be

20    asked to consider specific legal rules.  And I'll give you an

21    overview of those rules now, and then at the conclusion of the

22    case, I'll give you more detailed instructions.

23           The first issue that you're going to be asked to decide

24    is whether Ericsson has infringed any of the asserted claims

25    of the three patents-in-suit.

1        Infringement, ladies and gentlemen, is assessed on a

2    claim-by-claim basis, and the Plaintiff must show by a

3    preponderance of the evidence that a claim has been infringed.

4    Therefore, there can be infringement as to one claim but no

5    infringement as to another asserted claim.

6        And there are also a few different ways that a patent can

7    be infringed, and I'll explain the requirements for each of

8    these types of infringement to you in detail at the conclusion

9    of the case.  But, in general, a Defendant may infringe the

10   asserted patents by making, using, selling, or offering for

11   sale in the United States or importing into the United States

12   a product meeting all of the elements or requirements of a

13   claim from the asserted patents without the patentholder's

14   permission.

15       Now, the second issue that you're going to be asked to

16   decide is whether the asserted patents are invalid.

17   Invalidity is a defense to infringement.  And even though the

18   United States Patent and Trademark Office has allowed the

19   claims and even though an issued United States patent is

20   presumed to be valid, you, the jury, must decide whether those

21   asserted claims are invalid after hearing all of the evidence

22   presented during this case.  You may find a patent claim to be

23   invalid for several reasons, including because it claims

24   subject matter that is not new.

25       For a patent claim to be invalid because it is not new,

1    the asserting party, in this case the Defendant Ericsson, must

2    show by clear and convincing evidence that all the elements or

3    limitations of that claim are sufficiently described in a

4    single previously printed publication or patent.  If a claim

5    is not new, ladies and gentlemen, it is said to be anticipated

6    by the prior art.

7        And if you decide that any claim of the patents-in-suit

8    has been infringed but is not invalid, you'll then need to

9    decide what amount of money damages should be awarded to the

10   Plaintiff KPN to compensate it for that infringement that you

11   have found.  A damages award should put the Plaintiff KPN in

12   approximately the same financial position as it would have

13   been in had the infringement not occurred, but in no event may

14   an award be less than what KPN would have received if it had

15   been paid a reasonable royalty for the use of its patent.  And

16   I'll instruct you on the meaning of a reasonable royalty at a

17   later time.

18       Now, the damages that you might award, if any, again they

19   are meant to compensate the patentholder, and they are not

20   meant to punish the Defendants.  And you may not include in

21   any damages award that you might make an additional amount as

22   a fine or a penalty above what is necessary to fully and

23   completely compensate the patentholder for the infringement.

24   As I say, I'll give you more detailed instructions on the

25   calculation of damages at the conclusion of the case.

1        You should be aware, however, that the fact that I'm

2   instructing you on damages does not mean that I believe KPN is

3   or is not entitled to recover damages.  Again, that is an

4   issue that you and you alone will decide.

5        Now, you're going to be hearing from a number of

6   witnesses over the course of this trial, ladies and gentlemen,

7   and I want you to keep an open mind while you're listening to

8   the evidence and not decide any of the facts until you've

9   heard all the evidence.  That's important.  And while the

10  witnesses are testifying, remember that you the jury are going

11  to have to decide the degree of credibility and believability

12  to allocate to each of the witnesses and the testimony and

13  evidence that they give.       So while the witnesses are

14  testifying, you should be asking yourselves things like this:

15  Does the witness impress you as being truthful?  Does he or

16  she have a reason not to tell the truth?  Does he or she have

17  any personal interest in the outcome of the case?  Does the

18  witness seem to have a good memory?  And did he or she have an

19  opportunity and ability to observe accurately the things that

20  they've testified about?  Does the witness appear to

21  understand the questions clearly and answer them directly?

22  And, of course, does the witness' testimony differ from the

23  testimony of any other witness?  And if it does differ, how

24  does it differ?  And these are some of the kinds of things you

25  should be thinking about while you're listening to each of the

1    witnesses who will testify in this case.

2         I also want to talk to you briefly at this point about

3    expert witnesses.  When knowledge of a technical subject may

4    be helpful to the jury, a person who has special training and

5    experience in that particular field, we refer to them as an

6    expert witness, is permitted to testify to you about his or

7    her opinions on those technical matters.     However, ladies

8    and gentlemen, you're not required to accept any expert's

9    opinion or any other witness' opinion, for that matter.  It's

10   up to you to decide whether or not you believe an expert

11   witness or any witness, and whether you believe what they're

12   telling you is correct or incorrect, whether or not you want

13   to believe it or not believe it, and if you do believe it,

14   what amount of weight do you want to give to that testimony.

15        And I anticipate that there are going to be expert

16   witnesses testifying in support of both sides in this case,

17   and there will be competing opinions given in their testimony.

18   But when that happens, it's going to be up to you to listen to

19   their qualifications, and when they give an opinion on a

20   matter and explain the basis for that opinion, you will have

21   to evaluate what they say, whether you believe it, and to what

22   degree, if any, that you want to give that opinion weight.

23        Remember, ladies and gentlemen, judging and evaluating

24   the credibility and the believability of each and every

25   witness is an important part of your job as jurors.

1        Now, during the course of the trial, it's possible that

2    there will be testimony from one or more witnesses that are

3    going to be presented to you through what we call a

4    deposition.  In trials like this, it's difficult to get every

5    person in the court at the same time so they can testify live

6    from the witness stand.  So before the trial begins, the

7    lawyers for both sides take the depositions of the witnesses.

8        In a deposition, a court reporter is present, the witness

9    is present, the witness is sworn and placed under oath, and

10   the lawyers for both the Plaintiff and the Defendants question

11   that witness, and those sworn answers to those questions from

12   the witness are taken down and recorded along with the

13   questions from the lawyers.  And in many instances, those

14   questions and answers taken down at that deposition are video

15   recorded.

16       Now, when those witnesses cannot be here and present to

17   testify during the trial, it's possible that their testimony

18   will be played back to you in the form of those video

19   recordings or portions of those video recordings that were

20   taken and made during their depositions.

21       Let me also explain this to you, ladies and gentlemen.

22   The usual deposition in a case like this lasts up to seven

23   hours.  There may be -- I'm just going to give you an example.

24   There may be a witness who testifies by deposition because

25   they can't be here in person, and maybe they were deposed and

1    everything they were asked and that they answered was recorded

2    over seven hours.  It may be there's 15 minutes of that seven

3    hours that the parties believe is important for you to hear,

4    and if that person were present and called to the witness

5    stand, they'd be asked 15 minutes' worth of those questions.

6         But to avoid all of us having to listen to seven hours to

7    get 15 minutes' worth of testimony, the lawyers and the

8    parties are able to edit and slice and reconnect those

9    sections of those video recordings so that they can present

10   just the relevant portions that they intend for us to hear and

11   not the entirety of the perhaps seven-hour-long deposition.

12        So if you're seeing a witness testify during this trial

13   by deposition, it's entirely possible that you will notice

14   that there are places where, when it's presented, it looks

15   like it's edited or clipped.  That's because it has been.  And

16   you may hear different voices because a different lawyer is

17   now asking questions.  That's probably because it is a

18   different lawyer asking those questions.

19        If you're presented with a deposition witness in this

20   case, don't focus on those kind of small irregularities; focus

21   on the questions asked and the answers that that witness gave

22   under oath.  The substance of the questions and the answers,

23   not the presentation of it in case it has slight

24   irregularities in it, because to avoid that we would have to

25   listen to seven hours of deposition video recording to get 15

1    minutes' worth of evidence, and nobody wants to do that, I

2    promise you.  But be aware that that may be presented, and if

3    it is presented in that way, that's why it's presented in that

4    way.

5        I want you also to understand that if there are witnesses

6    who do not testify live but they are presented through

7    deposition, that they were sworn and placed under oath when

8    they were asked the questions that you'll see and hear, and

9    the answers they gave, are subject to the same rules as any

10   live witness in open court.  Therefore, their deposition

11   testimony is entitled to the same consideration by you insofar

12   as that's possible and is to be judged as to the credibility

13   and believability of the witness and you are to decide what

14   amount of weight, if any, to give to their testimony just as

15   you would with any live witness who will appear during this

16   trial.

17       Also, ladies and gentlemen, I want to let you know that

18   throughout the course of the trial you're going to see several

19   documents.  The Court has already taken up with the parties

20   those documents and their admissibility under the Federal

21   Rules of Evidence.

22       If you are presented with an exhibit during this trial,

23   that means I've already reviewed it and determined that it's

24   admissible under the rules of this court.  That saves the

25   lawyers from having to make a presentation in open court,

1    present their reasons, let me hear the arguments against, and

2    let me decide while you're sitting here whether that document

3    should be an exhibit in the case or not.  I've already done

4    that in advance, and the lawyers and I, I promise you, we have

5    spent hours, in fact sometimes days, going through this

6    material before you were selected so that we can save having

7    to do all of that during the trial.

8        Now, some of the documents that have been pre-admitted by

9    the Court that are going to be used during the trial as

10   exhibits and that you're going to see may well have redactions

11   in them, sections where some of the language in that document

12   has been blacked out.  If there are redactions in any

13   documents shown to you during the trial, it's because I have

14   ordered those redactions.

15       You are not to speculate or guess what's covered up by

16   the redactions.  You're not to speculate or guess why the

17   Court ordered those redactions to be there.  In fact, you're

18   to focus on the part you can read.  You are not to focus on

19   the part that's been blacked out or redacted that you can't

20   read.  Pay attention to what's shown to you; don't get focused

21   on things that you can't read that have been redacted.  Just

22   know if those redactions are there, it's because I determined

23   that they were appropriate and I ordered them.

24       Now, during the course of the trial it's possible that

25   the lawyers are going to make certain objections.  And when

1    they make objections, I will rule on those objections.  And

2    it's the duty of an attorney for either side of the case to

3    object when the other side offers testimony or evidence that

4    the attorney believes is not proper under the rules of the

5    Court and the Rules of Evidence.

6        If I should sustain an objection to a question addressed

7    to a witness, then you must disregard that question entirely.

8    The witness is not going answer it, and you should draw no

9    inference from the wording of the question and you should not

10   speculate about what the witness might have said if I had

11   allowed them to answer the question.  In other words, if I

12   sustain an objection to a question addressed to the witness,

13   then you should disregard the question and consider that it's

14   never been asked in the first place.

15       However, if I overrule an objection addressed to a

16   question from a witness during the trial, then you should hear

17   the witness give the answer, if I've overruled the objection,

18   and you should consider the question and the answer just as if

19   no objection had been made, and you should not let the

20   objection that was made detract from your considering both the

21   question and the answer.  Again, if I overrule the objection,

22   just consider the question and the answer as if no objection

23   had been made.

24       Now, by me allowing the testimony or other evidence to be

25   introduced over the objection of an attorney, I want you to

1    understand that the Court does not in doing that express any

2    independent -- any opinion or any amount of weight is

3    indicated with regard to the effect of that evidence.  As I've

4    said before, you're the sole judges of the credibility and

5    believability of the witnesses and what effect and weight, if

6    any, to give to the evidence.  So if I should overrule an

7    objection don't consider that as a part of evaluating the

8    credibility or the believability of the witness and their

9    evidence.

10        Now, as I said, before jury selection today during

11   pretrial hearings that the Court had with counsel for the

12   parties, we worked many, many hours to get through most of

13   these disputes in advance of the trial so that you would not

14   have to sit here and listen to those and possibly be confused

15   or misdirected by some of those other issues.

16        And I want to compliment the parties and their counsel

17   for working diligently with the Court to get through those.

18   And I promise you, even though you may not fully appreciate it

19   at this point, we have saved many, many hours of you sitting

20   in those chairs listening to things that have already been

21   dealt with to streamline the process.

22        And this means if the parties offer you an exhibit in the

23   case that I've already determined that it's admissible and

24   I've deemed it pre-admitted for use during this trial, that

25   means they don't have to formally offer it on the record, draw

1    an objection, let me hear the different arguments for and

2    against, and rule on whether it's admissible.  I've already

3    done that, and that's going save us a lot of time as we go

4    through this trial.

5        All that being said, it's still possible objections are

6    going to arise during the course of the trial.  And when they

7    do, I'll rule on those objections, either overruling them or

8    sustaining them.

9        You should also know, ladies and gentlemen, that the law

10   of the United States permits a United States District Judge to

11   comment to the jury regarding the evidence in a case, but such

12   comments from the judge on the evidence are only expressions

13   of the judge's opinion and the jury may disregard those

14   comments in their entirety because, as I've told you, you, the

15   jury, are the sole judges of the facts, you are the sole

16   judges of the credibility and believability of the witnesses,

17   and you are the sole judges as to how much, if any, weight to

18   give to the testimony that's presented during this trial.

19       And even though the law permits me to comment to you on

20   the evidence in this case, as I indicated earlier, I'm going

21   to try very hard not to comment on any of the evidence

22   throughout the trial because, as I've said, evaluating that

23   testimony and evidence is your job, not mine.

24       Now, the court reporter in front of me, Mr. McRoberts, is

25   going to take down everything that's said during this trial.

1    As a matter of fact, he's taken down everything that's been

2    said in open court since you walked in the courtroom this

3    morning.  But the written transcript of everything that's said

4    is not going to be available to you when you have heard all

5    the evidence and you retire to the jury room to deliberate on

6    the verdict.  That means, ladies and gentlemen, you're going

7    to have to rely on your memories of the evidence that's been

8    presented during the trial.

9        In a moment, you're each going to be given a juror

10   notebook, and in that notebook you're going to find blank

11   pages and a legal pad where you can take notes during the

12   trial, if you choose to.  It's up to each of you to decide

13   whether you want to take notes during the course of the trial,

14   and if you do, how detailed or not detailed you want those

15   notes to be.

16       But, remember, if you choose to take notes over the

17   course of the trial, those notes are for your own personal use

18   only.  You still have to rely on your memory of the evidence

19   that's presented during the trial, which is why you should be

20   paying close attention to the testimony of each and every

21   witness.

22       And you should not abandon your own recollection during

23   your deliberations because somebody else's notes indicate

24   something different.  Any notes are meant to refresh your

25   recollection and that's the only reason a juror should be

1    keeping them.

2        I'm now going to ask our Court Security Officer to pass

3    out these juror notebooks to the members of the jury.

4                    (Pause in proceedings.)

5        THE COURT:  In these notebooks, ladies and

6    gentlemen, you'll see that you each have a copy of the three

7    asserted patents in this case.  You'll also see that there is

8    a section or an entry behind the patents themselves where the

9    language from the claims that the Court has interpreted or

10   construed is included for you.  You'll see on one side the

11   language from the claims that the parties asked the Court to

12   construe or interpret and you'll see the construction or

13   interpretation corresponding on the other side of the page

14   that the Court's adopted.  Again, you must apply my

15   constructions or definitions to that claim language throughout

16   the trial.

17       Behind that or following that, you should find a section

18   of witness pages, and I've asked that those be tabbed so that

19   you can find the respective witnesses without any undue delay

20   while they're being called and presented during the trial.

21       And on each of those witness pages, there should be a

22   head-and-shoulders photograph of the witness with their name

23   below it and then space for note-taking if you choose to do

24   it.  I've often found that a jury being able to go back and

25   look at the picture of who gave the testimony after trial can

1    be helpful, so that's why that's done that way.

2         And then behind those tabbed witness pages, you should

3    find a new legal pad that you can take additional notes on and

4    there should be, I believe, in the front pocket of each of

5    those notebooks an additional pen or a pen for you to use in

6    case you don't have one with you.  Again, that's if you choose

7    to take notes, and that's up to you individually.

8         Also, ladies and gentlemen, these notebooks should stay

9    in your possession throughout the trial.  They are not to be

10   left laying around where somebody not on the jury could pick

11   one up and look at them.  They should either be in your

12   personal possession when you're in the courtroom.  If we call

13   a recess or a break for lunch or at the end of the day, then

14   you should take them with you to the jury room when you go

15   back to the jury room and at the end of the day leave them on

16   the table in the jury room and pick them up the next morning.

17        Now, the one exception to that is there may be times

18   during the trial when we have a short recess, and if I think

19   we're going to be just a few minutes in a short recess, 10 or

20   12 minutes, I may say, ladies and gentlemen, you're excused

21   for recess, but you may leave your notebooks in your chairs.

22   And in that case, just close them and leave them in the chair

23   where you're sitting.

24        I'll do that if you're going to be out of the jury box

25   for a short period of time.  If it's going to be longer than

1   that, I'm going to ask you to take them to the jury room with

2   you.  Again, they should not be where anybody other than you

3   have access to your own notebooks.

4       Now, in a moment we're going to hear opening statements

5   from the lawyers for the parties.  These opening statements,

6   as I mentioned earlier, are designed to give you a road map of

7   what each side expects to offer during the course of the trial

8   by way of evidence.  And as I told you again already, what the

9   lawyers tell you in this case is not evidence.  The evidence

10  is the sworn testimony from the witnesses from the witness

11  stand who are placed under oath and subject to cross

12  examination, and the evidence in this case are those exhibits

13  which the Court has deemed to be admissible under the Federal

14  Rules of Evidence and procedure and which the Court has

15  admitted into evidence in this case.

16      The admitted exhibits and the sworn testimony of the

17  witnesses, that's the sole universe of the evidence in this

18  case; not what the lawyers tell you or the arguments that they

19  may make.

20      Now, what the lawyers tell you and the arguments that

21  they present are meant to give you their impressions of the

22  evidence, and they have a duty to point out to you what they

23  believe the evidence will show.  But just remember, what they

24  tell you is not evidence.

25      Now, after the parties through their counsel have

1    presented their opening statements, then we'll proceed to the

2    Plaintiff's case in chief.  And as I told you before lunch,

3    the Plaintiff will then call its witnesses and they'll

4    testify, and the Defense counsel will be able to cross-examine

5    those witnesses.  And when we've gone through all the

6    Plaintiff's witnesses, then the Plaintiff will rest their case

7    in chief.

8        And then we'll turn to the Defendants, and they will put

9    on their evidence in the Defendants' case in chief.  In the

10   same manner, the Defendants' witnesses will be called and will

11   testify on direct examination from questions asked by Defense

12   counsel, and then Plaintiff's counsel will cross-examine the

13   Defense witnesses, just the reverse of what happened in the

14   Plaintiff's case in chief.  And when the Defendants have

15   called all their witnesses and put on their case in chief,

16   they will rest.

17       And as I mentioned before lunch, the Plaintiff, because

18   it has the burden of proof, may have an opportunity to call or

19   will have an opportunity to call rebuttal witnesses, if they

20   choose to.  We'll determine at that time whether or not the

21   Plaintiff's going to call any rebuttal witnesses.

22       If the Plaintiff does, they'll testify under oath,

23   they'll present their evidence on direct examination, they'll

24   be cross-examined by Defense counsel.  And when any rebuttal

25   witnesses are finished, that will complete the Plaintiff's

1   rebuttal case.  When that happens, if there are rebuttal

2   witnesses or if there aren't rebuttal witnesses when the

3   Defendants' case in chief has ended, that will complete all

4   the evidence in this case.

5       After you've heard all the evidence in this case, then

6   I'll give you my final instructions on the law that you are to

7   apply to that evidence in answering the questions in the

8   verdict form.  Those final instructions from me to you is

9   called or is often called the Court's charge to the jury.  And

10  then once I've given you my final jury instructions, you'll

11  then hear closing arguments from the Plaintiff's counsel and

12  the Defendants' counsel.  And then when you've heard closing

13  arguments, I'll direct you to retire to the jury room and to

14  deliberate on your verdict.

15      Now, I told you before lunch that it's important that you

16  not communicate with anybody about this case or any of the

17  evidence or any of the testimony, and I want you to understand

18  that applies to the eight of you as well.  You are not to

19  discuss the evidence in this case among each other until that

20  point in time when you've heard all the evidence, you've

21  received my final instructions, you've heard closing arguments

22  from the parties, and then I tell you to retire and deliberate

23  in the jury room on your verdict.  That is an inflection

24  point.  That's a point in time where I like to think of a

25  light switch being turned on.  At that point when you retire

1    to deliberate, but not before, you go from not being able to

2    discuss the evidence with each other to being required to

3    discuss the evidence with each other while you deliberate in

4    attempt to reach a unanimous decision on how to answer the

5    questions that are going to be in the verdict form.

6         So until you've heard all the evidence, until you've

7    heard my final instructions on the law, and you've heard

8    closing arguments from the attorneys, you must not discuss the

9    case with each other in any way.  But at that point but not

10   before that point, but at that point when you retire to

11   deliberate, you go to a different posture which is that you're

12   required to discuss it among yourselves in an attempt to reach

13   a unanimous decision on the verdict.

14        Also I want to mention one more time, because I think

15   it's important, during the course of this trial you're going

16   run into or be in close contact with some of the people who

17   are trying this case, either the lawyers or their support

18   staff.  Most of the people in that gallery right now are

19   connected with one side or the other of this case.  There are

20   not many unbiased observers out there.

21        So if you run into any of these folks, and this is a

22   small courthouse by federal court standards, when they don't

23   speak, when they don't smile, when they don't act friendly,

24   don't hold it against them, don't think they're being rude;

25   simply understand that they're following my instructions,

 1    which all go back to that one basic fundamental premise that

 2    the sole source of the information that you should have to

 3    draw upon to answer the questions in the verdict form must be

 4    limited to the sworn testimony from the witnesses in open

 5    court and subject to cross-examination and those exhibits that

 6    the Court has determined and ruled are admissible as evidence

 7    in this case.  That's it; no more.

 8        So that's why you have all these instructions about not

 9    doing research.  That's why you have these instructions about

10    not talking to anybody, including each other, until all the

11    evidence is in.  That's why you have these instructions about

12    nobody involved in either side of this trial having a

13    conversation or being friendly or speaking to you during the

14    course of the trial.  They all relate back to that one

15    important fundamental premise.

16        So with that, ladies and gentlemen, we will proceed to

17    hear opening statements from the attorneys for the parties at

18    this time, and we'll begin with the Plaintiff's opening

19    statement.

20        Ms. White, you may address the jury on behalf of the

21    Plaintiff.  Would you like a warning on your time?

22              MS. WHITE:  Please, Your Honor.  Five minutes?

23              THE COURT:  I'll warn you when you have five minutes

24    remaining.  You may proceed.

25              MS. WHITE:  Thank you, Your Honor.

1          You know my name, but please let me introduce myself to

2     you.  I'm Lexie White.  I'm part of the club that's guilty of

3     being born outside of Texas, but I've lived in Texas for the

4     last 17 years with my husband and our four children.  And I am

5     privileged to represent KPN in this case.

6          This case involves decisions.  We all make them every

7     day.  Companies like KPN and Ericsson make them, too.  The

8     evidence will show you that Ericsson made a decision.  That

9     decision was to ignore KPN's property rights.  KPN had to make

10    decision, too--do nothing or stand up for itself.  It chose to

11    stand up for itself, and that is why we're here.

12         The evidence will show that KPN and Ericsson had a long

13    history of licensing each other's patents.  However, you'll

14    learn that KPN stopped purchasing as much equipment from

15    Ericsson, and whether by coincidence or as a result, Ericsson

16    began ignoring KPN's substantial patent property rights.

17    That's why we're here.  Ericsson is using KPN's property and

18    they're refusing to pay for it.

19         Now, at the end of this week, you-all will have some

20    decisions to make, and those decisions will be based on the

21    evidence that's presented to you.  In the next 25 minutes, I'm

22    going to describe the evidence that I expect you'll see and

23    hear.  That evidence includes the history between the parties,

24    the patents that we believe Ericsson is using without

25    permission, and the damages that we believe it owes for that

 1    unauthorized use.

 2         First, the history.  These parties actually have a

 3    relationship that dates back 100 years.  I don't have time to

 4    cover all of that.  But for their patents, you will learn that

 5    first in 2004, then again in 2010, and then again in 2014, KPN

 6    and Ericsson entered into these patent license agreements.

 7    Each one gave Ericsson permission to use for a limited period

 8    of time all of KPN's patents, eventually including each of the

 9    three patents at issue in this case.  The licenses also gave

10    KPN the right to use Ericsson's patents.  That's what's called

11    a cross license.  I give you permission to use my patents, you

12    give me permission to use yours in return.

13         Ericsson also paid on top of that cross license $48

14    million worth of vouchers that KPN used to purchase Ericsson's

15    equipment.  You'll learn that the parties did a lot of

16    business together back then.  KPN purchased very expensive

17    equipment from Ericsson using these vouchers like a pre-paid

18    credit card.  KPN needed Ericsson's equipment to run its

19    business because, as you've heard, KPN is a telecommunication

20    network operator.  We are kind of like the AT&T of the

21    Netherlands.  We have 4 million customers.  We employ about

22    25,000 people.  Now, that makes us a whole, whole lot smaller

23    than AT&T whose services reach a quarter billion people.  But

24    we're in the same industry.  Our customers are people like you

25    and me.

1       Ericsson's customers are huge companies because Ericsson

2  is one of just three vendors in the world that make all of the

3  cell towers and base stations that are used to power a

4  wireless network.  Around 40 percent, almost half of all of

5  the cellular and network traffic in the world, goes through a

6  piece of Ericsson's equipment.  So as you might imagine,

7  Ericsson sells to all the big players--AT&T and Verizon and

8  even some small ones like us.

9       But you will hear that around the time that KPN began

10  dealing with one of Ericsson's competitors instead, Ericsson

11  began dealing with Ericsson's patent property rights very

12  differently.  There are a lot of emails exchanged during that

13  time period, and we'll show you some of them.

14       Ms. Gerritse, who's actually in the courtroom from KPN's

15  headquarters in the Netherlands --

16       Could you raise your hand, Ms. Gerritse?

17       -- she invited Ericsson in January 2017 to renew its

18  license.  She offered -- as you can see on the bottom there

19  what is highlighted, she offered to meet with them in Sweden

20  which is where Ericsson is headquartered and where all the

21  business executives that made this decision are located.

22  Ericsson responded two months later that they should pick up

23  the negotiations after the summer.

24       And you'll see that that pattern continued all year as

25  KPN on the top would reach out, sometimes repeatedly, and

1    Ericsson always wanted more time.  Sometimes it wouldn't

2    respond for weeks or even months.  Then when it would respond,

3    it had a lot of questions which we answered.  Then it wanted

4    more time or it would go silent again, or it would ask the

5    same questions we already answered, which we'd answer again.

6         And you will see and hear about the mounting frustration

7    as the weeks turned to months, the months to many months, and

8    then years, four years of negotiating, circling around the

9    same issues, new questions, same questions, new excuses and

10   delay.

11        Ultimately instead of renewing this license agreement

12   like it had for more than a decade, you will hear that

13   Ericsson refused to get KPN's permission to use any of KPN's

14   patents, not a single one.  Ericsson's company witnesses have

15   maintained in this case that KPN's entire portfolio of 1500

16   patents has zero value to Ericsson, and you won't see any

17   evidence that Ericsson suddenly changed its products to avoid

18   any of KPN's patents.

19        Patent rights, as you heard, are property rights just

20   like a deed to a piece of property.  The evidence will show

21   that Ericsson knows this is our property, they've had our

22   patents, they've had four years to study them, take a license,

23   or stop using them.  Instead, Ericsson wants to stay on our

24   property for free.  They won't pay to renew the license and

25   they won't leave.  And that's why we're here.  And we need

1    your help.

2         The first question you're going to be asked is the

3    question of infringement.  So let's talk about the patents

4    that Ericsson is infringing.

5         In the time we have, my team and I will talk to you about

6    three of KPN's patents that Ericsson is, we believe, using

7    without permission.

8         The first is the '089 Patent, and our first witness is

9    Ms. Lia Gerritse.  She worked directly with the inventors to

10   file the application that led the U.S. Patent Office to grant

11   what is now the '089 Patent.  You will hear that KPN spends

12   between 300 and half a billion dollars every year on research

13   and development.  We do this to protect our property and to

14   prosper in business.  Both of those things help KPN to be

15   profitable and to deliver a better customer experience.

16        Ms. Gerritse is part of the department that works with

17   the inventors, including the '089 inventors here.  And what

18   this patent does is really pretty neat, because one of the

19   most critical challenges for a large network operator like an

20   AT&T or a Verizon is how to monitor the network, especially

21   over a large area.  Is there a coverage hold or a radio

22   link-down?

23        Think of the little bars on your cell phone.  Well,

24   before KPN's patent, network operators were forced to do this

25   the old-fashioned way--by literally sticking someone in a car

1    and having them drive all over the coverage area.  Anyone

2    remember these commercials, Can you hear me now?  Can you hear

3    me now?

4        Well, KPN's '089 Patent gave network operators a new

5    option.  KPN invented a way to arrange the network, a network

6    configuration that would allow all of the different cellular

7    devices that are already interacting with the network to also

8    collect measurements of signal or service quality across

9    different networks that they are connected to.  You'll see

10   multiple figures in the patent showing the different ways it

11   can be configured or arranged.  But the key point is that the

12   network is configured to receive these measurements without

13   anyone getting behind the wheel to drive-test all over the

14   network.  It was a new way of solving a problem, a big costly

15   problem, especially for the big network providers like AT&T

16   who are Ericsson's biggest customers.

17       You will see that Ericsson touts the benefits of KPN's

18   invention when it's selling its products to customers like

19   AT&T.  Here's a document that we found in Ericsson's internal

20   files.  Ericsson describes its products as providing a remote

21   method to use for troubleshooting and verification of the

22   radio network instead of using traditional drive tests.  This

23   should make such activities simpler and cheaper.  That's what

24   Ericsson said about this technology before they were sued.

25       Now they say the technology is worthless, it's not used

1    by anyone.  You-all will be the judges of the credibility of

2    the witnesses.  You can weigh what they say before they're

3    sued with what they say after they're sued.  I think the

4    evidence will show they are saying different things.

5          You will also see that Ericsson incorporated the '089

6    technology into the network equipment that it sells, and they

7    sometimes refer to it as MDT.  It stands for minimization of

8    drive tests.

9          You will hear from our second witness, Doctor

10   Mangione-Smith.  He is a Ph.D. research engineer and a former

11   engineering and computer science professor at UCLA.  He will

12   compare the system that Ericsson sells to each asserted patent

13   claim element-by-element.  This testimony will be

14   time-consuming and technical.  I ask you to bear with us.

15         Ericsson has denied infringing any claim, so we have to

16   prove each one one-by-one or they'll say we didn't meet our

17   burden of demonstrating that it's more probable than not that

18   Ericsson is infringing.

19         Now, Ericsson will have an opportunity to call its own

20   experts and witnesses in, and I expect them to deny infringing

21   any of the claims.  I don't know everything you will hear, but

22   one dispute that you will probably hear is whether the patent

23   is limited to one example that the patent gives where a 3G

24   network, for instance, is measuring a 4G network.

25         I think you will hear that a network is also understood

1    to include an individual base station with a lot of different

2    cell phones or cellular devices connected to it.  But that's a

3    dispute that you're going to hear.  They say it's 3G to 4G.

4    We say it also includes cell to cell.

5         You may also hear Ericsson say, well, our customers

6    aren't using the '089 technology.  We believe the evidence

7    will show that's wrong, but I want to be very clear about one

8    thing:  We are not accusing Ericsson's customers in this case.

9    That's why you don't see AT&T or Verizon sitting here.  We

10   accuse Ericsson's products, the system of hardware or software

11   that Ericsson sells.  You will see it is the system that is

12   described in the patent claims that we're asserting here.

13        But I think you're going to hear Ericsson talk about

14   these two words down here in the claim, 'configured to'.

15   Ericsson says its products are not configured to obtain the

16   network measurements described in the patent.  You'll see the

17   parties agreed to a meaning for this term, and it's in your

18   jury notebook.  It says plain and ordinary meaning, not merely

19   capable of.

20        Ericsson will say that its products don't meet this

21   requirement because they're merely capable of infringing, and

22   the reason they give is they say the users have to turn them

23   on, activate them, take certain steps to use them.

24        The way I think about the position that you'll hear is

25   it's kind of like saying, I can't violate a patent on a

1    computer designed to send and receive email.  Even though the

2    computer has all the specialized software preinstalled

3    configured to do just that, send and receive email, Ericsson

4    would say that can't violate the email patent; the user has to

5    turn it on.

6        The evidence will show that makes no sense.  The computer

7    is not a blank slate; it's configured to send and receive

8    email.  It just has to be turned on.  We believe the evidence

9    here will show Ericsson is not selling a blank slate.

10       Doctor Mangione-Smith looked at the internal source code

11   and technical documents for Ericsson's products.  You will

12   hear that he found something called the M 1 report which is

13   configured to tell a network what the '089 Patent describes,

14   how strong the signal is, where the device measuring the

15   signal is located.

16       He also found code configured to tell devices out in the

17   network to go and take measurements, create reports, and send

18   them back to the network.  That's actually what the '089

19   Patent describes.  Ericsson designed its product specifically

20   to perform these functions shown here in their own internal

21   documents, not to be a blank slate, not to be merely capable,

22   but to be configured as the '089 describes.

23       And you'll see why, why Ericsson is giving its customers

24   more than a blank hard drive with no software -- because

25   Ericsson's customers demand it.  AT&T, Ericsson's biggest,

 1    most important customer, listed minimization of drive testing

 2    as a high-1 priority.  That's just one step below critical.

 3    And you will see Ericsson not only assured AT&T that MDT would

 4    be included in what it was trying to sell them, Ericsson

 5    actually proved to AT&T that its product was configured to

 6    perform the '089 functionality.  They field-tested the

 7    minimization of drive test functionality for AT&T.

 8         You will see Ericsson repeatedly advertises MDT as a

 9    reason to buy Ericsson's products.  You will hear that while

10    MDT was an optional feature in Ericsson's 4G LTE software,

11    each of its major big three U.S. customers bought the option.

12    None opted out.

13         You're also going to see that Ericsson didn't take out

14    this supposedly worthless MDT technology in its 5G products

15    which were released after this lawsuit over MDT was filed.

16    Instead, they doubled down on it.  They included MDT in the

17    base software package that Ericsson includes with all of its

18    5G radio software.  And this is the evidence that we found in

19    Ericsson's internal documents.

20         Now, in the face of this evidence, you will hear while

21    this lawsuit was pending, Ericsson commissioned what it calls

22    an audit and produced it to us to support this notion that no

23    one is using MDT, none of its customers want or use it.  It

24    doesn't.  It shows the opposite.  Customers are clearly

25    turning it on, activating and enabling it in the base stations

1    they are using.  And that is just looking at two snapshots in

2    time that Ericsson selected using a database that Ericsson

3    controls.  Ericsson did not look at any other days or points

4    in time.  It has that data available and chose not to.

5         The evidence will also show that Ericsson knows MDT is

6    not designed to be left on all the time.  You heard the

7    suggestion in voir dire that your battery would be drained by

8    this technology.  That's -- it's not designed to be left on

9    all the time or even used in every base station.  It's

10   supposed to be done in short periodic intervals to check where

11   you might have a problem, to check where your customers might

12   not be receiving service, and then turn it off quickly.

13        And you may be presented with a lot of evidence on this

14   point whether and how customers use the products that Ericsson

15   sells.  But at the end of the day, the evidence will show it's

16   all a sideshow.  AT&T or T-Mobile are not on trial here.

17   Ericsson is, because Ericsson is using KPN's patented

18   technology in the products that Ericsson is selling.

19        So first Ericsson will tell you they don't infringe.  But

20   they do have a fallback argument, and that is, well, even if

21   we do infringe, the '089 Patent is invalid.  However, that is

22   Ericsson's burden to prove invalidity.  I'm not going to say

23   anything about this fall-back defense right now, but we will

24   respond to it when it's our turn to do so.  I will say this:

25   We think the Patent Office got it right when it issued the

1    '089.

2       Doctor Mangione-Smith will do the same analysis for each

3    of these other two patents.  I'll touch on them just briefly

4    now.  But the '637 Patent helps to keep the network from

5    overloading when it's congested.  If you need to make a 911

6    phone call, you cannot have that call fail because the network

7    is down, which is a big problem now that the internet of

8    things has all of our parking meters and 18-wheeler fleet

9    management systems and gas meters pinging the network.  The

10   patent teaches how to send away the robots so that your call

11   can go through.

12      The '235 Patent relates to something that's really very

13   brand new--authenticating a mobile device to a network.  That

14   is a security feature to make sure that someone who's trying

15   to access the network is who they say they are.  And it's

16   specific to Ericsson's 5G products.

17      Now, most of the network equipment out there now is 4G.

18   You might even see some 3G.  Ericsson has only just started

19   rolling out its 5G products.  We gave Ericsson notice of this

20   patent so that they could stop using it or take a license

21   before there are a lot of damages owed.  And that's a good

22   segue to the last issue, which is, what is KPN owed for the

23   use of its property by Ericsson.

24      Here, you will hear from Mr. Wagner.  He's an expert in

25   financial forensics.  He was required to use two assumptions

1    that you're going to hear a lot about.  The first is actually

2    written into the Patent Act.  It says if you find Ericsson is

3    infringing, then "the damages can't be less than what's

4    written there, a reasonable royalty for the use made of the

5    invention by the infringer."  Ericsson is the infringer here

6    and owes for each product sold.  Each sale is a use or act of

7    infringement.

8         Mr. Wagner had to follow another rule.  He had to assume,

9    when he's calculating damages in this case, that the patent is

10   both valid and infringed.  That's what we have to do to

11   calculate damages in a lawsuit.  But as you can imagine,

12   that's not quite how KPN and Ericsson negotiated before this

13   lawsuit.

14        When Ericsson took a license back in 2004 and 2010 and

15   2014 to KPN's patents, they didn't do what the experts are

16   required to do and look at here.  It was a business deal.

17   They were business partners.  KPN needed to be on friendly

18   terms with their major supplier.  There are only two other

19   companies in the world that KPN can get this critical

20   equipment from that it needs to run its business besides

21   Ericsson, and their business deals reflected that reality.

22   KPN didn't get a royalty for every use.  It got a cross

23   license to Ericsson's portfolio and 48 million in vouchers.

24        Now, those voucher agreements, by the way, in 2004, 2010,

25   and 2014, you will see they all contain this language that you

 1    have on the screen.  It says, "This voucher agreement shall

 2    not be used as a reference as regards the value of patents or

 3    of fair and reasonable compensation for the use of patents of

 4    the parties."  Ericsson promised never to argue that KPN's

 5    patents are only worth the $48 million in vouchers.  The

 6    evidence won't support that anyway.

 7         But the evidence will also show you that Ericsson's

 8    promise in writing in these three different agreements is

 9    worthless.  Ericsson and its expert relies almost exclusively

10    on what it agreed not to when calculating damages in this

11    case.

12         But in any event, when Ericsson decided to become an

13    unwilling licensee requiring us to file a lawsuit, well,

14    juries obviously can't award vouchers and cross licenses.  Now

15    we have to follow the law, and so Mr. Wagner will show you the

16    evidence of the sales Ericsson has actually made using KPN's

17    patents, looking at each patent individually.

18         Now, for the '235 Patent, the 5G patent in the middle

19    there, that's not very much money.  It actually results in a

20    royalty to us of less than a thousand dollars because Ericsson

21    is rolling out its 5G products literally as we speak.  And we

22    hope, perhaps optimistically, that they will agree eventually

23    to license this patent before there are a lot of damages owed.

24    But we need your help even though those sales have only begun

25    now.

```
 1          By contrast, for the '089 Patent, the one on the top,
 2   Ericsson has sold many, many products incorporating KPN's
 3   patented invention.  You will hear that Mr. Wagner calculates
 4   a reasonable royalty rate to KPN for that '089 Patent is what
 5   you see there, 0.225 percent.  That means for every dollar of
 6   product that Ericsson sells, KPN would receive two-tenths of a
 7   penny.  Now, that adds up to a big number only because
 8   Ericsson has sold many, many products incorporating the '089
 9   Patent technology.
10          Now, Ericsson will try to exclude some of their sales by
11   arguing that they were for hardware unrelated to the patent.
12   The evidence will show that's wrong.  The '089 talks in
13   several places about the hardware that's required to practice
14   the invention.  Here's just one.  It's a network node.  You
15   will hear it referred to in this case as an eNodeB, which is
16   an industry term for a base station.
17          In fact, Ericsson's documents talk about MDT being
18   performed in the nodes, or eNBs.  You will also hear what went
19   in -- you will hear about all of the prior license agreements
20   between KPN and Ericsson's competitors.  Each of Ericsson's
21   competitors has licensed KPN's patents.  None of them required
22   us to chase them down in a lawsuit.  They wanted a business
23   deal.  They didn't want a jury to calculate how much they had
24   used KPN's invention.  You will hear that Ericsson's two
25   biggest competitors, Nokia and Huawei, have each taken a
```

1    license to KPN's patents and didn't require us to chase them

2    down.

3         Now, there is one last defense that I haven't even

4    mentioned because it confuses me.  It stands for fair,

5    reasonable, and non-discriminatory.  That's a mouthful, but it

6    basically means if a patent is essential, then you have to

7    license it on what are called FRAND rates.

8         So another fall-back for Ericsson is, well, if we do

9    infringe, then the patent is essential and we want a discount.

10   That really is what we expect them to say.  We don't infringe,

11   but if we do, we want a discount.  I'm going to let them

12   explain that one to you.

13        And you're going to hear a lot of defenses.  Ericsson

14   will say, we don't infringe any of KPN's patents, but if we

15   do, then those patents are invalid, never should have been

16   issued in the first place.  But if that's wrong, no one is

17   using them, they're not important, we shouldn't pay much

18   money.  But if that's wrong, they are so important, that they

19   are essential and we want a discount.

20             THE COURT:  You have five minutes remaining.

21             MS. WHITE:  It's called covering all the bases, but

22   it's not credible and it won't be supported by the evidence.

23        I won't get to talk to you like this again until the

24   closing argument, and I am certain that my opposing counsel

25   who's very good will say things in his opening statement that

 1    make me want to jump back up here and respond.  That's not how

 2    this works.  I don't get to do that.

 3         So please keep an open mind like the Judge instructed you

 4    as the testimony and evidence unfolds, because at the end of

 5    this, you-all will have some decisions to make.  And most of

 6    all, thank you.  I know it's costing you time away from your

 7    jobs and your families to be here, and on behalf of my team

 8    and my client, we're very grateful to you for listening to

 9    this evidence.

10         Thank you.

11              THE COURT:  Defendants may now present their opening

12    statement to the jury.

13         Would you like a warning on your time, Mr. Stevenson?

14              MR. STEVENSON:  No, thank you, Your Honor.  I have a

15    stopwatch.

16              THE COURT:  All right.  You may proceed.

17              MR. STEVENSON:  May it please the Court.

18         Good afternoon, ladies and gentlemen.  Ericsson's defense

19    in this case is very straightforward.  Neither Ericsson nor

20    its customers use the technology that's claimed in KPN's

21    patents.  Ericsson's equipment works differently than the

22    claims in the three patents in this case, and the features

23    just aren't being used.  And Ericsson should not have to pay

24    KPN for technology that it's not using.

25         The reason KPN's technology isn't being used is because

1    while KPN's patents have interesting ideas, you'll see that

2    they're not commercially practical.  And later in my opening,

3    I'll go into those details.

4        Now, you heard a little bit about KPN and Ericsson's long

5    business history, and before filing this suit, KPN approached

6    Ericsson and accused it of infringement of about 15 patents,

7    families of patents, including the three that are asserted in

8    this lawsuit.  And this lawsuit is just about three patents.

9        Ericsson respectfully listened to KPN's position,

10   Ericsson engineers spent a lot of time analyzing the patents,

11   reviewing them, and we shared our analysis and review with KPN

12   in writing, and concluded that Ericsson wasn't using these

13   inventions and shouldn't have to pay royalties for them.

14       Now, in patent licensing, just as well as in patent

15   litigation, the rule is simple--you pay a reasonable royalty

16   for what you use, but you don't have to pay for what you're

17   not using.  And that's been Ericsson's position throughout the

18   years in its business relationship with KPN.  If we're using a

19   patent, we're actually using a patent, we'll pay fair

20   royalties.  But if we're not using it, we just shouldn't have

21   to pay.  And in a nutshell, that's what our case is about.

22       Now, before we get into some more details, let me

23   introduce you first to Ericsson, who we're proud to represent

24   in this case.  So Ericsson is one of the leading cellular

25   equipment providers in the world.  Its U.S. headquarters are

1    here in Texas.  It's up in Plano on Legacy Road, which is part

2    of the Eastern District of Texas.  In addition to the Plano

3    facility, Ericsson was very proud to announce recently that

4    its going to build its new 5G factory of the future in

5    Lewisville, Texas.

6        Ericsson's worldwide headquarters is in Sweden, and

7    that's where we got our start.  It was back in 1876.  The

8    company was started by Lars Magnus Ericsson.  That's why it's

9    called LM Ericsson now.  And he was a one-man telegraph shop

10   in Sweden.  Then shortly after that, the land line phone got

11   invented, and he began repairing land line phones.  Then he

12   started making phones, making telephone switchboards.  And for

13   decades, that was Ericsson's business was making telephones,

14   making central office switches.

15       And then in the 1980s, Ericsson got into cell phones, the

16   cellular business.  They started making phones and also

17   network equipment.  And Ericsson sold phones for about 25

18   years.  You may have heard of them from the phones.  You may

19   have owned an Ericsson phone in the past.  But then they spun

20   that off, the phone part of their business, off to Sony, but

21   Ericsson does continue to make cellular network and that's the

22   base stations.  That's Ericsson's main product, the cellular

23   base stations that you see along the side of the road.

24       Their customers, as you heard, are the network operators

25   the AT&Ts, the T-Mobiles, the Verizons.  And there are also

 1    companies all over the world, including KPN, who was a

 2    customer for years of Ericsson.

 3         This is KPN's corporate headquarters in Rotterdam, and

 4    they're one of the major network operators, as you heard, in

 5    the Netherlands.

 6         Now, we're all familiar with second generation, 2G; third

 7    generation, 3G; fourth generation, 4G; 5G networks.  We've

 8    heard of all that before, and Ericsson's been selling base

 9    stations throughout all the generations.  On average, an

10    operator like a U.S. operator for each one of the generations

11    will buy about 70,000 base stations to populate its network.

12    And that's per generation.

13         And if you ever want to know what generation you're on,

14    what network you're on, you can just look in the upper

15    right-hand corner of your phone and it will usually say 4G, or

16    LTE.  That means the same thing.  It may say 5G.  And 2G and

17    3G today are really basically obsolete now.  We are on to 4G

18    and 5G networks.

19         And you've noticed that each generation of the network

20    seems to get better, faster.  You've got better battery life,

21    faster downloads.  And that's in large part due to Ericsson's

22    R&D and their contributions to the technology.  And I'm not

23    going to suggest for a minute that that's all Ericsson -- that

24    Ericsson's the sole inventor of all this.  It's an

25    industry-wide effort.  It's very collaborative.  But Ericsson

 1    does do its share, and it spends 3 to 5 billion a year on

 2    research and development.  And that's Ericsson.

 3         But now let me introduce you to our corporate

 4    representative from Ericsson, Mr. Patricio Delgado.  You met

 5    him this morning in voir dire.  He's a vice president, and he

 6    works in the patent licensing group of Ericsson.  He's worked

 7    there about 12 years.  And his job is to value Ericsson's

 8    patent portfolio as well as other companies' patent

 9    portfolios.

10         You're going to hear the word 'portfolio' in the case.

11    That's basically a group of patents.  And as companies get

12    patents, they group them into what are called portfolios.

13         Now, what you'll hear is that Ericsson has thousands of

14    patents, and so do many other companies Ericsson deals with.

15    So the companies in the industry license each other so they

16    can make interoperable products.

17         Now, the interesting thing about all of these thousands

18    of patents is only a very small subset are actually

19    commercially used.  And that's not just true for Ericsson.

20    That's true across the industry.  And so Mr. Delgado's job at

21    Ericsson, when he's working on these licensing deals with

22    other companies, is to look at the Ericsson portfolio and look

23    at the other company's portfolio and figure out which of the

24    patents in there actually are being commercially used, what

25    are the portion of commercial use patents.

1          And you will hear from Mr. Delgado in this case as a

2    witness.

3          You're also going to hear from some other vice presidents

4    of Ericsson--Mr. Jacob du Plooy, who is in the back of the

5    courtroom, and Jeff Diamond.  Now, they're vice presidents who

6    work with customers on technical matters.  They work for

7    Ericsson, but they -- they face the customers, a lot of like

8    the technical support for the big network customers.  They

9    help them figure out what equipment they need, to architect

10   their system, set it up, test it, troubleshoot products, do

11   upgrades.

12         And this isn't a seldom forget business by any means.

13   After Ericsson sells equipment to customers, they stay

14   involved.  They collaborate after the sales.  And you'll hear

15   from those witnesses who are going to explain to you how the

16   Ericsson equipment is actually set up and used in the field.

17         Now let's talk about the patents.  There are three of

18   them.  And because the numbers can get a little confusing,

19   we've also given them nicknames.  Let's start with the '089

20   Patent.  We call that the drive testing patent.  That's the

21   one for which KPN seeks $31 million.  The second patent, the

22   '637, we'll refer to as the deny access patent for which they

23   seek $370,000.  And the '235 Patent is the channel

24   authentication patent for which they seek a little over $500.

25   And for obvious reasons, I think all the parties will end up

1    spending almost all their time talking about the drive

2    testing, the '089.

3         You're going to hear from two experts in the field,

4    Dr. Stephen Wicker, who is sitting in the back, and Doctor

5    Kevin Jeffay, who is also in the back.  Doctor Wicker teaches

6    electrical engineering at Cornell University, and Doctor

7    Jeffay teaches computer science at the University of North

8    Carolina.  They split up the patents, and both have analyzed

9    KPN's infringement assertion.  They have looked at the

10   workings of the Ericsson equipment and provided very lengthy

11   written reports and have concluded that KPN's patents are not

12   used and not infringed.

13        And let me preview for you what the witnesses are going

14   to tell you about these patents and their lack of use in

15   infringement.  So let's start with the '089.

16        The problem the '089 addresses is dead spots or coverage

17   holes in the cellular network.  And we've all experienced

18   that.  Right?  We've hit a dead spot.  I usually hit one on

19   I-20 somewhere between Longview and Tyler, and I'm sure you

20   got your few favorites as well.  And the network providers are

21   obviously always looking for the dead spots.  And when they

22   find one, they can put up another base station and try to

23   patch the hole.

24        Coincidentally, Ms. White and I did not share slides in

25   advance of preparing them, and we both found the Sprint

 1    can-you-hear-me-now guy.  And that was our example that we

 2    were both going to give you.  She may have stolen my thunder

 3    in that, but this is basically what drive testing is.

 4         Now, it's more sophisticated than walking around, saying,

 5    can you hear me now.  It's backpacks with logging information,

 6    you know, arrays of phones put on cars as they drive around.

 7    But what they're doing, historically, the operators, and still

 8    to today you will hear, they're still doing it today, because

 9    this does things that the MDT feature can't do, is the drive

10    tests.

11         Now, the theory of KPN's patent is the following:  Can we

12    replace the drive testing and look for coverage issues in the

13    network just by using all the phones that are out there in the

14    population, you know, in people's pockets, walking around.  In

15    other words, we all turn into the drive testers, quote,

16    unquote, automatically take the signal measurements and send

17    them back to the network.  And that's what the patent

18    proposes.

19         And let me show you a figure.  It's got a little bit of a

20    depiction from figure 3 of the patent, which we'll talk about,

21    but the idea that's disclosed in the patent and described is

22    the following:  If you have a known network, like a 3G

23    network, that network would connect to and instruct your phone

24    to go measure, for instance, an unknown network like the 4G,

25    they may be building out the 4G network or they may just be

1    interested in finding coverage holes there, your phone would

2    then measure the 4G network and send the readings back over to

3    the 3G network, which is obvious because if you find the

4    coverage hole in the 4G network and you don't have service,

5    you can't send the reading back.  So that's a little bit of

6    the idea of the patent.

7        Now, while this sounds interesting in theory, like many

8    patents it's not commercially practical in the real world.

9    Why?  It drains your battery badly.  The reason it's a battery

10   drainer is the phone is constantly pinging the network to

11   measure and transmit data, and it cuts battery life in half or

12   worse.  The evidence will show that no network operators in

13   the United States use this feature or have ever used it

14   commercially.  One briefly tested it, but isn't using it.

15       Now, you heard KPN's attorney argue in the opening

16   statement, or at least predict in the opening statement that

17   you'll hear, that operators bought this feature as part of a

18   package so they must be using it, they must value it.  But

19   that isn't the case.  And what you're going to hear is this

20   feature, MDT, is one of hundreds of features that come along

21   with a software package when customers buy an Ericsson base

22   station.

23       You know, it's a lot like all the pages of pre-installed,

24   preloaded apps you get on your phone when you get a new phone,

25   and many of them aren't used.  Similarly, many of the hundreds

1    of features that are just defaulted into an Ericsson software

2    package are never used, and this is one of the features that

3    just isn't used.

4        Now, KPN's lawyer also told you in her opening statement

5    that the operators in the United States have activated this

6    feature, but that's not the whole story.  And this is a very

7    important, very important, part of the case, because the

8    feature has never actually been configured by any carrier in

9    the United States commercially.

10       So activating a base station, right, is really nothing

11   more than setting a flag in software.  It's in a setup screen,

12   and it's one of literally thousands of settings.

13       AT&T and Verizon -- so you saw a slide that was placed up

14   with a list of base stations.  AT&T and Verizon have set the

15   flag to disabled across their whole network with the exception

16   of 1 or 200 base stations.  T-Mobile has set the flag to

17   enabled for its network.  But setting the flag to enable does

18   not configure or activate the MDT feature because something

19   else is absolutely necessary to happen, and that is the second

20   part of it, which is, you have to get consent from the user.

21   To be configured and activated, the network operators must get

22   customer consent to log their phones.

23       Now, the base station actually does a mandatory database

24   check for customer consent before the MDT feature can be

25   activated or used.  And if a customer consent is not in that

1   database, if it's not logged into the database, the phone will

2   not be configured to use MDT, and this requirement is actually

3   coded into the programming of the base station.

4        And so that's why in this drawing here or the slide we

5   have this power circuit breaker switch light analogy.  And the

6   reason we put it there is, you know, activating in the base

7   station is sort of like flipping the circuit breaker in your

8   house.  You know, that doesn't turn the light on.  If you want

9   the light to come on, you have to do more, which is flip the

10  light switch in the room and screw a lightbulb into the

11  socket.

12       And what you're not going to see is the lightbulb or

13  switch ever coming into play.  You won't see any evidence in

14  this case that a single operator in the United States has

15  obtained or even asked for customer consent.  No lightbulbs,

16  no flipped switches.  And, remember, KPN has the burden of

17  proof here.

18       Now, I'm going to ask you to do something.  I'm going to

19  ask you to keep a running tally in your heads as you listen to

20  the evidence of how many actual customer consents KPN will put

21  into evidence.  I mean, there are 300 million-plus cellular

22  subscribers, customers, in the United States.  So if I were

23  consenting, you would think KPN would have no problem bringing

24  that evidence forward.

25       Now, what has been argued is, well, the Ericsson software

1   may be capable of doing this, and there was a discussion about

2   capable versus configured and you saw the PC analogy.  And I

3   think the takeaway from that was, well, this might get done in

4   the future, but it's not being done today.

5       And I think that argument or that line of analysis you'll

6   see is wrong for two reasons.  The first is, the evidence is

7   going to show that this feature has been part of the Ericsson

8   software bundle since 2016 and nobody's used it for six years.

9       Secondly, we're going to look in this case with the

10  witnesses very carefully at the claims of KPN's patents.  And

11  Judge Gilstrap instructed you about the importance of the

12  claims.  That really is what defines whether there's

13  infringement or not.  The language that's used in the claims

14  is that the base station, or the network, must instruct the

15  phone to take measurements, and it has to be configured to

16  take measurements and to report the measurements back to the

17  base station.

18      And you'll see, if we can go to the next slide, please,

19  Mr. Moreno, that configured means not merely capable of.  And

20  this is the claim construction that Judge Gilstrap told you

21  about.  It's in the tab in your juror notebooks called

22  Construed Terms.  We don't have to turn to that now, but these

23  are rulings from the Court that are binding.  They are the

24  instructions of the Court for what you have to find.  And KPN

25  has the burden to show infringement by showing that the

 1    feature is actually configured today, not merely being capable

 2    of being used in the future.

 3         And here's the evidence you're going to see.  If a

 4    carrier wants to put a phone in its network into this MDT

 5    mode, it has to send it a configuration message.  You're going

 6    to hear about that message in the case.  It's called the RRC,

 7    connected reconfiguration, message.  And I know some of you

 8    are trying to write it down.  I will say it again because it

 9    will be important in the evidence--RRC, connected

10    reconfiguration.

11         The reason it's called a reconfiguration message is this

12    message sends the configuration to the phone if it's ever

13    used, if the message is ever sent, it would send the

14    configuration to the phone to begin doing the measurements.

15    It has some parameters about what to measure, how often to

16    measure, that sort of thing.  That's the configuration

17    message.

18         What you will hear is the RRC reconfiguration message

19    cannot and will not be sent unless there is a customer consent

20    in the database of the network reflected in there and the base

21    station checks and finds that customer consent.  Without it,

22    the configuration message is never sent to the phone, and

23    without the configuration message ever being sent to the

24    phone, the phone will not do MDT and won't be configured.  And

25    that's the evidence you're going to hear.  And that's why this

 1    isn't used.

 2         But even if we were to posit a hypothetical world where

 3    all the base stations were actually configured, right, all the

 4    flags were set to enabled and every customer had consented and

 5    they were starting to use this, KPN's patents still wouldn't

 6    be infringed.  And that's because Ericsson's equipment works

 7    differently than KPN's patent.

 8         Now, KPN's patent claims, and this is claim 13 that we'll

 9    show in the evidence, one of the ones they are asserting, it

10    requires a first and second wireless access network.  Two

11    networks, first and second wireless access network.  And the

12    phone is instructed over the first network to take

13    measurements of the second network.  But that's not how

14    Ericsson equipment works.

15         KPN's technical expert, I believe, is going to tell you

16    that in Ericsson's MDT feature, if it were to be used, a phone

17    connects to a single base station, a single cell, and measures

18    a single neighboring base station or a single neighboring

19    cell, but the claim isn't infringed by a system that compares

20    one cell to another or uses one cell to measure another.  That

21    isn't two separate networks.

22         Now, on top of that, you'll hear from us that KPN didn't

23    actually invent what they're accusing of infringement.  So

24    this individual cell approach that I just described to you

25    that you're going to hear from KPN's expert was actually

 1    invented originally by Motorola back in the 1990s, back in the

 2    2G days.  They actually got a patent on it, and you'll see

 3    that patent.  It's called the Tayloe patent.  It's owned by

 4    Motorola.  And that patent is prior art to this patent.

 5         The patent is now expired to Motorola so the technology,

 6    because the patent has expired, is freely publicly available.

 7    But that's the approach Ericsson is using, the approach in the

 8    Motorola patent.  And KPN cannot validly claim that their

 9    patent covers the Motorola approach that was not invented by

10    them and was actually invented by Motorola decades earlier.

11         Let's turn now to the second patent, the '637 deny access

12    patent.

13         This addresses a completely different problem than the

14    drive testing patent we just looked at.  The problem being

15    addressed by this patent is, during the time of day when

16    there's network congestion like drive time when a lot of

17    people are on their phones, the network needs to limit the

18    number of phones and other devices that will connect to it

19    just to keep it from going over capacity.

20         And the theory behind this patent is, to reduce

21    congestion, the network would set a time interval and during

22    this time interval it's going to tell a group of devices,

23    don't try to connect to the network.  So think of it as

24    putting your phones in time-out or a group of phones in

25    time-out.

1          Now, the claim requires that the network keep a register

2     or like a list of the devices that are in time-out.  And then

3     if a device in time-out actually tries to connect, they will

4     be denied access.  Now again, while that's interesting in

5     theory, there's practical problems.  Ericsson base stations

6     never deny access to phones.  What if it's an emergency call?

7     Ericsson deals with high traffic times differently, not by

8     denying access.  What it does is it gives voice calls

9     priority, and it works -- the Ericsson equipment works in data

10    around the voice calls.  So access is never denied.

11         And you'll hear that if traffic in the network gets very

12    high, Ericsson base stations can ask a phone to back off for a

13    short period of time.  But if the phone tries to connect

14    anyway, perhaps because it's an emergency, the Ericsson base

15    station will never deny that request.  And that's why this

16    patent isn't infringed, either.

17         Third, let's talk about the '235 authentication patent.

18    This is the patent KPN is asking for $512 on.  When a phone

19    connects to the network, obviously there is authentication.

20    Your phone and the base station authenticate each other by

21    exchanging a sequence of very complicated codes using shared

22    secret keys.

23         Now, this has been the case for decades.  KPN did not

24    invent this.  KPN's patent proposes adding additional levels

25    of authentication on top of what's already been done where the

1    channel number that the phone is -- is coming in on is

2    also authenticated as well.  But in -- this idea, again, isn't

3    used in practice in today's cellular networks.  There isn't a

4    need for this additional authentication.  Ericsson base

5    stations do not send channel information as part of

6    authentication.

7         Now, I'd like to talk about the business history between

8    the parties, and it has been a long business history.  But the

9    business relationship between Ericsson and KPN with regard to

10   patents was a bit different than Ericsson had with its other

11   network customers.  You know, even though Ericsson and KPN

12   were business partners, KPN insisted it had patents that

13   Ericsson infringed and needed to license.

14        Now, Ericsson doesn't have these type of arrangements

15   with its other network customers who also own their own

16   patents.  But KPN owns patents, they have every right to

17   assert patents, and we 100 percent respect their right.  So

18   when KPN brought the patents to us and said, you may infringe

19   these, Ericsson carefully analyzed the patents that KPN was

20   asserting.

21        Now, the two companies disagreed over the technical

22   merits for years of what Ericsson was and wasn't using.  And

23   Ericsson didn't believe it was using KPN's technology and

24   didn't believe it needed to pay for a license, but KPN was

25   insistent.  And that put us in an awkward position, to be

1    candid, because you can't win an argument with a customer.

2        So the way this issue historically resolved itself was

3    KPN and Ericsson basically agreed to disagree.  Ericsson

4    didn't -- Ericsson provided KPN with a discount by a voucher

5    program on the equipment it was buying, and it didn't ask for

6    a license in return.  Instead, we agreed KPN would just

7    provide a non-assert.  And this is basically saying, a

8    non-assert, that the two sides agree to disagree, but let's do

9    business together and let's just not go to court.

10       But things changed in 2020 when KPN told Ericsson it

11   wasn't going to buy any more equipment from them.  They were

12   going to ship their business from Ericsson to Huawei, a

13   competitor of Ericsson in base stations, and Ericsson was

14   certainly disappointed to lose KPN as a customer and we

15   certainly hoped to win their business back, but until then we

16   respect KPN's right to do business with whom they choose to do

17   be with.

18       But that meant, with KPN not doing business with Ericsson

19   anymore, the voucher discount program and agreeing to disagree

20   just wasn't feasible anymore.  And so before filing this suit,

21   KPN asked Ericsson to pay it, to continue the voucher program

22   and pay $2.8 million Euros per year for a license.  That's

23   about a little more than $3 million a year.  And that's not

24   just for the three patents-in-suit; that's for all of KPN's

25   patents that they own worldwide.

1       But Ericsson had looked at the patents and was still of

2  the opinion we aren't using them, and we gave them a detailed

3  written description -- analysis of why, but they just weren't

4  satisfied.  So KPN brought this dispute to court, and Ericsson

5  is here in court to defend itself and show you why we don't

6  use the patents.  And it will be up to you, ladies and

7  gentlemen, to decide.

8       Now, KPN suggested in her opening that Ericsson took too

9  long to -- to license KPN's portfolio, we should have taken

10 the deal.  But I want you to consider the objective facts when

11 you look at this.  KPN has hundreds or thousands of patents.

12 They asserted 15 families against us in negotiations, and they

13 brought a case on three patents, these three.  One they admit

14 is worth $500, another is worth a few hundred thousand

15 dollars, and none of the three are being used.  And we've got

16 to assume that they brought their best foot forward in this

17 litigation.

18      Really quickly on damages, that can be quickly addressed.

19 If the patents aren't used or aren't infringed, nothing is

20 owed.  And you'll see in this case that KPN is asking far more

21 than the market says their patents are worth.  Damages are

22 driven 99 percent in this case by a single patent.  And KPN is

23 asking you to award an amount many times what others in the

24 industry have licensed KPN's patents for and also many times

25 more than its own license offer to Ericsson.

1        Finally, ladies and gentlemen, that concludes my remarks.

2   But before sitting down, I'd like to thank you in advance for

3   your service in this case.  I think all the parties agree jury

4   service is a major commitment, and we greatly appreciate you

5   taking the time to help us resolve this dispute.

6        We're on a time budget in this case.  We promise to do

7   our best to respect your time and attention and to make the

8   evidence presentation as straightforward and as simple as

9   possible.  And I'd just ask you one thing:  Please keep an

10  open mind during the case.  I know you will.  We speak second,

11  and we put on our evidence second.

12           THE COURT:  Time's expired, Mr. Stevenson.

13           MR. STEVENSON:  Thank you, Your Honor.

14       And we look forward to presenting our case to you.

15           THE COURT:  All right, ladies and gentlemen.  You've

16  now heard opening statements from both of the competing

17  parties.

18       Let me ask you this, counsel does either party wish to

19  invoke the Rule?

20           MS. WHITE:  Yes, Your Honor, for the Plaintiff,

21  please.

22           THE COURT:  All right.  Am I correct that you wish

23  to invoke the Rule such that fact witnesses are covered but

24  expert witnesses and corporate representatives are not?

25           MS. WHITE:  That's right, Your Honor.

1        THE COURT:  All right.  That means, the Rule having

2   been invoked in that fashion, that if you are a fact witness

3   in this case, you are required to wait outside the courtroom

4   until you're called to testify.  If you are a designated

5   expert or if you're a corporate representative, you may remain

6   in the courtroom through the testimony of other witnesses.

7        Now, before I ask Plaintiff to call their first witness,

8   we're going to take a short recess, ladies and gentlemen, and

9   this is one where you can simply close your notebooks and

10  leave them in your chairs.  I'm going to try to keep this

11  short so we can get the first witness on the witness stand

12  promptly.

13       Please follow all my instructions, including not to

14  discuss the case with each other.  And, again, at this point

15  you still haven't heard any evidence.

16       With that, the jury is excused for a short recess.

17            (Whereupon, the jury left the courtroom.)

18            THE COURT:  The Court stands in recess.

19                    (Brief recess.)

20            THE COURT:  Be seated, please.

21  Let's bring the jury in, please, Mr. Latham.

22            (Whereupon, the jury entered the courtroom.)

23            THE COURT:  Please be seated, ladies and gentlemen.

24  I see a couple of jackets and sweaters that have been put

25  on in the jury box.  I want you to know I have absolutely zero

1   control over the temperature in this room.  It's all

2   controlled from the headquarters of the district in Tyler.  So

3   don't blame me if you're cold.

4        All right.  Plaintiff, call your first witness.

5            MR. HEALY:  Your Honor, KPN calls Ms. Cornelia

6   Gerritse, also KPN's corporate representative.

7            THE COURT:  All right.  If the witness will come

8   forward and be sworn, please.

9            (Whereupon, the oath was administered by the Clerk.)

10           THE COURT:  Please come around, have a seat on the

11  witness stand.

12       You may distribute binders, counsel.

13       All right.  Mr. Healy, you may proceed with direct

14  examination when you're ready.

15           MR. HEALY:  Thank you, Your Honor.

16                   CORNELIA GERRITSE,SWORN,

17  Testified on direct examination by Mr. Healy as follows:

18  Q.   Ms. Gerritse, good afternoon.  As you know, my name is

19  Andres Healy, and I'm one of the attorneys representing KPN in

20  this matter.

21       Would you please introduce yourself to the jury, Ms.

22  Gerritse.

23  A.   Yes.  I'm Lia Gerritse from the Netherlands.  I am

24  married for over 30 years.  I have four grown-up kids, and I

25  work at KPN.

```
 1    Q.   And, Ms. Gerritse, are you an expert witness?

 2    A.   No.

 3    Q.   Have you ever testified in a trial before?

 4    A.   No.

 5    Q.   Have you ever been to a U.S. trial before?

 6    A.   No.

 7    Q.   Are you nervous today, Ms. Gerritse?

 8    A.   Yes.

 9    Q.   And is English your native language?

10    A.   No.

11    Q.   What is your native language?

12    A.   Dutch.

13    Q.   And we certainly appreciate that, and I know that we've

14    been practicing quite a bit for today.  But if you do have any

15    trouble understanding myself or anyone, will you please let us

16    know?

17    A.   Yes.

18    Q.   And if people start talking a little too fast, will you

19    please let us know?

20    A.   Yes.

21    Q.   And I hope you understand, but if we do ask you to repeat

22    yourself today, would you mind doing that?

23    A.   That's okay.

24    Q.   Ms. Gerritse, could you please explain to the jury who

25    you work for?
```

```
 1    A.    I work for KPN BV.

 2    Q.    And is KPN BV the same company that is the Plaintiff in

 3    this case?

 4    A.    No.  It's the wholly-owned company from KPN NV, and KPN

 5    BV is responsible for the day-to-day operations in the

 6    Netherlands.

 7    Q.    And so of those two companies, which do you work for?

 8    A.    The BV.

 9    Q.    Okay.  And when was KPN founded?

10    A.    It was around 1880.  Also used to be in charge of the

11    Postal Services.

12    Q.    We heard a little bit earlier about Ericsson being in

13    charge of the telegraph.  KPN do that as well?

14    A.    Yes, KPN as well, yes.

15    Q.    But what does KPN do today, Ms. Gerritse?

16    A.    Today we are a technology company.  We provide

17    telecommunication service in the Netherlands, so for instance

18    cellular service but also more traditional telephone.  We are

19    like the AT&T or Verizon of the Netherlands.

20    Q.    Sizewise, how does KPN compare to AT&T or Verizon?

21    A.    We are tiny, very small.

22    Q.    Roughly speaking, how many subscribers does KPN have?

23    A.    Around 4 million.

24    Q.    Do you have any idea as to how many customers AT&T has?

25    A.    I understand around 200 million.
```

```
 1   Q.   Now, does KPN have any operations in the United States?

 2   A.   No, we don't.

 3   Q.   Does KPN sell any products in the United States?

 4   A.   No, we don't.

 5   Q.   So can you explain to the jury why KPN is here in this

 6   case today?

 7   A.   Yes, we have patents in the USA, and USA courts is the

 8   only place they're important.

 9   Q.   Now I want to take a step back.  When did you first start

10   working at KPN?

11   A.   That was in 1987.

12   Q.   And what position do you currently hold at KPN?

13   A.   At the moment I work for the Intellectual Property

14   Department.

15   Q.   And can you explain to us what the Intellectual Property

16   Department does at KPN?

17   A.   Yes.  We advise KPN on all kinds of intellectual property

18   and then you have to think about patents but also trademarks

19   and copyrights.

20   Q.   And with respect to patents, which is why we're here

21   today, what does the Intellectual Property Department

22   typically do?

23   A.   Well, most of our time is based -- spent on prosecuting

24   patents like we are here to explain and also in licensing.

25   Q.   And do you have any special qualifications to hold the
```

1   position that you do?

2   A.   I'm a European patent attorney.

3   Q.   And what does it take to become a European patent

4   attorney?

5   A.   After university in the Netherlands, then you spend about

6   three years working as an apprentice for a qualified European

7   patent attorney.  Then you have to pass an exam, and then you

8   are a European patent attorney yourself.

9   Q.   Do you have an engineering background at all?

10  A.   No.

11  Q.   Do you have any technical background?

12  A.   No.

13  Q.   And can you explain to the jury, why does KPN invest in

14  new technology and patents?

15  A.   Yes.  Like we said, we are a telecommunications company.

16  There's a lot of developments there.  We constantly have to

17  improve our network, make it more efficient, make it cheaper,

18  make it better.  So our engineers are constantly working on

19  improving our technology, and we file patents to protect our

20  inventions and to make sure that we get a good compensation

21  for our investments in money and resources.

22          THE COURT:  Let me ask the witness, could you pull

23  the microphone just a little bit closer?  That's fine.  Thank

24  you.

25          THE WITNESS:  Okay.

1              THE COURT:  Go ahead, counsel.

2              MR. HEALY:  Thank you, Your Honor.

3    Q.   (BY MR. HEALY)  We heard a little bit about what Ericsson

4    spends in research and development.  What does KPN, generally

5    speaking, spend each year on researching and developing new

6    telecommunications products?

7    A.   Well, hundreds of millions.  For instance, in 2020 we

8    spent around 300 million, and the year before was 450 million.

9              MR. HEALY:  Mr. Boles, if we could bring up the

10   first slide, which I believe has PX 1, PX 3, and PX 5 on it?

11   Q.   (BY MR. HEALY)  Ms. Gerritse, do you understand that

12   these are the three asserted patents in this case?

13   A.   Yes.

14   Q.   And did any of these three patents result from KPN's

15   research and development activities?

16   A.   Yes, all three of them.

17   Q.   Now, did you personally do any work on the prosecution of

18   any of these three patents?

19   A.   Yes, on the '089.

20   Q.   And does KPN have any sort of standard procedures that it

21   goes through when it's prosecuting the patent?

22   A.   Yes.

23   Q.   For the benefit of the court reporter, if you would let

24   me finish my question?

25   A.   Certainly.

1   Q.   No problem.  Can you explain to the jury what those

2   standard procedures are?

3   A.   Yes.  When an engineer within KPN has an invention, he

4   usually he has to come to our department and then would --

5   what we call a disclosure.  And then we take a look at the

6   disclosure and discuss with the inventor.  Usually there are

7   more inventors.  So really understands what's the invention,

8   how it works, which problem it solves.

9        And then if it is -- if we judge it important enough,

10  then we coordinate between the inventor and an outside

11  counsel, and that outside counsel then actually writes the

12  patent.  And we are organizing all this work.

13  Q.   Is it fair to say that your role is largely coordinating

14  between the inventors and the outside counsel?

15  A.   Yes.

16  Q.   And did you employ this process for the '089 Patent?

17  A.   Yes, I did.

18  Q.   And, roughly speaking, how long did this process take?

19  A.   It was about nine months.

20  Q.   Now, when each of these three patents issued, was it

21  originally owned by KPN alone?

22  A.   No.

23  Q.   Who else owned an interest in these patents when they

24  issued?

25  A.   It was co-owned with the Nederlandse Organisatie voor

1   Toegepast-Natuurwetenschappelijk Onderzoek, or shortly TNO.

2   Q.   And is it okay if the rest of us just refer to that

3   entity as TNO?

4   A.   Yes.

5   Q.   I certainly appreciate that.  What is TNO?

6   A.   TNO is an independent research organization in the

7   Netherlands.  They perform research in all different areas and

8   amongst others in wireless telecommunication technologies.

9   Q.   And does KPN have any sort of -- does KPN have any

10  special relationship with TNO?

11  A.   Oh, we are independent companies.  But in 2010, KPN

12  transferred its research department to TNO, and since that

13  time, we worked very closely with them on developing new

14  wireless technologies.

15  Q.   Does KPN pay TNO for any of the services that TNO

16  provides?

17  A.   Yes.

18  Q.   And does TNO still own any portion of the three patents

19  at issue?

20  A.   No, not in these three patents.

21  Q.   What happened with respect to TNO's rights?

22  A.   They assigned all the rights in these patents to KPN, and

23  in return they received a license to keep using the patents

24  for their research, and they will get 25 percent of all monies

25  KPN generates with the patents after deduction of certain

```
 1    costs and expenses.

 2    Q.    So if KPN receives any monies in this case, will TNO

 3    receive 25 percent of those monies?

 4    A.    After deduction of costs and expenses, yes.

 5              MR. HEALY:  And, Mr. Boles, if you can pull up PX

 6    473, 474, and 476.

 7    Q.    (BY MR. HEALY)  Ms. Gerritse, have you reviewed these

 8    documents?

 9    A.    Yes.

10    Q.    And what are these documents?

11    A.    These are the actual assignments from TNO to KPN that we

12    filed with the U.S. Patent Office.

13    Q.    Did you also say you do work related to licensing of

14    KPN's patents?

15    A.    Yes, that is true.

16    Q.    And can you explain to the jury what it means to license

17    a patent?

18    A.    Well, patents give you basically the right to preclude

19    everyone else from practicing your patent, and by giving

20    someone a license to your patents, you allow them to practice

21    your patent as well.  And that's, of course, valuable.

22    Q.    Does KPN charge for licenses to its patents?

23    A.    Yes, we do.

24    Q.    Is KPN the only company in the world that licenses its

25    patents?
```

1    A.    No.

2    Q.    Is KPN the only company that charges to license its

3    patents?

4    A.    No.

5    Q.    What does KPN do with the money that it receives from

6    licensing its patents?

7    A.    We use it to offset the costs of further research and

8    development in the improvement of our technologies.

9            MR. HEALY:  And, Your Honor, at this point we're

10   going to move into confidential materials so I'd move to seal

11   the courtroom.  And I'll note that at least the initial

12   portion, Ericsson individuals do not need to leave.

13           THE COURT:  All right.  Based on counsel's request,

14   I'll order the courtroom sealed to protect confidential or

15   proprietary information.

16       I'll direct that persons present who are not subject to

17   the protective order in this case should excuse themselves

18   from the courtroom until it's reopened and unsealed.

19       Mr. Healy, you indicated there's some portion of this

20   that the Ericsson personnel could remain for.  I don't know

21   how to police that.  I mean, if you want to stop when you want

22   me to ask the Ericsson people not subject to the protective

23   order to leave and let me know, that's fine.  If you want them

24   to go ahead and leave now, that's fine.  But I don't know when

25   you're going to reach that point.  Only you do.  So you're

1    going to have to let me know.

2        But if KPN has no problem with Ericsson personnel who are

3    not otherwise subject to the protective order remaining for a

4    portion of this, I'll permit it until you indicate otherwise.

5            MR. HEALY:  That's perfectly fine, Your Honor.

6            THE COURT:  All right.  With that understanding,

7    we'll consider the courtroom and the record are sealed at this

8    time.

9                    (Courtroom sealed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          (Courtroom unsealed.)

7              MR. STEVENSON:  May we approach to pass out cross

8    binders?

9              THE COURT:  You may.

10                           (Brief pause.)

11             THE COURT:  All right, counsel.  Proceed with

12   cross-examination.

13                        CROSS EXAMINATION

14   By Mr. Stevenson:

15   Q.    Ms. Gerritse, you are a patent attorney in Europe.

16   Correct?

17   A.    Yes, that's correct.

18   Q.    And your title within KPN is what?

19   A.    European patent attorney.

20   Q.    Okay.  And how many people are there in your department

21   involved in patent licensing?

22   A.    Six.

23   Q.    And the head of that department is Mr. Wuyts?

24   A.    Wuyts, yes.  That's right.

25   Q.    But you've been selected to be the representative of KPN

 1   for this trial, haven't you?

 2   A.   Yes, that's right.

 3   Q.   And that means you're testifying on behalf of the company

 4   here in the trial.   Correct?

 5   A.   That's how I understand it.

 6   Q.   Okay.   And I'd like to ask you about some of the

 7   statements and assertions your company has made in this case.

 8        Do you recall --

 9            MR. STEVENSON:   May I have the elmo, please?

10   Q.   (BY MR. STEVENSON)   Do you recall seeing this slide in

11   the opening statement?

12   A.   Yes.

13   Q.   And this was argued about AT&T and its use of the

14   minimization of drive testing feature.

15   A.   I do not really recall that.   Maybe you can --

16   Q.   Well, Do you remember seeing this slide in opening?

17   A.   Yes.

18   Q.   And it was a discussion of, on the slide, minimization of

19   drive testing.   Right?

20   A.   Yes.

21   Q.   You understand that's the '089 Patent?

22   A.   Yes.

23   Q.   That's the patent that KPN is seeking $31 million in

24   damages in this case for?

25   A.   That's right.

1    Q.   And that's the patent that Ericsson contends isn't being

2    used in the United States.   Correct?

3    A.   That's my understanding, yes.

4    Q.   Now, this slide shows three columns, FAJ, feature name,

5    and NIRT priority, doesn't it?

6    A.   I see that on the slide, yes.

7    Q.   And you understand that's a -- that's a blow-out of

8    Plaintiff's Exhibit 71?

9    A.   No, I don't see it.   I do not have PX 71.

10   Q.   Do you see in the upper right-hand corner or upper

11   left-hand corner?

12   A.   Yes.

13   Q.   Excuse me.   It says PX 71.   That's the source for this

14   slide, isn't it?

15   A.   If you say so.

16   Q.   I believe it's your company's slide, isn't it, ma'am?

17   A.   I have not seen this slide.

18   Q.   I would like to ask you about it because that's been

19   presented in this trial by your company, hasn't it?

20   A.   I've seen it, yes.

21   Q.   You saw it in the opening, didn't you?

22   A.   I'm not sure.

23   Q.   Let me ask you about it.   I want to show you PX 71 on the

24   elmo.   This is the source document it came from.

25             MR. HEALY:   Objection, Your Honor.   May I approach?

1          THE COURT:  I'm sorry?

2          MR. HEALY:  May I approach, Your Honor?

3          THE COURT:  Approach the bench, counsel.

4          (The following was had outside the hearing of the

5          jury.)

6          MR. HEALY:  Your Honor, this is a confidential

7  Ericsson document that the witness has never been entitled to

8  see.  I don't know why we're asking her questions about it.

9          MR. STEVENSON:  It was shown in open court by her

10  lawyer in opening, and I want to ask a question --

11          THE COURT:  It's a pre-admitted exhibit in this

12  case, isn't it?

13          MR. HEALY:  My point is it's a document marked as --

14  as confidential, the witness has never seen it.  I see no

15  reason to ask her technical questions about the document.  If

16  you want to ask questions, that's fine, but the witness --this

17  is what we got into earlier where they want to ask our witness

18  technical questions, she's not an expert, she has no

19  engineering background, she has no idea about the technical

20  background of Ericsson's own documents.  And I don't

21  understand this line of questioning.

22          THE COURT:  Well, she's not an expert witness and

23  she's not going to give opinions.  But to the extent it's a

24  pre-admitted exhibit in this case, counsel for Ericsson's

25  entitled to ask her what she knows about it.  It may be very

1    little, but he's entitled to inquire.

2              MR. HEALY:  Okay.  Understood.

3              THE COURT:  Let's proceed.

4              MR. HEALY:  Thank you.

5              (The following was had in the presence and hearing

6              of the jury.)

7              THE COURT:  Objection's overruled.  Let's proceed.

8    Q.   (BY MR. STEVENSON)  So I want to show you a page from

9    this document, and this says, AT&T, 21 quarter 2GAed features.

10   Do you see that?

11   A.   Yes.

12   Q.   And that is the same -- I'm going to put your slide from

13   opening back up.  That's the same as the slide from opening,

14   the same title.  Right?

15   A.   I would like to see the document.  I mean --

16   Q.   Here's what I'd like to ask you --

17   A.   -- you're switching slides.

18   Q.   Yeah,  I'm going to direct your attention to, because I

19   want to make the point and see if you agree with me, that I'm

20   showing you the source document that this slide was made from.

21   A.   Okay.

22   Q.   So you'll notice at the bottom, we have a control number

23   on the documents on this case.

24   A.   Yes.

25   Q.   You've heard of those before.  Those are Bates numbers?

1    A.    Bates numbers, yes.

2    Q.    You've dealt with those before.  Right?

3    A.    Yes.

4    Q.    And it ends in 84212, the slide?

5    A.    Yes.

6    Q.    Okay.  Now I'm going to go over to the source document

7    and show you that source document also ends in 84212.

8    A.    Okay.

9    Q.    This is the document that's the slide was made from,

10   wasn't it?

11   A.    Apparently.

12   Q.    Okay.  Now, what I'd like to ask you about is, on the

13   slide, the NIRT priority box was squared up.  Do you remember

14   that?

15   A.    Where was this?

16   Q.    On the slide --

17   A.    Okay.  Yes.

18   Q.    -- the NIRT priority box was squared up?

19   A.    Okay.

20   Q.    Do you remember?  And that was one of three columns here.

21   But it appears, doesn't it, ma'am, that the slide only shows

22   these three columns, and it cuts off remaining columns to the

23   right, doesn't it?

24   A.    Yes.

25   Q.    And what the slide did is it looked at the minimization

1   of drive testing row.  Correct?

2   A.    Maybe we can check to the other slide.

3   Q.    Happy to.  Happy to.  Let's go back to the slide that was

4   in opening.  Do you see the minimization of drive testing

5   where it was identified?

6   A.    Yes.

7   Q.    Okay.  And it identified that as a high-1, and that was

8   highlighted as well, wasn't it?

9   A.    Yes.

10  Q.    Okay.  But if we look over to the rows that were cut off

11  of the slide that was shown in opening, there is another row

12  that talks about deployed.  Do you see that?

13  A.    I see that row, yes.

14  Q.    And the answer as to whether the feature is deployed by

15  AT&T is no, isn't it?

16  A.    Well, I see that in this column there is a no, but I have

17  absolutely no background information of where this slide is

18  coming from and what it means, so...

19  Q.    Do you know who put this slide together?

20  A.    No.

21  Q.    Under auto on, whether it's automatically on, the entry

22  in there is no as well, isn't it?

23  A.    I can see that on that slide, but I have no idea what it

24  means.

25  Q.    If we go over to feature activation, whether it's part of

1  the feature activation for AT&T, this document says no,

2  doesn't it?

3  A.   I cannot make an interpretation.  I can see that in this

4  column, this row, there is a no, but what's the meaning, I

5  cannot...

6  Q.   Well, the deployed box wasn't on the slide that we saw in

7  opening, was it?

8  A.   I don't think so, no.

9  Q.   The auto on box was not on the slide we saw in opening,

10  was it?

11  A.   No.  I cannot remember seeing it.

12  Q.   The feature activation box was not on the slide we saw in

13  opening, was it?

14  A.   I do not remember seeing it.

15  Q.   Why was the slide cut off to eliminate information that

16  would have shown to the jury that this feature by AT&T isn't

17  activated, isn't automatically on, and isn't deployed as of

18  Q2, 2021?

19  A.   Like I said before, I've never seen this slide before.  I

20  don't know.

21  Q.   Do you consider that to be relevant information here?

22  A.   What?

23  Q.   That it's not deployed activated and it's not

24  automatically on in the AT&T network?

25  A.   I don't know whether that's represented in the slide.

1    Q.   So, Ms. Gerritse, I heard you say that you manage the

2    prosecution of the '089 drive testing patent?

3    A.   I call it coordinated it, yes.

4    Q.   Coordinated the prosecution?

5    A.   Yes.

6    Q.   And what does it mean to prosecute a patent?

7    A.   It is the whole process, from disclosure you receive from

8    the inventor, and then we have to have a draft provided by

9    usually outside counsel, and then we file the patent

10   application at the European Patent Office usually and later on

11   in other countries.  And then you can receive from the Patent

12   Office's office actions that need to be entered.  That's up

13   until the end of the patents in the different countries, and

14   that's the whole process of prosecution.

15   Q.   And before filing this lawsuit, KPN sent an email to

16   Ericsson with this patent and other patents, didn't it?

17   A.   Yes, we did.

18   Q.   In fact, you drafted and sent that email.  Correct?

19   A.   Yes.  January 2017.

20   Q.   And attached to that email was a claim chart for the '089

21   Patent.  Right?

22   A.   No, for the European patents in the patent family.

23   Q.   The European counterpart to the --

24   A.   Yes.

25   Q.   But that was a claim chart that was intended to apply to

1    the whole family of patents.  Correct?

2    A.    No, not necessarily.  At that moment it applied to the

3    '495 to the EP counterpart.

4    Q.    But you also identified in that claim chart other

5    counterparts, didn't you?

6    A.    That we had other counterparts, yes.

7    Q.    Including U.S. counterparts?

8    A.    That's right.

9    Q.    Okay.

10         THE COURT:  Let's make sure you both pause between

11   the other one speaking so we don't get any conflict in the

12   record, please.

13   Q.    (BY MR. STEVENSON)  And were you involved in the

14   preparation of that claim chart?

15   A.    No.

16   Q.    But you did transmit it on behalf of KPN.

17   A.    That's true.

18   Q.    And that claim chart you're saying was an assertion

19   against Ericsson that they needed a license under that patent.

20   A.    The claim charts presented one way of infringing the

21   claims of the patent.

22   Q.    And that's what you were accusing Ericsson of doing.

23   A.    Yes.

24   Q.    Okay.

25         MR. STEVENSON:  Your Honor, may we approach?

1          THE COURT:  Approach the bench.

2          (The following was had outside the hearing of the

3     jury.)

4          MR. STEVENSON:  I'd like to ask the witness about

5     the claim chart now.  She is the prosecuting attorney.  She

6     worked for the inventor.  She transmitted it to Ericsson and,

7     candidly, is the only witness in this case I can ask about the

8     claim chart.

9          THE COURT:  What's KPN say?

10         MR. HEALY:  KPN's position is she's not a technical

11    person.  She testified she had no involvement in preparing the

12    claim chart.  She just forwarded it along.  And I think what

13    counsel is trying to get into is a blow-by-blow analysis of a

14    technical issue that they can talk to an expert about or

15    should have had their expert opine about.

16       It's not an appropriate thing for a fact witness -- he

17    wants to get expert testimony off the cuff from a non-expert

18    witness.

19         THE COURT:  What is it you are trying to do, Mr.

20    Stevenson?

21         MR. STEVENSON:  I am trying to show the allegations

22    that were made by KPN at the time they sent the claim chart.

23    I'm not asking for opinion.  I just want her to go ahead and

24    read the document and say, here is what we alleged because

25    later with our witnesses we're going to show that we don't do

 1      what they allege in the claim chart.  Their theory is

 2      eventually changed.

 3           And a lot of this back and forth in the negotiations

 4      which we've heard an awful lot about has to do with technical

 5      disagreements.  And the basis of the technical disagreement is

 6      we think they're just wrong about their claim chart.  This is

 7      the same language that is at issue in this case.  It's the

 8      exact issue that we're having in this case, which is this

 9      whole issue about one or two networks and configurations.

10           And this is the position they took with us, and they say

11      we are a willful infringer, and we disagree.  And I think we

12      should be able to show that we don't do and we have a very

13      strong non-infringement argument as to the theory they

14      presented to us in the beginning of the negotiations.

15                MR. HEALY:  Willful infringement, Your Honor,

16      depends upon notice of a charge of infringement.  We very

17      specifically did not talk about the claim charts because this

18      witness cannot talk about the claim charts and we don't want

19      to open any doors.

20           What he wants to do is say KPN's position changed, isn't

21      that inconsistent, and use it to attack our infringement

22      theory.  Your Honor has already ruled in MIL 7 that these

23      claim charts pre*Markman* -- *Markman* positions in terms of

24      contentions not relevant evidence.  The evidence of

25      infringement is for the experts to decide and it's for the

1    experts to talk about.  He just said that his own expert

2    witness is going to address this.  So why does he need to talk

3    about them with my fact witness who has no technical

4    background at all?

5             THE COURT:  That's a good point.

6             MR. STEVENSON:  She is a European patent attorney,

7    and she sent this to us.  And their whole position in this

8    case is that we're willful because, you know, the negotiations

9    dragged out.  The truth is we were arguing about this and

10   other patents.  And I think we should be entitled to show what

11   they sent us, what it says, and just stop at what it says.

12   Here's what you sent us, here's the position you took when you

13   put it out there, and then I'll move on.

14            MR. HEALY:  The document in the record, given you'll

15   be able to show it to your witness, your expert witness, and

16   you're going to be able to ask him all these questions.

17   What's the point of asking a fact witness?  I mean, he wants

18   to ask her off-the-cuff questions and -- and ask a

19   non-technical person expert questions.  This is inappropriate,

20   Your Honor.  This is what we're concerned about at this point.

21            MR. STEVENSON:  Because Ms. Gerritse sent it to us

22   and participated in the technical negotiations.

23            MR. HEALY:  You've already established who sent it.

24   You've established the number.  You can show your witness the

25   number and your expert can address to the extent it's in his

1   report.  There is no need to ask a witness who has no idea

2   about a document questions about it, particularly a technical

3   document to a non-technical, non-expert witness.

4          THE COURT:  Well, she is the corporate

5   representative of KPN, and I think in that posture it's

6   appropriate for her to confirm these were sent by the company.

7      But beyond confirming they were sent, I think any

8   internal or granular discussion about what they do say,

9   especially if your expert's going to opine on them, is beyond

10  her -- it's beyond her capability as a patent lawyer who by

11  her own testimony coordinated some of the prosecution here but

12  didn't handle the intricacies of it.

13     I have no problem with you getting her to confirm what

14  was sent and that they went from KPN to Ericsson, but that's

15  where you need to stop, Mr. Stevenson.

16         MR. STEVENSON:  Thank you.

17         (The following was had in the presence and hearing

18         of the jury.)

19  Q.  (BY MR. STEVENSON)  Going back to the claim charts, Ms.

20  Gerritse --

21         THE COURT:  Counsel, reapproach the bench just for a

22  minute.

23         (The following was had outside the hearing of the

24         jury.)

25         THE COURT:  When I said that she can confirm that

1    they were sent from KPN to Ericsson, part and parcel of that

2    is she can confirm that that was KPN's position at the time

3    they were sent, but that's where we stop.

4              MR. STEVENSON:  Thank you.

5              (The following was had in the presence and hearing

6              of the jury.)

7              THE COURT:  All right.  Let's proceed.

8              MR. STEVENSON:  May we have DX 151, please?

9    Q.   (BY MR. STEVENSON)  So is this the claim chart for the

10   European version of the '089 Patent, drive testing patent, Ms.

11   Gerritse?

12   A.   Yes.

13   Q.   And that patent, although it covers the European patent,

14   would also cover the family of patents.  Correct?

15   A.   Well, we would have to compare the claims of the EP

16   patents with the family member patents.

17   Q.   Okay.  And it states, though, that there's a United

18   States of America patent, 8,626,175.  Correct?

19   A.   Yes, that's correct.

20   Q.   And that is the predecessor patent to the one that's

21   being asserted in this suit, isn't it?

22   A.   Yes.  That was the number before it got reissued, yes.

23   Q.   And this reflected your position at the time you sent it.

24   Correct?

25   A.   Yes.

1    Q.   And this was your position on how the claim should be

2    read against the 3GPP standard.   Correct?

3    A.   Yes.   Like I said, it was one way.

4    Q.   Thank you.   That's all I have on this.

5         Now, let me ask you a little bit about your technical

6    background.

7    A.   Yes.

8    Q.   Now, you told me you managed the prosecution or were

9    involved and coordinated the prosecution of the -- the patent.

10   Did you work with the inventors?

11   A.   I had meetings with the inventors, yes.

12   Q.   Okay.   And did you help in drafting or preparation of the

13   patent specification at all?

14   A.   No, not really.   I outsourced that to outside counsel.

15   Q.   Okay.

16   A.   So once we decide we want to draft a patent application

17   for an invention, we bring the inventors and the outside

18   counsel in contact with each other and they draft the patent

19   application.

20   Q.   Okay.

21             THE COURT:   Please try to speak up.

22             THE WITNESS:   Yeah.

23   Q.   (BY MR. STEVENSON)   Let's talk a little bit about the

24   history between Ericsson and KPN.

25        Now, you agree with me, don't you, that KPN and Ericsson

1   had from 2004 to 2017 a series of voucher agreements.  Right?

2   A.   Yes, that's right.

3   Q.   And you gave the total amount of that around 40 million,

4   but that was over a course of 14 years, wasn't it?

5   A.   Yes.

6   Q.   Okay.  And on average KPN was paying 1 to 3 million

7   dollars a year or, excuse me, KPN was receiving in vouchers

8   about 1 to 3 million dollars a year from Ericsson.  Correct?

9   A.   Yes, correct.

10   Q.   Okay.  And over those years, you also were aware that KPN

11   had been asserting over and over again at each renewal that

12   Ericsson needed to take a license agreement.  Right?

13   A.   Yes.

14   Q.   And you understand, though, that in many of these

15   meetings, historically, Ericsson analyzed the patents and told

16   KPN that it didn't think it was infringing them.

17   A.   Personally I was only involved in the negotiations

18   starting in 2017.

19   Q.   But as the corporate representative of KPN, do you

20   understand the history was that Ericsson at these inflection

21   points for renewal would say, we don't think we infringe your

22   patents?

23   A.   What was your question?

24   Q.   Do you understand that at the inflection points when

25   these agreements would come up for renewal, Ericsson would

1    meet or speak with KPN and say, we don't think we infringe

2    your patents?

3    A.   Yes, I understand that.

4    Q.   Right.  But the deal that Ericsson did was they would do

5    a voucher deal which would give KPN a discount on purchases

6    from Ericsson.  Right?

7    A.   Well, it gave a voucher that we could use as a credit to

8    buy Ericsson equipment which we would have bought anyway.

9    Q.   Right.  And it gave you -- it gave you a discount.

10   A.   Well, I wouldn't call it a discount.  It doesn't feel

11   like a discount.

12   Q.   Well --

13   A.   It is real value for KPN because they received credits

14   for a number of millions, and what we spent in credits in

15   vouchers we would not have to spend in cash.

16   Q.   But you understand, of course, KPN was a significant

17   customer of Ericsson's.

18   A.   Yes.

19   Q.   And you've heard the old expression, you can't win an

20   argument with a customer?

21   A.   I've heard that before, yes.

22   Q.   Okay.  And over the years KPN and Ericsson agreed to

23   disagree as to the merits of KPN's patent assertion, didn't

24   they?

25   A.   Yes.

1    Q.   So let's talk about how that agreement to disagree

2    between Ericsson and KPN over all these years got papered up.

3         The agreement was structured as a voucher and a

4    non-assertion agreement.   Right?

5    A.   Yes, we've seen that.   That's right.

6    Q.   And under the non-assertion agreement, KPN did not

7    actually grant Ericsson a license under its patents; it

8    granted a contractual promise not to sue Ericsson.   Correct?

9    A.   That's correct.

10   Q.   And let's talk about what a license is.   If somebody

11   infringes a patent, they can go to the patent owner and get

12   permission, and that's called a license, isn't it?

13   A.   There is one way of getting to a license, yes.

14   Q.   Right.   And what a license is, it's a contract.   Correct?

15   A.   Yes.

16   Q.   And sometimes money is paid, sometimes other

17   consideration is given, but it's a written contract between

18   two companies.   Right?

19   A.   Yes.

20   Q.   And it's basically giving a company that would otherwise

21   infringe a patent permission to do what's in the patent.

22   Right?

23   A.   That's a license, yes.

24   Q.   But you and I will agree, won't we, that if you don't

25   infringe a patent you don't need a license to that patent.

1    Fair?

2    A.    Yes.

3    Q.    So under the non-assertion agreement, let's talk about

4    how it worked.   KPN promised not the file any lawsuits against

5    Ericsson on KPN patents.   Correct?

6    A.    That's correct.

7    Q.    And in return, Ericsson agreed not to file any lawsuits

8    against KPN as to Ericsson's patents.   Right?

9    A.    That's right.

10   Q.    Now, historically, before 2017 Ericsson had never accused

11   KPN of infringement or asserted patents against it, had it?

12   A.    That's right.

13   Q.    You were a customer.   Right?

14   A.    Yes.

15   Q.    Okay.   But these non-assertion agreements kept getting

16   done.   And will you agree with me, ma'am, that the fact that

17   Ericsson has entered into these non-assertion agreements

18   historically with KPN is no admission of any kind that

19   Ericsson infringes a single KPN patent?   Will you agree with

20   me?

21   A.    Yes, I can agree with that.

22   Q.    In fact, that's written in the contract, isn't it?

23   A.    Yes.

24          MR. STEVENSON:   Let's look at PX 269, please.

25   Q.    (BY MR. STEVENSON)   This is the non-assertion agreement,

1    isn't it?

2    A.    Yes, it is.

3            MR. STEVENSON:  Let's go to the second page, please,

4    and zoom in on the C at the bottom.

5    Q.    (BY MR. STEVENSON)  And this is what we were talking

6    about just then, weren't we?

7    A.    Yes.

8    Q.    "Nothing in this agreement will be construed as an

9    admission of infringement of patent and/or other intellectual

10   property rights."  Correct?

11   A.    That's correct.

12   Q.    Okay.  So what was going on between KPN and Ericsson is

13   you were agreeing to disagree for over a decade.

14   A.    Yes.

15   Q.    Let's talk about now how the financial part of the deal

16   worked.

17           MR. STEVENSON:  We can take this down.

18   Q.    (BY MR. STEVENSON)  There -- you will agree with me,

19   won't you, that for instance in the 2014 agreement there

20   was -- the voucher agreement was structured as a discount.

21   A.    Can you put it on the screen?

22   Q.    Well, I can, but I'd like to ask you what you remember

23   about it.  Was it structured as a discount or you don't

24   remember?

25   A.    What do you mean was structured as a discount?  It was a

1   voucher agreement.

2   Q.   Okay.  Well, let's look at it.

3   A.   Yes.

4        MR. STEVENSON:  Let's pull up DX 414 at 3.  Let's go

5   back to the front page just so the witness can get context,

6   please.  Page 1, please.  Thank you.

7   Q.   (BY MR. STEVENSON)  Does this appear to be the 2014

8   voucher agreement?

9   A.   I see no year here, but --

10        MR. STEVENSON:  If you'd zoom out, Mr. Moreno, and

11   go to the signature page at the end.

12        THE WITNESS:  Yes.  This was the 2014 agreement.

13        MR. STEVENSON:  There we go.  All right.  We can go

14   back to page 3 of it, please.

15   Q.   (BY MR. STEVENSON)  So let's talk about how the

16   financials of this work.

17        MR. STEVENSON:  And zoom in, please, on the A and B

18   paragraph right under your cursor, sir, right under -- there

19   you go.

20   Q.   (BY MR. STEVENSON)  So let's talk about exactly how this

21   voucher deal worked.

22        Ericsson would give KPN a voucher of 500,000 Euros per

23   year if KPN had sales of more than 50 million Euros in that

24   year.  Correct?

25   A.   That's correct.

1  Q.   And let's talk about -- we talked a lot about Euros.

2  Today a Euro is about equal to a dollar.  Right?

3  A.   At the moment I think so, yes.

4  Q.   Back then, do you remember what the --

5  A.   I think 1.2 is what we keep on average, yes.

6  Q.   So -- and it varies from year to year, but I think you

7  and I can agree it's somewhere between even and 1.2 --

8  A.   Yes.

9  Q.   -- which would have meant this, in U.S. dollars, might

10  have been $600,000?

11  A.   Yes.

12  Q.   But if KPN didn't buy 50 million Euros' worth of

13  equipment, how much would it get in a voucher from Ericsson

14  that year?

15  A.   It is nothing.

16  Q.   Okay.

17  A.   At this day of signing the agreement, we knew that we

18  were going to spend it.

19  Q.   Right.  And you understand that Ericsson would do this

20  because they want to incentivize you to remain a customer.

21  Right?

22  A.   Could be.  I don't know what Ericsson's motives were, but

23  I know what KPN's motives were.

24  Q.   But it's -- it's pretty financially obvious, isn't it?

25  If you spend 50 million Euros with us, we'll give you a

1    $500,000 voucher to use on your next going forward chunk of

2    sales?

3    A.    Yes.

4    Q.    And that works out to one percent, doesn't it?

5    A.    Yes.

6    Q.    Okay.  Then the second -- there is a second part of this,

7    though, in B.  And it says, if KPN does spend more than 50

8    million Euros, it gets an additional 1.5 percent discount.

9    Correct?

10   A.    Voucher, yes.

11   Q.    And in prior years before 2014, there was also a voucher

12   arrangement between the two parties, wasn't there?

13   A.    Yes.

14   Q.    Okay.  So let's now talk about the renewal negotiations.

15        So when you approached Ericsson in 2017 and you sent an

16   email to them saying we'd like to start, I believe it was, in

17   January we'd like to start having renewal negotiations --

18   A.    Yes.

19   Q.    -- you were talking about negotiating another voucher

20   agreement that would cover the whole portfolio.  Right?

21   A.    A non-assertion would cover -- yeah, in combination of

22   the non-assertion agreement and a voucher agreement would

23   cover the whole portfolio.

24   Q.    And let's talk about what that means.  What we've talked

25   about the whole history before 2017, all these prior deals,

1    what I think we agree upon is they covered KPN's whole

2    portfolio.

3    A.    Yes.

4    Q.    That was a non-assert as to every patent KPN owned.

5    Right?

6    A.    And it refers to every patent Ericsson owned.

7    Q.    But it covered every patent KPN owned.  Right?

8    A.    Yes.

9    Q.    And before 2017 you had never presented to Ericsson your

10   '089 Patent.  Correct?

11   A.    Correct.

12   Q.    And how many patents do you have in your portfolio?

13   A.    Patents around 1500.

14   Q.    And how many were you asserting in 2017 that Ericsson

15   might need to take a look at for purposes of valuing your

16   portfolio?

17   A.    Oh, I've not really counted that.  We provided an

18   overview, but...

19   Q.    So you and I -- are you finished?

20   A.    Yes.

21   Q.    Okay.  You and I will agree, though, that many, many

22   companies have thousands of patents in their portfolio.

23   A.    Yes.

24   Q.    But frequently when you go to license with someone, only

25   a small number of them have real value.

1    A.    A small number, yes, has -- are driving the deal, yes.

2    Q.    Right.  And so when licensing professionals get together

3    and negotiate, one of the issues they have is finding the

4    patents that matter to this company at this time.  Fair?

5    A.    Yes, that's fair.

6    Q.    Okay.  And so what you did to see what patents might

7    matter to Ericsson at this time is you sent them a batch of

8    claim charts in January of 2017.  Right?

9    A.    Yes, and the separate overview of all the patents, yes.

10   Q.    Okay.  And then the parties got together and had a number

11   of technical discussions and debates over whether those

12   patents that you sent to Ericsson -- were used by Ericsson,

13   might be infringed by Ericsson equipment.  Correct?

14   A.    No, that's not correct.

15   Q.    Oh, you received a technical response from Ericsson,

16   didn't you?

17   A.    Ultimately we received one technical expert, yeah.

18   Q.    And you had meetings about them.  Correct?

19   A.    One meeting, yes.

20   Q.    Okay.  Where the technical details were discussed and

21   there was a debate over the positions Ericsson was taking.

22   A.    No, there was no real debate.

23   Q.    Well, you -- you've seen the emails, haven't you?

24   A.    Yeah, but there is no meeting.  Those were emails.  We

25   had one meeting where Ericsson shortly provided their vision

```
 1    of our patents.
 2    Q.   Let's talk about the emails.
 3         And do you have the cross binder at your desk?
 4    A.   No.
 5    Q.   It may be on the witness stand behind you?
 6    A.   That's KPN.
 7              MR. STEVENSON:  May I approach to give the witness a
 8    cross binder?  We gave one to your counsel, and I apologize,
 9    ma'am.
10              THE COURT:  We have an extra one.
11              MR. STEVENSON:  Thank you.
12    Q.   (BY MR. STEVENSON)  We looked at a lot of emails in your
13    direct examination, didn't we?
14    A.   Yes.
15    Q.   And many of them were written by Mr. --
16    A.   Wuyts.
17    Q.   Wuyts.  Who's the head of licensing at KPN?
18    A.   The head of the IPR department, yes.
19    Q.   And is he your boss?
20    A.   He's my boss, yes.
21    Q.   And you made the point about -- in your direct
22    examination you didn't think Ericsson was willing to take a
23    license.
24    A.   Yes, I agree with that, yes.
25    Q.   But isn't it true that throughout these negotiations
```

1    Ericsson consistently told you it was happy to enter into a

2    license agreement, but first it needed to see KPN patents that

3    had technical merit and Ericsson was using?

4    A.   Well, they said that on a few occasions.  In general,

5    they were just not replying, delaying, evasive answers,

6    premature to discuss.

7              MR. STEVENSON:  I'm going to object as

8    non-responsive.

9              THE COURT:  Overruled.  You characterized it one way

10   in the question and she characterized it one way in the

11   answer.

12   Q.   (BY MR. STEVENSON)  Didn't Ericsson tell you in October

13   of 2019 it was happy to take a license but it needed to see

14   patents from KPN that it really believed that it needed and

15   needed to use?

16   A.   Yes.

17   Q.   And didn't they tell you that again in December of 2019

18   the same thing--we're happy to take a license from KPN, but we

19   need to see patents that we believe we need a license to and

20   that we use?

21   A.   'Happy' is probably not a word I would use, but they were

22   willing to take a license.

23   Q.   We were willing to take a license but we wanted to see

24   patents --

25   A.   Yes.

1   Q.    -- that we actually used.

2        And now you understand we're talking in 2017 about a

3   license.  Correct?

4   A.    Yes.

5   Q.    The prior deals were non-assert for the prior 14 years.

6   Now we're talking about a license agreement.  Right?

7   A.    No.  I think we were suggesting -- we were proposing a

8   continuation of the non-assert and voucher agreement.  It's

9   not a license agreement.

10  Q.    Now, we saw a lot of emails you selected to show to the

11  jury, but would you agree with me that KPN wrote a fair number

12  of emails to Ericsson that got a bit testy over time?

13  A.    Testy?

14  Q.    Testy.

15  A.    I do not understand the word 'testy'.

16  Q.    Ill-tempered.

17  A.    Ill-tempered.  Well, we've sent a number of emails

18  voicing our frustration.

19  Q.    Okay.  Well, let's go through some of the things that

20  were said, and I'll see if you remember, and if you don't I'm

21  happy to look into the emails in the witness binder.

22        But do you remember in September of 2019 KPN sent a group

23  of claim charts -- 5G claim charts to Ericsson.

24  A.    Yes.

25  Q.    Okay.  And then you requested a meeting with Ericsson,

1   didn't you?

2   A.   Yes.

3   Q.   And Ericsson wrote back to you and asked you to, quote,

4   "Clarify which patents would, in your opinion, be subject to

5   such a discussion at that meeting."

6        Do you remember that?

7   A.   Yes.

8   Q.   And in response, you accused Ericsson of delay tactics

9   because they asked you to say which patents you wanted to

10  speak about.

11  A.   I cannot remember that.  Maybe it's best to go over the

12  email.

13  Q.   Do you remember you refused initially to even discuss the

14  claim charts you'd sent Ericsson?

15  A.   I do not remember that, no.

16  Q.   Before we look -- and we'll look at the email, but before

17  we do let's talk about what a claim chart is.

18       You've dealt with claim charts in much of your career,

19  haven't you?

20  A.   Yes.

21  Q.   And a claim chart is something that patent lawyers use to

22  communicate with each other about what we'll call whether a

23  patent is being used or infringed.

24  A.   Well, that's a very broad definition of a claim chart.

25  Q.   All right.  But to talk about what a chart is, what it

1    usually does is it takes the claim of the patent and compares

2    it to what the patent owner would consider to be proof that

3    the claim is met.  Right?

4    A.    That's right.

5    Q.    Right.  And so the jury can understand what we're talking

6    about when we talk about claim charts, the reason we do them

7    is each claim has a number of elements to it, doesn't it?

8    A.    A number of features, yes.

9    Q.    Right.  And we saw some in the slides what a claim looks

10   like, and I think the jury will see them later.  But you've

11   dealt with claims in your career.  Right?

12   A.    Yes.

13   Q.    And you understand that for a claim to be infringed,

14   every single element of that claim needs to be met in an

15   accused device.

16   A.    Yes, device mattered.

17   Q.    And so what patent lawyers do is, to make sure they don't

18   miss an element they take every element and they put it in a

19   chart form, don't they?

20   A.    Yes.

21   Q.    And what the chart looks like is, it's a number of rows,

22   and each row has one of the elements on the left and then over

23   to the right there's usually information about what is being

24   accused of infringement and maybe some comments.  Correct?

25   A.    That's correct.

 1   Q.   And that's how you structured your claim charts that you

 2   sent to Ericsson, didn't you?

 3   A.   Yes.

 4   Q.   Okay.  But you understand -- frequently those are the

 5   subject of debate?

 6   A.   Yes.

 7   Q.   I mean, sometimes companies send KPN claim charts and

 8   contend that they need to take a license to something.  Right?

 9   A.   Yes.

10   Q.   And you don't just take it at face value and say, Well,

11   they sent us a chart; we need to pay them.  You review the

12   chart, don't you?

13   A.   Yes, of course.

14   Q.   Right.  And frequently the chart is incorrect.  Sometimes

15   there's mistakes or you have a disagreement over what they

16   claim is being covered.  Fair?

17   A.   That's right.

18   Q.   And it's not unfair for Ericsson to do that in its

19   dealings with KPN.

20   A.   No, that's not unfair.

21   Q.   Right.

22   A.   It took them a long time to do it.

23   Q.   But it's not unfair for a company that you send a claim

24   chart and say is infringing to have a technical discussion

25   with you where they disagree with you.  There's nothing unfair

1    about that at all, is there?

2    A.    No.  We do it all the time.

3    Q.    There's nothing unwilling about that, is there?

4    A.    No that's not unwilling, no.

5    Q.    That happens all the time in the industry.  That's what

6    licensing professionals do--they sit down and have these

7    discussions, don't they?

8    A.    Yes, but the timing is an issue.

9    Q.    So let me ask you to turn to page -- excuse me, PX 587.

10   And that's one of the documents in there.  Excuse me.  I'll

11   ask you to go to PX 589.

12   A.    589.  Yes.  I'm there.

13   Q.    Okay.  And I'm going to move forward a little bit, but

14   Ericsson sent you a technical response to the claim charts

15   that you sent, didn't they?

16   A.    By that time, let me think.  I don't think so yet.

17   Q.    Well, let's look -- have you look at the email?

18   A.    This is an email.

19   Q.    That's at 589.  And I'll have you turn to the third page.

20   Tomas Dannelind sent you an email on December 12th, didn't he?

21   A.    Yes.  Okay, yes.

22          MR. STEVENSON:  And if we can pull that up, please.

23   Pull up 589, please.  And can you zoom in on the Dannelind

24   email?  Go up a little bit.  The one above it, please.

25   Q.    (BY MR. STEVENSON)  Mr. Dannelind says, "Please find

1    attached our position having analyzed all claim charts

2    received from KPN."

3         Do you remember that?

4    A.   Yes.

5    Q.   And he told you, "Please get back to us with regards to

6    any questions you might have related to our analysis or

7    conclusions."

8    A.   Yes, I see that.

9    Q.   He told you, We documented our analysis thoroughly and

10   will be able to provide more details.

11   A.   Yes, I see that he said that.

12        MR. STEVENSON:   Okay.  And we can take that down.

13   Q.   (BY MR. STEVENSON)  And then if we go to the second page

14   of this exhibit, this is the response of Mr. Wuyts.  He

15   responded by calling this, on the fifth line, "an unwilling

16   licensee trick," didn't he?

17   A.   Yes.

18   Q.   He also said in the next section --

19   A.   What he said is that for all the cases except the 5G

20   charts it is an unwilling licensee trick.  In the 5G charts we

21   provided shortly before, but all the other cases we provided

22   in 2017.  And if you come back then in October 2019 with your

23   first reply, that's delaying, that's unwilling, I would say,

24   yes.

25   Q.   And Ericsson also in its technical analysis challenged

1  the validity of several KPN patents, didn't it?

2  A.   Yes.

3  Q.   And that happens all the time in negotiations, doesn't

4  it?

5  A.   Yes.

6  Q.   Nothing unwilling or not standard about a company who you

7  make a patent assertion against coming back and saying, We

8  think there's prior art that renders your patent invalid?

9  A.   Agreed.

10  Q.   That's perfectly fair.  Right?  And that's something that

11  Ericsson did, didn't it?

12  A.   Yes.

13  Q.   And what he said in his responsive email, Mr. Wuyts to

14  Ericsson, is he's going to disregard the invalidity dreams

15  recited in the Ericsson slide set.  Is that what he said?

16  A.   Well, he said that he's doing that because the form of

17  the novelty charts was no manageable for us.

18  Q.   And then the next one he said to us he didn't think we

19  read your patents or, at most, we spent 20 minutes on the

20  analysis?

21  A.   That was the impression we had, yes.

22       MR. STEVENSON:  We can take that down now.

23  Q.   (BY MR. STEVENSON)  And so, finally, it got to the point,

24  didn't it, Ms. Gerritse, that Ericsson wrote back to you in

25  March of 2020 and said there was a disturbing trend in what

```
 1   you guys were sending to Ericsson in terms of emails.  Do you

 2   remember getting that?

 3   A.   No, I do not remember it, no.

 4   Q.   I'll have you look in your book.  It's the document

 5   that's KPN-Ericsson Bates No. 56227.  It may refresh your

 6   recollection.

 7   A.   56227?

 8   Q.   Correct.  It's going to say KPN-Ericsson 56227 on the

 9   tab.  It's about the halfway point, a little past it.

10   A.   What do you want me to look specifically?

11   Q.   Mr. Dannelind sent you a March 5th, 2020, email.  He sent

12   it to Mr. Wuyts?

13   A.   Uh-huh.

14   Q.   Copied you, didn't he?

15   A.   Uh-huh.

16           THE COURT:  Just a minute.

17           THE WITNESS:  Yes.

18           THE COURT:  You're going to need to answer verbally

19   and out loud.

20           THE WITNESS:  Yes.

21           THE COURT:  Let's continue.

22   Q.   (BY MR. STEVENSON)  Do you remember, now having looked at

23   this, in the fourth line Mr. Dannelind said that "Your email

24   correspondence has shown an increasing trend of inflammatory

25   comments"?
```

1    A.    I see that, yes.

2    Q.    He told you that rather than addressing Ericsson's

3    positions on the merits, instead your emails tell a partial or

4    mischaracterized story?

5    A.    I see that.

6    Q.    He said it was a failing effort to cast Ericsson as an

7    unwilling licensee.

8    A.    Yes.

9    Q.    And then in the next paragraph he said, "Ericsson has a

10   deep respect for intellectual property rights"?

11   A.    Yes.

12   Q.    And to that Mr. Wuyts responded the same day, "I think

13   the tone of your email is definitely something you wouldn't

14   wish to attach to an email."

15         Is that how he responded?

16   A.    Yes.

17   Q.    Let's talk a little bit, then, about the reason KPN sent

18   claim charts to Ericsson.

19         I heard you testify that in 2017 the reason you sent

20   claim charts on patents to Ericsson is you wanted Ericsson to

21   give you value, to give you credit in the negotiations for

22   renewal for new patents you'd gotten.  Right?

23   A.    Well, that's a summary of the situation.

24   Q.    Okay.

25   A.    We -- I mean, the existing non-assertion agreements and

1    voucher agreements were about to expire and we invited

2    Ericsson to start discussions about the renewal and informed

3    them about our new patents.

4    Q.   And you wanted to make more in voucher agreements.  You

5    wanted to get more, this renewal, than you had the last time?

6    A.   Yes.

7    Q.   And you wanted to send your patents to Ericsson to

8    convince them that you had more patent value than last time.

9    Correct?

10   A.   Yes.

11   Q.   Is this -- and after Ericsson reviewed and responded to

12   KPN's patents, Ericsson, in fact, asked you to send it more

13   claim charts, didn't it?

14   A.   I cannot remember that.

15   Q.   Let's look at the correspondence.

16          MR. STEVENSON:  Will you pull up PX 589 and go to

17   page 3?

18   Q.   (BY MR. STEVENSON)  So this is the email we looked at

19   just a moment ago, didn't we?

20   A.   Yes.

21   Q.   Tomas Dannelind December 12th, 2019 email?

22   A.   Uh-huh.

23          MR. STEVENSON:  Let's blow out the second paragraph,

24   please.  Right there.

25   Q.   (BY MR. STEVENSON)  And what Ericsson told you is, "if

1    you have any more claim charts you would like us to review,

2    please send these to us."

3        Do you remember that?

4    A.   Yes I see it.

5    Q.   "And that includes any implementation patents you might

6    have where you believe Ericsson should willingly sign a

7    license under those."

8    A.   Yes.

9    Q.   "However, without knowing or understanding why we need a

10   license, we will obviously be unwilling to sign a license."

11   A.   Yes.

12   Q.   So here Ericsson is telling you, you know, put your best

13   foot forward send us what you've got.  Right?

14   A.   Yes.

15       MR. STEVENSON:  And then if you go down to the next

16   paragraph, please.

17   Q.   (BY MR. STEVENSON)  Ericsson observed it should be a

18   two-way street.  Right?

19   A.   Yes, they are providing us with their patents.

20   Q.   All right.  He said, "For the sake of reciprocity, KPN

21   offering Ericsson a license under KPN patents, we'll be giving

22   or offering KPN a license under Ericsson patents."  Right?

23   A.   Yes.

24   Q.   And I thought I heard you say on direct that you thought

25   Ericsson's patents were valuable to KPN.

1    A.    Definitely.

2    Q.    And is there one particular patent you have in mind when

3    you say Ericsson's patents were valuable to KPN?

4    A.    No, no particular patents.   In general it's a big

5    portfolio.   Ericsson charges a lot.

6    Q.    And you understand that Ericsson, because it's a two-way

7    street, wanted KPN to review its patents to determine what

8    value they had to KPN.   Fair?

9    A.    Yes.

10   Q.    Right.   I mean, in other words, you and Ericsson were

11   sitting down talking about doing what's called a cross

12   license.   Right?

13   A.    That's what we had over the years, yes.

14   Q.    Yes.   What that means is it's like a trade, isn't it?

15   A.    Yes.

16   Q.    Right.   So KPN comes to Ericsson and says, We have our

17   patents and we want you to give us fair value for our patents

18   to the extent you're using them.   Right?

19   A.    Yes.

20   Q.    And the claim charts get reviewed and it goes back and

21   forth and there's a discussion about how valuable the patents

22   are and how much they're going to get used.   Right?

23   A.    That's normally the situation, yes.

24   Q.    And then Ericsson said to KPN, All right.   If you want a

25   license to our patents, we want you to give us value and

```
 1   credit for our patents.

 2   A.    Yes.

 3   Q.    And to do that, Ericsson was proposing to send you

 4   patents and claim charts that it thought KPN might need and

 5   find of value.  Right?

 6   A.    They are proposing that, yes.

 7   Q.    And is it your testimony, ma'am, that if someone -- to be

 8   a willing licensee, if someone approaches you and says, I've

 9   got patents, I think you should look at them and consider

10   taking a license, let's have a discussion, that you should

11   receive those patents and analyze them and engage in good

12   faith?

13   A.    Maybe normally, but we had -- the relation between

14   Ericsson and KPN was not really of that kind.  We are not

15   equally situated companies.  We are a customer of Ericsson.

16   We are an operator.  We use equipment from Ericsson from other

17   suppliers that gives a whole different perspective to this

18   situation.

19   Q.    And Ericsson has patents that you consider valuable to

20   KPN?

21   A.    Yes.

22   Q.    That KPN needs a license to?

23   A.    At least we would appreciate to have a non-assert, yes.

24         MR. STEVENSON:  So let's go in this exhibit to the

25   first page.
```

1    Q.   (BY MR. STEVENSON)  Do you recall, Ms. Gerritse, that one

2    day later after Ericsson said it was going to send patents to

3    KPN and that we wanted you to please consider them for what

4    the reciprocal value should be, your boss Mr. Wuyts wrote back

5    to Ericsson and threatened to sue Ericsson's customer Verizon.

6    A.   Yes, I know that.

7    Q.   Let's look at what he said.

8              MR. STEVENSON:  Will you go down to paragraph 4 of

9    this email?

10   Q.   (BY MR. STEVENSON)  He said in 4, "Following in on the

11   suggestion of reciprocity, do we understand that you want us

12   to submit patent cases against Ericsson's unlicensed customers

13   such as Verizon?"

14   A.   Yes, I see that.

15   Q.   And you-all understood that Verizon was one of Ericsson's

16   most significant customer relationships in the world?

17   A.   I don't know that.

18   Q.   Well, they are one of the biggest carriers in the world.

19   Right?

20   A.   Yes.

21   Q.   And you knew Ericsson was a significant supplier of them

22   of equipment to them?

23   A.   I didn't -- I personally don't know that, no.

24   Q.   You didn't know?

25   A.   Who was supplying equipment to which telecommunication

1    operator.

2    Q.   You didn't know that Ericsson was supplying equipment to

3    Verizon, is that your testimony?

4    A.   Personally I didn't know it.

5    Q.   Well, you know it today, don't you?

6    A.   Yes.

7    Q.   Okay.  And then it goes on to say, "Verizon under patent

8    court assertion of Huawei, that never sold any equipment in

9    the USA, definitely will not be pleased, to say it prudently."

10   What does it mean--"to say it prudently"?

11   A.   This is English, but to say it carefully.

12   Q.   So you're being careful with your words here with us?

13   A.   Yes.

14   Q.   Okay.  "To understand that Ericsson wishes KPN to submit

15   patent cases against its customers."  I mean, it's a serious

16   matter, isn't it, Ms. Gerritse, that you would threaten to sue

17   a significant customer of Ericsson like Verizon and suggest

18   that Ericsson was wishing that that happened or asking for it

19   to be done?  I mean, you understand that's a serious thing to

20   say here.

21   A.   Yes.  That's true.  I think it's a proof that we were

22   very frustrated at that moment in time.

23   Q.   You also mentioned raising the point at the European

24   commission.  They are regulators in Europe, aren't they?

25   A.   Yes, it's European commission.  Yes.

1  Q.   And then you say, "Under these thoughts, we cannot make

2  any sense of the Ericsson approach suggested herebelow, being,

3  in short, an inducement or push to assert patents against

4  Ericsson's own customers."

5  A.   Yes.

6  Q.   Ma'am, you and I agreed that Ericsson just wanted to get

7  reciprocal credit for its patents and that's why they wanted

8  to send them to you, didn't it?

9  A.   Well, like I said, asserting -- a supplier asserting

10  patents against an operator client is quite unusual.

11  Q.   Well, you had with Ericsson a mutual non-assert for 14

12  years.

13  A.   Yes.  That was without.

14  Q.   You just told us that Ericsson had valuable patents that

15  KPN needed.

16  A.   That were valuable for KPN, yes.

17  Q.   Right.  And it's fair for Ericsson to want to get fair

18  consideration of its patents, isn't it?

19  A.   Yes.

20  Q.   I mean, you've heard the expression what's sauce for the

21  goose is sauce for the gander.  Right?

22  A.   Well, no, but I get the meaning.

23  Q.   You get the meaning.

24         THE COURT:  Let's avoid colloquialisms for a witness

25  who doesn't speak English that well, please.  And asking her

1    to define English words is probably not a good idea either.

2    Let's move on.

3    Q.   (BY MR. STEVENSON)  All right.  And the truth is,

4    Ms. Gerritse, Ericsson never filed an infringement case

5    against KPN, did it?

6    A.   Not yet, no.

7    Q.   It hasn't?

8    A.   It hasn't, no.

9    Q.   And this case has been pending for over a year, hasn't

10   it?

11   A.   Yes.

12   Q.   Okay.  Now, I want to go forward --

13          MR. STEVENSON:  We can take this down.

14   Q.   (BY MR. STEVENSON) -- to a financial offer.

15        You recall that Ericsson and KPN had a licensing meeting

16   in March of 2020?

17   A.   Yes.

18   Q.   Was that by Zoom or was that by --

19   A.   No that was --

20   Q.   In person?

21   A.   It was February 2020.  That was one of the last in-person

22   meetings, yes.

23          MR. STEVENSON:  Okay.  And can we see Exhibit 396,

24   please?

25   Q.   (BY MR. STEVENSON)  Is this a slide show that KPN

```
 1    presented to Ericsson --

 2    A.   Yes.

 3    Q.   -- at that meeting?

 4         Now you didn't talk about this in your direct testimony,

 5    did you, this slide, or this PowerPoint show?

 6    A.   Did we not show this one?  No?  Okay.

 7              MR. STEVENSON:  And if we'll go to page 4 of the

 8    PowerPoint.

 9    Q.   (BY MR. STEVENSON)  And I assume you were involved in

10    this in some way, shape, or form?

11    A.   Yes.

12    Q.   This shows some of the patents that were presented to

13    Ericsson?

14    A.   Yes.

15    Q.   And one of them is the second row, the 495.

16    A.   Yes.

17    Q.   EP.  That's the European equivalent of the patent that's

18    being asserted here for drive testing.  Right?

19    A.   It's the '089, yes.

20    Q.   Okay.  So that was one of the patents that was under

21    discussion that you were trying to get credit for in the

22    licensing meeting.

23    A.   Yes.

24    Q.   This was one of the new patents that was awarded since

25    the last voucher deal that you wanted Ericsson to take note
```

```
 1    of.  Right?

 2    A.    That's right.

 3              MR. STEVENSON:  Okay.  And let's go now to page 15

 4    of the document.

 5    Q.    (BY MR. STEVENSON)  You did a calculation here, didn't

 6    you?

 7    A.    Yes.

 8    Q.    Okay.  And what you did is you went year-by-year from

 9    2004 to 2017?

10    A.    Yes.

11    Q.    And those are the columns across the top?

12    A.    Yes.

13    Q.    And that's when the prior non-assert and voucher

14    agreements were in place.  Right?

15    A.    Yes.

16    Q.    And then you have a row -- the first one says 'GVA

17    return', and that's where you're looking at how much in

18    voucher discounts or voucher consideration KPN received that

19    year.  Fair?

20    A.    Yes, that's right.

21    Q.    And then what we see happen is in 2004 it's 3.54 million.

22    A.    Yes.

23    Q.    So this comma is like a decimal point in the U.S.  Right?

24    A.    Yes.

25    Q.    And this is in millions of Euros.
```

1    A.    Yes.

2    Q.    Which is a little bit more or about the same as a dollar.

3    Fair?

4    A.    Yes.

5    Q.    And then it goes up and down and fluctuates, but then in

6    2015, '16, and '17 it goes down significantly, doesn't it?

7    A.    Yes.

8    Q.    In 2015 it's 890,000?

9    A.    That's right.

10   Q.    In 2016, KPN received from Ericsson 540,000?

11   A.    Yes.

12   Q.    And then 610,000 in 2017?

13   A.    Yes, that's right.

14   Q.    And then what you did is you tried to look each year at

15   the number of patents in use.

16   A.    Yes.

17   Q.    So what you're doing here, I take it, ma'am, is out of

18   the thousands of patents that KPN owns, you're looking at how

19   many are actually applicable to Ericsson in that year.

20   A.    Well, what we did is we looked back at the negotiations

21   and the technical discussions for the previous agreements and

22   then looked at Ericsson's statements about use or non-use of

23   the patents, and then we counted the patents that we thought

24   they were using.

25   Q.    And -- right.  And so out of the thousands of patents

1    that KPN had in 2004, you came to the conclusion that Ericsson

2    was using three of them?

3    A.    Yes.   W didn't have thousands of patents, but they were

4    using three of KPN's patents.

5    Q.    How many patents did you have?   This in 2004.

6    A.    I don't exactly -- at the moment we had 1500.   It must

7    have been much less in 2004.

8    Q.    Hundreds?

9    A.    Hundreds, yes.

10   Q.    Oka.   And that continues that Ericsson is using about

11   three KPN patents, or exactly three, until 2010.   Right?

12   A.    Yes.

13   Q.    And you understand Ericsson didn't agree to this; this is

14   KPN's proposal or KPN --

15   A.    This is our assessment, yes.

16   Q.    It's your assessment to Ericsson?

17   A.    Yes.

18   Q.    And you understand Ericsson thinks it's zero.

19   A.    I understand it, yes.

20   Q.    But we now know where the goalposts are.   Right?   Sorry.

21   I just violated the Judge's order.

22   A.    I don't understand that one.

23          THE COURT:   Let's be careful about speaking over

24   each other.   We've got two lawyers here, you both know about

25   the importance of keeping the record clear, and I've raised

```
 1    this before.  So remember you're not having a conversation

 2    outside; you're in a courtroom.  There is a record.  Let's

 3    keep it clean.  All right?

 4         Let's proceed.

 5              MR. STEVENSON:  Yes, Your Honor.

 6    Q.  (BY MR. STEVENSON)  So starting, then, in 2011, there's

 7    another renewal there.  Right?

 8    A.  Yes.

 9    Q.  And you go to thinking that Ericsson is using five

10    patents of KPN.

11    A.  Yes.

12    Q.  And at this point does KPN have at least thousands of

13    patents?

14    A.  A thousand, yes, maybe.

15    Q.  Okay.  And then we go up to 2014 and there's a fractional

16    assessment, 5.46 patents for the period of 2014 through 2016

17    and '17?

18    A.  Yes, that's right.

19    Q.  And is it fractional because some patents expired during

20    the course of that agreement?

21    A.  Yes.

22    Q.  And so you gave them partial credit?

23    A.  Yes.  You can see that in a few slides up where I made

24    this calculation, yes.

25              THE COURT:  Ms. Gerritse, please make sure he's
```

1   finished with his question before you start answering.  All

2   right?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Let's continue.

5   Q.   (BY MR. STEVENSON)  And then what you did -- and this is

6   the part --

7              MR. STEVENSON:  You can eliminate the highlighting

8   there, Mr. Moreno.  And I do want to highlight the 'GVA per

9   patent' column.

10  Q.   (BY MR. STEVENSON)  You calculated on a per-patent basis

11  how much voucher consideration Ericsson was providing to KPN.

12  Right?

13  A.   Yes.

14  Q.   Okay.  And let me stop here and let's talk about the

15  significance of this.  Now, you understand there's three

16  patents at issue in this lawsuit.  Right?

17  A.   Yes.

18  Q.   The jury's not being asked to determine infringement of

19  the whole KPN portfolio.  Right?

20  A.   That's right.

21  Q.   The jury's not being asked to determine the validity of

22  the whole KPN portfolio.  Right?

23  A.   That's right.

24  Q.   The jury's not being asked to determine what a reasonable

25  royalty rate would be for the entire KPN worldwide portfolio.

1    Fair?

2    A.    Yes.

3    Q.    What's being adjudicated in this proceeding is three

4    patents as to whether valid, infringed, and what -- if they

5    are, what the damages would be for the United States of

6    America.   Right?

7    A.    Yes.

8    Q.    And so you understand, one of the things that we have to

9    think about in this case is if your portfolio was worth X, all

10   your patents, what are the ones in suit really worth.   Fair?

11   A.    No, I don't think that's fair.

12   Q.    Well, if a hundred apples are worth X, what are three

13   apples worth?

14   A.    But that's not what we are looking at in this case.   We

15   are looking at the value of one patent or of three patents but

16   per patent.

17   Q.    Okay.   Well, let's look at the value per patent that you

18   estimated in this document that you gave us in March of 2020.

19   What you did is you looked at how much Ericsson had been

20   providing in voucher discounts or other consideration to KPN,

21   and then you divided that by the number of patents you thought

22   Ericsson was using.   Right?

23   A.    That's right.

24   Q.    And you got an average per patent rate, and for 2017, the

25   last year before the agreement expired, it was $110,000 per

1    patent, wasn't it?

2    A.    That's right.

3    Q.    For the prior year, 2016, it was $100,000 per patent.

4    A.    Yes.

5    Q.    And for the prior year to that it was $160,000 per

6    patent.

7    A.    Yes.

8    Q.    Now, in your licensing presentations, you never single

9    out the '089 Patent and say this one is better than all the

10   rest.

11   A.    No, we don't do that.

12   Q.    Okay.  But in here, in court, for that one patent for the

13   United States KPN is seeking $31 million.  Isn't that right?

14   A.    That's right.

15   Q.    Does KPN use the '089 Patent in its network?

16   A.    The '089?  Well, our equipment can do it.  It's

17   configured in the equipment, and we have performed a trial

18   and we are now considering whether we will switch it on.

19   Q.    So you haven't switched it on; you're considering.

20   A.    At the moment we are considering switching it on, yes.

21   Q.    So it's off today.

22   A.    Yes.

23   Q.    This is a feature that's been out there since 2016, and

24   as of today you haven't turned it on?

25   A.    No.

1   Q.   So KPN doesn't even use this feature that it's seeking

2   $31 million for.

3   A.   At the moment we don't, but we have future plans to do

4   it.

5                MR. STEVENSON:   Pass the witness.

6                THE COURT:   Is there redirect by the Plaintiff?

7                MR. HEALY:   Yes, Your Honor.

8                THE COURT:   Let's proceed with redirect.

9                         REDIRECT EXAMINATION

10  BY MR. HEALY:

11  Q.   Ms. Gerritse, I want to follow up on that last question.

12       Can you explain why KPN hasn't been able to switch on the

13  MDT functionality in its own networks?

14  A.   Yes.   It is because we cannot -- well, we have some

15  problems with the European privacy rules.

16  Q.   So is that a legal requirement?

17  A.   Yes, that's a legal requirement.

18  Q.   And is that a European legal requirement?

19  A.   Yes.

20  Q.   Does that requirement apply here in the United States?

21  A.   No.

22  Q.   And Ms. Gerritse, counsel started off his presentation by

23  showing you a document, PX 71.

24                MR. HEALY:   Mr. Boles, if we could bring that up.

25  Q.   (BY MR. HEALY)   Do you see in the bottom right-hand

1   corner here this is a document produced by Ericsson?

2   A.   Yes.

3            MR. HEALY:  And if we could pull up ON the left-hand

4   side.

5   Q.   (BY MR. HEALY)  At the bottom do you see it says

6   'restricted, attorneys eyes only'?

7   A.   Oh, yes.

8   Q.   Were you able to see this document before today?

9   A.   No.  And I think that's what I said in the beginning,

10  yes.

11  Q.   Were you allowed to see this Ericsson document before

12  today?

13  A.   No.

14  Q.   Do you have any understanding of what this document

15  contains?

16  A.   No.

17           MR. HEALY:  And Mr. Boles, if we could bring up the

18  slide that counsel mentioned?  Do you have the slide from the

19  opening, Mr. Boles?  We'll circle back to that.

20       Mr. Boles, if we could get the slide up that we used

21  during opening for that slide.  Thank you.  This is it.

22  Q.   (BY MR. HEALY)  Now, this is the slide that Mr. Stevenson

23  showed you on the elmo.  Do you see it on the screen?

24  A.   Yes.

25  Q.   Okay.  Can you see it better now?

1    A.   Yes.

2    Q.   And if you look in the background, do you see that there

3    are a number of columns?

4    A.   Yes.

5    Q.   Does that include the columns that Mr. Stevenson

6    suggested to you we had omitted?

7    A.   Yes.

8    Q.   I want to speak to you next about a document that was not

9    placed on the screen, and Mr. Stevenson asked you about a

10   document KPN_Ericsson_56227.  Do you see that this is the same

11   Bates number?

12   A.   Yes.

13   Q.   And Mr. Stevenson asked you some questions about this

14   document but he didn't show it to us on the screen.  Right?

15   Do you recall that?

16   A.   Okay.  Yes.

17   Q.   And Mr. Stevenson asked you -- suggested to you that

18   maybe KPN's tone in response was too short?

19   A.   Yes.

20   Q.   And do you see at the email below from Mr. Dannelind is

21   dated March 5th?

22   A.   Yes.

23   Q.   And unlike Ericsson in this case, KPN responded the same

24   day.  Do you see that?

25   A.   Yes, I see that.

1    Q.    Okay.  And the portion that Mr. Stevenson had you read

2    was the top sentence of this email.  Correct?

3    A.    Yes.

4    Q.    Could you read the second sentence for me?

5    A.    "If you wish to talk about this, always welcome to the

6    Netherlands to discuss face-to-face or call me.  You have my

7    number."

8    Q.    Did Mr. Dannelind take up KPN on its offer to discuss

9    this face-to-face?

10   A.    No.

11   Q.    Did Mr. Dannelind call Mr. Wuyts and say, Let's talk

12   about this?

13   A.    To the best of my memory, no.

14         MR. HEALY:  If we could bring up, Mr. Boles, PX 612.

15   I think it's slide 34.  Just the first page, please.  Thank

16   you.

17   Q.    (BY MR. HEALY)  Do you recall Mr. Stevenson telling you

18   -- asking you questions about certain claim positions that

19   Ericsson had sent in December of 2019?

20   A.    Yes.

21   Q.    Does this document look like those positions?

22   A.    Yes, I think so, yes.

23   Q.    And do you recall Mr. Stevenson criticizing KPN for not

24   responding to those positions?

25   A.    Yes.

```
 1              MR. HEALY:  If we could go to page 10 of this
 2   document.
 3   Q.   (BY MR. HEALY)  Is this the -- well, let me ask you the
 4   question.
 5        EP 495, how does that relate to the '089 Patent?
 6   A.   That is the European family member of the '089 Patent.
 7   Q.   So for the entirety of the '089 Patent family, is this
 8   what Ericsson sent you?
 9   A.   Yes.
10   Q.   What claim chart was this responding to?
11   A.   To the claim chart I have sent in January 2017.
12   Q.   So roughly three years earlier?
13   A.   Yes.
14   Q.   And did anything else in this document contain any
15   positions from Ericsson about the '089 Patent or any patent
16   in that family?
17   A.   No, this was it.
18   Q.   A single page?
19   A.   Yes.
20   Q.   And the first position that Ericsson says here is that
21   the patent is not essential.  Do you see that?
22   A.   Yes.
23   Q.   Okay.  Do you understand that Ericsson is asserting a
24   FRAND defense in this case?
25   A.   Yes.
```

1    Q.   Can a patent be subject to FRAND if it's not essential?

2    A.   No.

3    Q.   So one of those two positions is inconsistent?

4    A.   That's right.

5    Q.   One of them is wrong?

6    A.   Yes.

7    Q.   Okay.  And then Mr. Stevenson pointed out Ericsson had

8    taken the position that the '089 Patent family was invalid.

9    Do you recall that?

10   A.   Yes.

11   Q.   And is this the entirety what Ericsson said about

12   invalidity that Mr. Stevenson pointed to?

13   A.   Yes.

14   Q.   And he pointed to two references.  Is that right?

15   A.   That's right.

16   Q.   Is Ericsson asserting either one of these references in

17   this case?

18   A.   No.

19   Q.   In your experience -- well, strike that.  Let's move on.

20        MR. HEALY:  Can we bring up PX 589, Mr. Boles?

21   Q.   (BY MR. HEALY)  Do you recall earlier today that

22   Mr. Stevenson asked questions and made -- asked you questions

23   about Ericsson's claim charts that it had sent to KPN?

24   A.   Can you repeat the question?

25   Q.   Sure.  Do you recall Mr. Stevenson asking you questions

1    about claim charts that Ericsson had prepared for its patents

2    and sent to KPN?

3    A.    Yes.  He was referring to an email where they were only

4    announced, but in the end they have sent them.

5    Q.    Okay.

6              MR. HEALY:  And if we could go to page 2 of this

7    document.

8    Q.    (BY MR. HEALY)  Those claim charts that Ericsson sent --

9              MR. HEALY:  I'm sorry.  This is 589.  At page 1.

10   I'm sorry, Mr. Boles.

11   Q.    (BY MR. HEALY)  And this is the document where

12   Mr. Dannelind announced he was going to do that?

13   A.    Yes.

14   Q.    Okay.  Did KPN respond to those claim charts?

15   A.    When we received them, we analyzed them and then

16   responded, yes.

17   Q.    Okay.

18             MR. HEALY:  Could we go to I believe it's 589 at

19   page 2?  I'm sorry, Mr. Boles.  It's my mistake--246; PX 246.

20   And if we could go to page 2.

21   Q.    (BY MR. HEALY)  Now, do you see paragraph 3 here?

22   A.    Yes.

23   Q.    Okay.  And this is an email from KPN to Ericsson?

24   A.    Yes.

25   Q.    Okay.  And Mr. Wuyts says, "As I had already anticipated

1    in my memo of December 13th last."  Do you see that?

2    A.   Yes.

3    Q.   So that's referring to the first time that KPN had

4    responded to Ericsson's new assertions.

5    A.   Yes.

6    Q.   Okay.  And then the remainder of this paragraph sets

7    forth KPN's position about each of those patents that Ericsson

8    had identified as being infringed by KPN.  Correct?

9    A.   Yes, that's correct.

10   Q.   Did KPN take four years to send this response?

11   A.   No.

12   Q.   And let's just take a look at some of these examples.

13        Mr. Stevenson pointed you to a comment by Mr. Wuyts about

14   notifying the EPO.  Do you recall that?

15   A.   The European commission, yes.

16   Q.   And do you see No. 2 here?

17   A.   Yes.

18   Q.   And what is Mr. Wuyts saying about that patent?

19   A.   In the package was one patent that was already revoked by

20   the Board of Appeal of the European Patent Organization.

21   Q.   Is that a reason to notify the EPC if someone's asserting

22   the patent they've already been revoked?

23   A.   No.

24   Q.   And the second or the third paragraph says, "You sent us

25   the 25 and 1th patent that has the exactly the same claims

```
 1    as" --

 2              THE COURT:  Slow down, please, counsel.

 3              MR. HEALY:  You're right.  I apologize, Your Honor.

 4    Q.  (BY MR. HEALY)  Do you see that highlighted text, Madame?

 5    A.  Yes.

 6    Q.  This was pointing out that another patent also had claims

 7    that had already been revoked?

 8    A.  Well, after we complained about the 25th, they sent an

 9    additional patent instead of the revoked patent, and it's

10    exactly the same claims.

11    Q.  So KPN analyzed that patent, too?

12    A.  Yes, of course.

13    Q.  Did KPN take four years to do that analysis?

14    A.  No.

15    Q.  And you sent a response in writing as soon as you could?

16    A.  Yes.

17    Q.  And this is part of that response?

18    A.  Yes.

19    Q.  And then if you look down to the paragraph ending in (v),

20    you see that text before the black line?

21    A.  Yes.

22    Q.  And what is KPN saying here?

23    A.  Well, for all the patents Ericsson provided to us, we

24    checked internally within KPN which product we used to perform

25    that patent, and it turned out that a lot of the equipment we
```

1   used there is from Huawei, Nokia, and Ericsson itself.  And we

2   checked with Huawei, Nokia, and Ericsson-NL and they are all

3   licensed under Ericsson Sweden's patents.

4   Q.   So of the 26 patents that Ericsson sent you, it was

5   accusing you of infringing some by using Ericsson's own

6   products?

7   A.   Yes.

8   Q.   And the rest were Huawei and Nokia products?

9   A.   The majority.  There were a few examples.

10  Q.   Fair.

11  A.   Exceptions.

12  Q.   And in this time frame, since receiving their

13  notification in December, you had already spoken to the

14  suppliers?

15  A.   Yes, immediately we have to do that, yes.

16  Q.   And they -- immediately?

17  A.   Immediately, yes.

18  Q.   And they confirmed that they had licenses to Ericsson's

19  patents?

20  A.   Yes.

21  Q.   But Ericsson hadn't told you that.

22  A.   No.

23  Q.   And did this analysis, this outreach to these suppliers,

24  take four years?

25  A.   No.

1    Q.    I want to touch on one last thing that Mr. Stevenson

2    brought up.

3              MR. HEALY:  IF we could bring up DX 396.  If we

4    could go to page -- let me stop here.

5    Q.   (BY MR. HEALY)  Do you recognize this document as one

6    Mr. Stevenson discussed with you?

7    A.    We.

8              MR. HEALY:  DO go to page 15, Mr. Boles.

9    Q.   (BY MR. HEALY)  Do you recall Mr. Stevenson going through

10   with this page with you?

11   A.    Yes.

12             MR. HEALY:  If we can go to page 11.

13   Q.   (BY MR. HEALY)  Mr. Stevenson didn't show you this and

14   didn't show the jury this page.  Right?

15   A.    No.  I refer to it, but he didn't show it, no.

16   Q.    And this -- what does this page show?

17   A.    This page shows for every negotiation route we had with

18   Ericsson, which patents we discussed with them, and then the

19   patents between brackets we acknowledged that they were not

20   used by Ericsson.

21   Q.    And so this slide shows how KPN came up with that

22   calculation on page 15 that Mr. Stevenson showed you?

23   A.    Yes.

24   Q.    Okay.  And the values on page 15, do those reflect KPN's

25   belief about how much each patent is actually worth?

1    A.    No.

2    Q.    How is this calculation done:  Let's -- for example, 11

3    on the right-hand column.

4    A.    Yes.

5    Q.    How is that calculation performed?

6    A.    Well, just counting the patents, we provided Ericsson

7    over the course from 2017 to the end of 2020, and then, like I

8    said, the patents between brackets we gave Ericsson

9    credibility.  We said, Okay, you probably are not using that,

10   so we did not count them.  And we counted the patents of which

11   we thought Ericsson was using them, and then that ended up

12   with the 11.

13   Q.    So in 2013, for example, KPN just counted up the patents

14   that it had talked about with Ericsson and then subtracted the

15   ones that Ericsson said, We don't use.

16   A.    Yes.

17   Q.    And if you look on the 2020, you've got the EP 495 there.

18   Do you see that, second from the top?

19   A.    Yes.

20   Q.    Not in brackets?

21   A.    Not in brackets, no.

22   Q.    But let's focus on 2013.  So all you did was add up the

23   number of patents, subtract the patents that Ericsson said it

24   didn't use.

25   A.    Yes, that's right.

```
 1              MR. HEALY:  And now if we can go to slide 15,

 2   Mr. Boles.

 3   Q.   (BY MR. HEALY)  So when we're looking at number of

 4   patents in use here, that's all that calculation is.  Is

 5   that right?

 6   A.   Yes, that's right.

 7   Q.   Okay.  The GVA per patent is simply taking the amount of

 8   money in vouchers and dividing it by the number of patents

 9   that you had sent a claim chart on.

10   A.   Yes.

11   Q.   That's it?

12   A.   That's it.

13   Q.   Does that reflect the actual value in KPN's perspective

14   of that patent?

15   A.   No, not at all.

16   Q.   Does it reflect the value of the cross license to

17   Ericsson's patent portfolio?

18   A.   No.

19   Q.   Does it reflect the full .3 percent value of KPN's

20   patents that you have talked about?

21   A.   No, not at all.

22              MR. HEALY:  I have no further questions, Your Honor.

23              THE COURT:  You pass the witness?

24              MR. HEALY:  Yes, sir.

25              THE COURT:  Is there further cross, Mr. Stevenson?
```

1           MR. STEVENSON:  Yes.

2           THE COURT:  Proceed with additional cross

3    examination.

4           MR. STEVENSON:  Will you please pull up PX 605 at

5    page 7?

6                    RECROSS EXAMINATION

7    BY MR. STEVENSON:

8    Q.   Ms. Gerritse, I thought I heard you on the redirect

9    examination told the jury that when Ericsson wanted to send

10   you its patents to get valued, that it was accusing you of

11   infringement based on your use of Ericsson equipment.

12   A.   Yes.

13   Q.   Well, that's not what Ericsson told you.

14   A.   Well, like I said to Mr. Healy, the email you showed me

15   was just an announcement that they would send the patents, but

16   they didn't yet, and when we finally received them, we

17   analyzed them and then some of the patents are used -- applied

18   by KPN through Ericsson equipment.  So I cannot -- and then

19   contacted Ericsson in the Netherlands, which is our business

20   contract in Ericsson, and they confirmed that they have a

21   license from Ericsson IPR.

22           MR. STEVENSON:  Will you scroll down, please,

23   Mr. Moreno?  Continue to scroll down.  Continue.  There it is.

24   Q.   (BY MR. STEVENSON)  I'm talking and limiting my

25   questions, Ms. Gerritse, to whether Ericsson was accusing KPN

1    of infringing Ericsson patents by use of Ericsson equipment.

2    My question is specifically limited to that.

3         And didn't Ericsson tell you when it offered to send you

4    and told you it was going to send you the patents of Ericsson,

5    on the last line, "KPN is obviously licensed under Ericsson's

6    patents for products purchased from Ericsson."

7    A.   Yes, they said so.

8    Q.   And if you're licensed and the person who owns the patent

9    says you're licensed, then you don't infringe that patent.

10   Right?

11   A.   But you do not have to send the patents for analysis.

12   Q.   Well, that's the thing, Ms. Gerritse.  You buy equipment

13   from a lot of other companies, don't you?

14   A.   Yes, we do.

15   Q.   And you don't know that all those companies are licensed

16   from Ericsson as well, do you?

17   A.   Well, from the most important suppliers we know -- we are

18   aware of licenses and cross licenses in the industry.

19   Q.   You don't know if those cover all of Ericsson's patents.

20   A.   Not all of Ericsson's patents, no.

21   Q.   Right.

22   A.   That's true.

23   Q.   And you don't know if those licenses have certain

24   restrictions in them, do you?

25   A.   No, that's right.

1    Q.    But if you tell Ericsson, Don't even send us your patents

2    because if you do we'll sue your customer, then you don't have

3    a way of starting a dialogue to find out, do you?

4    A.    Can you repeat that?

5    Q.    I'll withdraw.

6    A.    Okay.

7    Q.    I also heard you talk about a privacy issue --

8    A.    Yes.

9    Q.    -- in the European commission or the European Union.

10        Now, you're aware, aren't you, that the 3GPP standard the

11    interoperability standard --

12    A.    Yes.

13    Q.    -- requires the customer consent to activate this MDT

14    tracking function?

15    A.    I'm not aware of that.

16    Q.    Okay.  Well, let's look at PX 658.

17    A.    Do you bring it on the screen?

18    Q.    I'll put it on screen for you.

19        MR. STEVENSON:  And if you'll go to page 106, and

20    that's 106 at the top.  Page 106, please.  One more.  Thank

21    you.

22    Q.    (BY MR. STEVENSON)  You know what the 3GPP standard is,

23    don't you?

24    A.    I know what 3GPP is, yes.

25    Q.    Right.  And you understand this is a standard that isn't

1    just applicable in Europe or -- this is the worldwide standard

2    that is being used for the MDT function.

3    A.    The worldwide is what you said?

4    Q.    3GPP, yes.

5    A.    Yes.

6    Q.    You understand that's an umbrella organization and this

7    standard is essentially now the worldwide standard, not just

8    Europe?

9    A.    Yes, that is right.

10   Q.    Okay.  And it says, doesn't it, "In the case of

11   area-based MDT, getting user consent is required before

12   activating the MDT functionality because of privacy and legal

13   obligations."

14   A.    I know that it says that, yes.  I see that.

15   Q.    So if you're a carrier anywhere in the world and you want

16   to do this, you have to get customer consent.  Correct?

17              MR. HEALY:  Objection, Your Honor.

18              THE COURT:  Just a moment.  What's your objection?

19              MR. HEALY:  Calling for expert testimony.  She's not

20   an expert.

21              MR. STEVENSON:  Your Honor, I'm following up on a

22   statement that was made in redirect examination that the

23   reason KPN has not turned this feature on has to do with

24   privacy issues that are unique to Europe, and I'm trying to

25   show that is not the case.

```
 1                    MR. HEALY:  May I respond, Your Honor?

 2                    THE COURT:  Please.

 3                    MR. HEALY:  Should I do it outside the hearing of

 4      the jury?

 5                    MR. HEALY:  Approach the bench.

 6                    (The following was had outside the hearing of the

 7                    jury.)

 8                    MR. HEALY:  What the witness testified before is

 9      GDPR.  That's not this.  This is --

10                    THE COURT:  Speak up just a little.

11                    MR. HEALY:  What the witness testified about before

12      was GDPR, which is a legal statutory requirement in Europe.

13      This is not that.  This is a technical standard.  I haven't

14      objected to him saying, this is what the standard says; can

15      you read it?  She already said she has never seen it, and now

16      he is asking her to apply it.  Again, this is a question for

17      his expert witness, not our fact witness, who doesn't have any

18      idea what this document is or what it is about.

19                    THE COURT:  What's your response, Mr. Stevenson?

20                    MR. STEVENSON:  The only point I'm trying to make

21      is --

22                    THE COURT:  I know what you're trying --

23                    MR. STEVENSON:  -- everybody needs to get consent.

24                    THE COURT:  I know the point you're trying to make,

25      but are you trying to do it through a technical document that
```

1    she said she doesn't know anything about?

2         MR. STEVENSON:  She's the corporate representative.

3    She sent the claim chart.  Her claim chart that she sent us

4    reads all over the 3GPP standard.  That's what they use.  And

5    now she's saying to the jury, Well, we didn't get consent, but

6    that's just for Europe; that has nothing to do with the U.S.,

7    that's a misimpression that she's created, and I want to kill

8    that misimpression now because you have to get consent in the

9    U.S.; there is no exception.

10        MR. HEALY:  Again, that's an issue for your expert.

11   This is -- she testified to GDPR, not this.  The 3GPP standard

12   is thousands of documents, no reference, no connection to this

13   document that you've shown.  She's testified that she just

14   forwarded claim charts that she didn't prepare.  She has no

15   idea about this document.  He is now asking her to analyze it

16   because he doesn't want to have his expert do it, or he can't

17   have the expert do it.  I don't know, but it's a question for

18   his expert if it's in his report.  It's not a question to ask

19   a fact witness who already said she had no idea what this

20   document is about.

21        THE COURT:  All right.  You need to restate your

22   question, and then once he's restated it if you want to reurge

23   your objection I'll hear it at that time.  Just start it over.

24        MR. HEALY:  Thank you, Your Honor.

25        (The following was had in the presence and hearing

1                of the jury.)

2           THE COURT:  All right.  Restate your question,

3  Mr. Stevenson.

4  Q.   (BY MR. STEVENSON)  Ms. Gerritse, this is a worldwide

5  standard, and what we've highlighted is what the standard

6  requires.  Correct?

7  A.   Well, I cannot agree with that.  I do not know which

8  standard it is, and I am aware on a high level about 3GPP

9  standards.  There are parts of the standards that are not

10  mandatory so I cannot answer that.

11  Q.   Let me go onto the next topic.  You talked about and your

12  counsel showed one slide which was a response of Ericsson to

13  the '089 Patent, and you said that was the entirety of the

14  analysis you got from Ericsson.  Do you remember that?

15  A.   At that moment, yes.

16         MR. STEVENSON:  All right.  Let's look at DX 580,

17  please.

18  Q.   (BY MR. STEVENSON)  Do you recall that Ericsson sent you

19  in February of 2020 a slideshow -- a slide deck on your claim

20  charts?

21  A.   Yes, but that was later.

22  Q.   That's in addition to what you showed the jury and said

23  this is the entirety of the analysis?

24  A.   That was the entirety of the analysis at that moment.

25  Q.   Well, the truth is Ericsson followed up with a lot more

1   detail, didn't it?

2   A.   That was later on, yes.

3   Q.   Okay.  So --

4   A.   At that moment it was the entirety.

5   Q.   At that moment it was the entirety, but within the

6   context of the negotiations it was not the entirety.  You

7   received a lot more analysis from Ericsson, didn't you?

8   A.   Yes.

9   Q.   Let's look at it.

10              MR. STEVENSON:  Let's go to slide 12, please.

11   Q.   (BY MR. STEVENSON)  This is the European equivalent of

12   the '089 Patent drive testing.  Correct?

13   A.   Yes.  That's right.

14   Q.   And we gave you our position that it's not essential.

15   Correct?

16   A.   Yes.

17              MR. STEVENSON:  Go to the next slide, please.

18   Q.   (BY MR. STEVENSON)  We then went on in detail about our

19   non-essential argument, didn't we?

20   A.   Yes.

21   Q.   We made the point to you that the plurality of terminals

22   is not required by the standard to be capable of communicating

23   with a first and second wireless access network, didn't we?

24   A.   I am not a technical expert.  I'm really not able to do

25   more than read what I see on the screen.  It's hard to

1    interpret it.

2    Q.   Is it your testimony that as the European patent attorney

3    for KPN who managed and coordinated the prosecution of this

4    patent, who talked with the inventors, who sent us the claim

5    charts, and who participated in the negotiations and the

6    technical discussions and presentations with Ericsson, you

7    don't know what any of this refers to or means?

8    A.   Yes.

9    Q.   Okay.  Let's continue and look -- we'll just look at the

10   pages and see how many there are and we'll count them.

11           MR. STEVENSON:   What's the next page, please?

12   Q.   (BY MR. STEVENSON)  Here we go into more detail about the

13   non-essentiality argument, isn't it?

14   A.   Yes.

15           MR. STEVENSON:   Okay.  Go to the next page.

16   Q.   (BY MR. STEVENSON)  Here we say it's not used, don't we?

17   A.   Yes.

18           MR. STEVENSON:   Will you blow up the red circle,

19   please?

20   Q.   (BY MR. STEVENSON)  And we tell you -- right here we

21   mention user consent, don't we?

22   A.   Where can I see this?

23   Q.   Last sentence in the red circled area.

24   A.   I don't know where -- I mean, it's clearly copies from a

25   page from another document.  I have no idea what I'm looking

1    at.

2    Q.    Well, Ericsson presented this to you, didn't it?

3    A.    Yes, they did, but you are now zooming in out of context.

4    Q.    Were you the lead negotiator for KPN when it came to

5    Ericsson and having the negotiations over patents?

6    A.    No.

7    Q.    Who is the lead negotiator?

8    A.    That's my manager Doctor Wuyts.

9    Q.    And you're telling us that of all the technical back and

10   forth that you had with Ericsson, all the disagreements over

11   patents, you can't interpret anything on this document that

12   Ericsson sent you or even understand any of their

13   non-infringement arguments they made.  Is that what your

14   testimony is?

15   A.    That's my testimony, yes.  For this I always consult with

16   our technical expert.

17            MR. STEVENSON:  Pass the witness.

18            THE COURT:  Redirect?

19            MR. HEALY:  No, Your Honor.

20            THE COURT:  All right.  You may step down,

21   Ms. Gerritse.  You may step down.

22        Well, ladies and gentlemen, I told you we might go to

23   6:00 it's six minutes after 6:00, so welcome to jury trials in

24   the Eastern District of Texas.

25            We're going to recess for the day here.  I'm going to ask

1    you to take your notebooks with you as you leave the courtroom

2    and go into the jury room.  Leave them on the table closed

3    there.  They'll be there in the morning for you.

4        I'm going to remind you of all the instructions I've

5    given you about your conduct during the trial, particularly

6    not to discuss the case with anyone in any way.  And I'll

7    remind you that when you get home, if whoever's there asks

8    about today, you really just need to blame it on me and say,

9    That very stern federal judge told me not to answer that

10   question.  So don't even try to answer the question about what

11   happened in court today because you'll almost assuredly

12   violate my instruction if you do.

13       Please be assembled in the jury room so that we can start

14   at 8:30 in the morning.  That's my goal.  There will be some

15   mornings I will be ready before 8:30, there will be some

16   mornings it may a minute or two after, but we are going do try

17   hard to start each day at 8:30.

18       Please travel safely to your homes, follow all the

19   instructions I've given you, travel safely back in the

20   morning, and we will see you tomorrow morning for the next day

21   of trail in this case.

22       With those instructions, the jury's excused for the

23   evening.

24            (Whereupon, the jury left the courtroom.)

25            THE COURT:  Be seated, please.

1          Counsel, the Plaintiff has used 1 and 35 minutes today,

2     the Defendants used 1 and 20 minutes today.  There are a few

3     odd seconds on each of those, but I'm just going to give it to

4     you through the minutes used.

5          Let me remind you, as we discussed earlier, that I'll

6     expect a representative from each side to be available before

7     I bring the jury in in the morning to read into the record

8     those items from the list of pre-admitted exhibits that have

9     been used during today's portion of the trial.  If there's any

10    question about that, you need to meet and confer with each

11    other well in advance of tomorrow morning so that that's

12    completely resolved.

13         I'll also remind you about your ongoing obligation to

14    meet and confer overnight regarding potential disputes.  If

15    there are any, I need to hear about them through

16    communications with my staff this evening, and then if they're

17    not resolved thereafter, I need a three-ring binder produced

18    by 7:00 tomorrow morning at chambers so that I can be prepared

19    to meet with you at 7:30.  It would not hurt my feelings at

20    all if you don't have any, but I would not bet the farm that

21    that will be the case.  So please follow my instructions with

22    regard to the meet and confer process carefully and

23    thoroughly.

24         Now, are there any questions before we recess for the

25    evening from either side?

1            MR. STEVENSON:  None from Ericsson.

2            MS. WHITE:  None for the Plaintiff.  Thank you.

3            THE COURT:  All right.  And I assume the Plaintiff's

4    going to proceed with Doctor Mangione-Smith as their witness

5    tomorrow.

6            MS. WHITE:  Yes, Your Honor.

7            THE COURT:  All right.  Have a good evening,

8    counsel.

9        We stand in recess until tomorrow morning.

10            (The proceedings were concluded at 6:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

COURT AND THE JUDICIAL CONFERENCE OF THE

UNITED STATES.


S/Shawn McRoberts                08/22/2022

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER